1       UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF TEXAS
2        SAN ANTONIO DIVISION

3 UNITED STATES OF AMERICA,  )
    Plaintiff,     )
4           ) No. SA:08-CR-301
    vs.       )
5           ) San Antonio, Texas
 STEVEN LYNN MOUTON,   ) October 5, 2009
6    Defendant.    )
 ------------------------------

7

        VOLUME 1 OF 2
8
       TRANSCRIPT OF JURY TRIAL
9    BEFORE THE HONORABLE XAVIER RODRIGUEZ
      UNITED STATES DISTRICT JUDGE
10
 A P P E A R A N C E S:
11
 FOR THE PLAINTIFF:
12
 United States Attorney's Office
13 Ms. Tracy Thompson Braun
 Ms. Sarah Wannarka
14 601 N.W. Loop 410, Suite 600
 San Antonio, Texas 78216
15
 FOR THE DEFENDANT:
16
 Mr. Karl A. Basile
17 Attorney at Law
 Greatview Building
18 8207 Callaghan Road, Suite 100
 San Antonio, Texas 78230
19
 COURT REPORTER:
20
 Karl H. Myers, CSR, RMR, CRR
21 Official Court Reporter
 655 E. Durango Blvd., Rm. 315
22 San Antonio, Texas 78206
 Telephone:  (210) 212-8114
23 Email:  karlcsr@yahoo.com

24 Proceedings reported by stenotype, transcript produced by
 computer-aided transcription.
25

```
1                              INDEX

2                    VOLUME 1 - OCTOBER 5, 2009

3    GOVERNMENT'S WITNESSES:

4    DAVID GONZALES:

5    Direct examination by Ms. Braun ----------------- 30
     Cross examination by Mr. Basile ----------------- 39
6
     KENDALL GEBAUER:
7
     Direct examination by Ms. Wannarka ------------- 42
8    Cross examination by Mr. Basile ----------------- 49

9    MICHAEL STARK:

10   Direct examination by Ms. Wannarka ------------- 52
     Voir dire examination by Mr. Basile ------------- 64
11   Cont'd direct examination by Ms. Wannarka ------- 65
     Recross examination by Mr. Basile -------------- 68
12
     GREG MARTIN:
13
     Direct examination by Ms. Wannarka ------------- 74
14
     SEAN HILER:
15
     Direct examination by Ms. Braun ----------------- 83
16   Cross examination by Mr. Basile ----------------- 99

17   SUSAN LANDRUM:

18   Direct examination by Ms. Braun ----------------- 101
     Cross examination by Mr. Basile ----------------- 112
19   Redirect examination by Ms. Braun -------------- 113
     Recross examination by Mr. Basile -------------- 114
20
     CHARLES COX:
21
     Direct examination by Ms. Wannarka ------------- 115
22   Cross examination by Mr. Basile ----------------- 128

23

24

25
```

```
 1                        EXHIBIT INDEX

 2    Government's Exhibit 1 was admitted on Page 37.
      Government's Exhibit 2 was admitted on Page 47.
 3    Government's Exhibit 3 was admitted on Page 64.
      Government's Exhibit 4 was admitted on Page 47.
 4    Government's Exhibit 5 was admitted on Page 61.
      Government's Exhibit 6 was admitted on Page 66.
 5    Government's Exhibit 7 was admitted on Page 121.
      Government's Exhibit 8 was admitted on Page 125.
 6    Government's Exhibit 9 was admitted on Page 105.
      Government's Exhibits 10-15 were admitted on Page 111.
 7    Government's Exhibits 18-20 were admitted on Page 77.
      Government's Exhibit 22 was admitted on Page 78.
 8    Government's Exhibit 23 was admitted on Page 79.
      Government's Exhibit 32 was admitted on Page 121.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (October 5, 2009, defendant present.)

 2               THE COURT:  Thank you.  Please be seated.

 3     07-CR-301, United States of America versus Steve Lynn Mouton.

 4     Is it Mouton?  Mouton?

 5               THE DEFENDANT:  Mouton.

 6               THE COURT:  Mouton.  Appearances, please.

 7               MS. BRAUN:  Your Honor, Tracy Braun and Sarah

 8     Wannarka on behalf of the United States.

 9               MR. BASILE:  Karl Basile on behalf of Mr. Mouton,

10     Your Honor.

11               THE COURT:  Where are we at?

12               MS. BRAUN:  Your Honor, for the record, also sitting

13     at counsel table is Special Agent Larry Baker with the FBI.

14               The government wanted just some clarification on the

15     Court's granting of the motion in limine.  The way we

16     understand that is that any allegations -- or sexual

17     misconduct on behalf of the defendant prior to this case will

18     not be mentioned, and we don't an -- we will not mention that.

19               THE COURT:  Well, first of all, I mean, it is a

20     motion in limine, so it is not an evidentiary ruling.  All I

21     am asking is, if you are going to raise those kind of issues,

22     the motion in limine is granted, and you need to approach the

23     bench before, so let's not misconstrue what my ruling is.  It

24     is not an evidentiary ruling.

25               MS. BRAUN:  Just to be clear, we don't anticipate
```

1    putting in any evidence of his prior sexual misconduct.  We do

2    anticipate putting in evidence of the fact that he is on -- is

3    and was on probation in October of 2007, which explains why

4    the probation officers came to his house.

5              We have instructed our witnesses not to mention why

6    he was on probation or any information regarding the deferred

7    prosecution or any other allegations of sexual misconduct,

8    just so that the record is clean, and they have all been

9    notified of such.

10             THE COURT:  Okay.  Mr. Basile, anything?

11             MR. BASILE:  Your Honor, I would just ask, before

12   they actually go into it, like the Court said, go to the

13   bench.  I may have some concerns depending on how they want to

14   approach that he is on probation, because, again, just knowing

15   someone is on probation, I think, could taint the jury, and I

16   understand that doesn't always make it inadmissible, but I

17   would like to find out -- I would like a little time -- a

18   little more detail on what they plan on presenting by that

19   witness, so I can make any point of objections on certain

20   issues that I may have problems with.

21             THE COURT:  Yes.  The trouble is, when I have to do

22   this balancing that I need to do, with the result of 404, I

23   have got to determine the probative value and whether or not

24   that probative value is substantially outweighed by potential

25   for unfair prejudice.

1          What I am trying to do is strike a balance here, and

2     the balance that I am striking is that, as far as the motion

3     in limine, it is granted, that any underlying sexual offenses

4     won't come in, and in all likelihood -- I am not making any

5     advanced evidentiary rulings, but in all likelihood, I would

6     not let in any of the past underlying criminal convictions,

7     because that would be too unduly prejudicial.

8          However, in striking this balance, though, I have

9     got to let the government say that he was on probation.  I am

10    not going to let them say why, because, otherwise, the jury is

11    going to be left wondering, why did they come in?  What basis

12    did they have to come to the house?  And the jury would get

13    confused by, was there any kind of an issue of improper

14    search?

15         So as I am striking that balance, that is how I have

16    struck it.  So a discussion of, he was on probation, and

17    that's why I came in, but nothing further is where we are at.

18         MS. BRAUN:  And, Your Honor, our first witness will

19    be David Gonzales, who is one of the probation officers.  He

20    will talk about it.  Next will be Kendall Gebauer, from the

21    sheriff's office, who was also present when they did the home

22    visit at the defendant's house.

23         He will mention that he was on probation, in

24    explaining why he was there.  And then Shawn Hiler from the

25    Department of Family and Protective Services will mention that

1    the defendant was on probation.

2          THE COURT:  Well, why do we have to have it

3    mentioned three times?  Why can't we establish by the first

4    witness that he was on probation?  Why do we need it

5    reinforced?

6          MS. BRAUN:  It may not need to be reinforced with

7    Investigator Hiler, but Deputy Gebaur will explain that he

8    often accompanies the probation department to go out, because

9    they are not allowed to carry weapons, and he is, and for

10   everybody's safety --

11         THE COURT:  Well, I am not sure we need to do all of

12   that either.  I mean, what is he going to say?  I mean, let's

13   just get to the nut -- the gist of what his testimony is going

14   to be.  What is the gist of his testimony?  That defendant

15   told him XYZ?

16         MS. BRAUN:  Well, starting with David Gonzales, the

17   probation officer, that he went there.  The defendant is on

18   probation.  I am also going to have him state that as a

19   probation officer, he is allowed to go into somebody's home

20   and he is allowed to look at the computer, so that the jury

21   doesn't wonder if he is overstepping his bounds, and that he

22   looked at the computer and found pictures of children, and he

23   is going to leave that alone, as to the fact that that, in and

24   of itself, was a violation, because that would go to why he is

25   on probation, but then he will talk about finding the picture

1     of this little girl's vagina and what he did with that.

2            THE COURT:  Right.  And all I am saying is, I think

3     you can do everything you are attempting to do without

4     overemphasis of the probation.  You can say:  You know, why

5     were you there?

6            Well, he is on probation, and as a result of

7     probation, we make periodic visits.  And just after that first

8     discussion, I don't think it needs to be brought up any more

9     that he was on probation, and I certainly don't think we need

10    to have a law enforcement officer talking about how he has to

11    carry a gun for protection.  That is not an issue here either.

12           So after the first witness talks about probation, no

13    further mention of probation, and no further mention about the

14    gun and the necessity for a weapon.

15           From what I know of this case, I am very confident

16    that you all are going to be able to do what you need to do

17    without complicating this matter for appellate purposes.

18           Anything further?

19           MR. BASILE:  No, Your Honor.  I just had an

20    agreement with one of the other U.S. Attorneys on the

21    forfeiture, that we are going to hold that off, but she is not

22    here right now.

23           MS. WANNARKA:  Your Honor, AUSA Mary Nelda

24    Valadez --

25           THE COURT:  Who is just walking through the door.

1            MS. WANNARKA:  She mentioned there is an agreement

2    with regard to the forfeiture, and she said there is a matter

3    to put on the record in that regard.

4            MS. VALADEZ:  I really didn't time it that way, but

5    here I am.  Good morning.  Mary Nelda Valadez for the United

6    States, Your Honor.

7            I spoke to Mr. Bastille briefly on Friday afternoon,

8    I believe it was, and he did say that the forfeiture matter

9    would be left for the Court to decide at sentencing and would

10   not need the jury to decide the issue, but I am here to make

11   sure that that is correct.

12           MR. BASILE:  That is correct, Your Honor.  I did

13   receive a proposed jury charge on that, but there will be no

14   need for that, since we are in agreement to let the Court

15   decide that at sentencing, instead of the jury.

16           THE COURT:  If there is a sentencing.

17           MR. BASILE:  Yes.

18           THE COURT:  Okay.  Anything further we need to take

19   up?  Do we have any idea where we are at with the jury?

20           COURTROOM DEPUTY:  I have been calling and there is

21   no answer.

22           THE COURT:  Okay.  You might want to go downstairs

23   and figure out what is going on.  I think our resources are

24   being taxed with all of Garcia's jurors.  Stand by and we will

25   let you know as soon as possible.

1          In the interim, why don't you flip your chairs

2     towards the panel and -- but don't go anywhere.  Okay.

3               MR. BASILE:  Your Honor --

4               COURTROOM SECURITY OFFICER:  All rise.

5               THE COURT:  I'm sorry.

6               COURTROOM SECURITY OFFICER:  Did you want to talk to

7     him?

8               THE COURT:  Do we need something?

9               MR. BASILE:  Nothing with this case, Your Honor.  I

10    had been set on a detention hearing up in Judge Mathy's court.

11    I called them Friday and told them that I was set for trial

12    here, and they apparently want me to make a quick appearance

13    and announce on the record.

14               THE COURT:  What day is this?

15               MR. BASILE:  Today.

16               THE COURT:  At what time?

17               MR. BASILE:  At 10:00 o'clock.  I just want to let

18    the Court know.  I know that your deputy has already

19    corresponded back and forth by e-mail a couple of times with

20    them.

21               COURTROOM DEPUTY:  They asked that he go up and put

22    on the record -- he can go right now.

23               THE COURT:  Yes.  Why don't you go right now.

24               MR. BASILE:  If I can do that real quick.

25               THE COURT:  If you can do that right now.

```
 1                    (Brief recess.)

 2                    (Jury panel present.)

 3                    THE COURT:  Thank you.  Please be seated.

 4                    (Voir dire proceedings had, not transcribed herein.)

 5                    THE COURT:  Thank you.  Please be seated.

 6                    Ms. Greenup, if you will read the names of the

 7        selected jurors.

 8                    COURTROOM DEPUTY:  As I call your name, if you would

 9        please come forward.

10                    Marcella J. Helmke.

11                    Edward Onofre.

12                    Gabriel Jasso.

13                    Cynthia Carrasco.

14                    Michael R. Verstuyft.

15                    Dugald Winter.

16                    Anna L. Counts.

17                    Martha P. Nelson.

18                    John R. Gidcumb.

19                    Julianne Damore.

20                    Joan D. Michaud.

21                    Marcus Cantu.

22                    James Hilton Alexandria III.

23                    THE COURT:  Is the government satisfied?

24                    MS. WANNARKA:  Yes, Your Honor.

25                    THE COURT:  Is the defense satisfied?
```

1          MR. BASILE:  Yes, Your Honor.

2          THE COURT:  Will you please swear in the impaneled

3     jurors.

4          COURTROOM DEPUTY:  Could you please stand and raise

5     your right hand.

6          (Oath administered to the jury.)

7          COURTROOM DEPUTY:  Thank you.

8          THE COURT:  Thank you.  Ladies and gentlemen, to

9     those of you who were not selected, my thanks to you all.  You

10    did perform a valuable service that we did need you for today.

11    I thank you for appearing.

12         One of my unpleasant tasks around here is to fine

13    individuals who do not respond to jury service, and I take

14    that responsibility very seriously.  So thank you here.

15         I am not sure that you are going to be needed for

16    any other juries.  Or are they going to be needed for the

17    magistrate court?

18         COURTROOM DEPUTY:  The magistrate court.  They need

19    to go back down.

20         THE COURT:  I'm sorry.  You will be needed for the

21    magistrate court, so if you will go back downstairs to the

22    jury assembly area, you will get further instructions.  Thank

23    you.

24         (Jury panel leaves courtroom.)

25         THE COURT:  To those of you here who have now been

1   selected as the jury in this case, I want to take a few

2   minutes to tell you something about your duties as jurors.  I

3   guess I ought to put your mind at ease.  We are going to have

4   lunch in just a second.

5           (Laughter.)

6           THE COURT:  Let me give you these preliminary

7   instructions, and then I will release you to have lunch and

8   then we will start hearing the rest of this case.

9           You are now the jury in this case.  I want to take a

10  few minutes to tell you something about your duties as jurors

11  and give you some instructions.  At the end of the trial, I

12  will give you more detailed instructions.  You must follow all

13  of my instructions in doing your job as jurors.

14          As I mentioned before, this is a criminal case

15  brought by the government.  I will sometimes refer to the

16  government as the prosecution.  The defendant has been charged

17  by the government with a criminal violation of law, and I read

18  to you earlier the indictment.

19          The charge against the defendant is contained in the

20  indictment.  The indictment is simply the description of the

21  charge made by the government against the defendant, but it is

22  not evidence that the defendant committed any crime.

23          The defendant pled not guilty to the charge.  A

24  defendant is presumed innocent and may not be found guilty by

25  you unless all of you unanimously find that the government has

1    proved the defendant's guilt beyond a reasonable doubt.

2          The first step in this trial after lunch will be

3    opening statements.  The government, in its opening statement,

4    will tell you about the evidence which it intends to put

5    before you so that you will have an idea of what the

6    government's case is going to be.

7          Just as the indictment is not evidence, neither is

8    the opening statement evidence.  Its purpose is only to help

9    you understand what the evidence will be and what the

10   government will try to prove.

11         After the government's opening statement, the

12   defendant's attorney may make an opening statement.  At this

13   point in trial, and during the opening statements, no evidence

14   has been offered.

15         Evidence is only coming from the witness stand and

16   from those exhibits that I admit into evidence.  What the

17   lawyers say is not evidence.

18         After opening statements, the government will first

19   offer evidence that it claims will support the charges against

20   the defendant.  The government's evidence may consist of the

21   testimony of witnesses as well as documents and exhibits.

22   Some of you have probably heard the term "circumstantial

23   evidence" and "direct evidence."  Don't be concerned with

24   those terms.  You are to consider all of the evidence I give

25   to you in this trial.

1          After the government's evidence, the defendant's

2    lawyer may present evidence in the defendant's behalf, but the

3    defendant's lawyer is not required to do so.  I remind you

4    that the defendant is presumed innocent and that the

5    government must prove the guilt of the defendant beyond a

6    reasonable doubt.  The defendant does not have to prove his

7    innocence.

8          If the defendant decides to present evidence, the

9    government may introduce rebuttal evidence.  After you have

10   heard all of the evidence on both sides, the government and

11   the defense will be given time for final arguments.

12          I just told you that the opening statements by the

13   lawyers are not evidence.  The same applies to closing

14   arguments.  That is not evidence either, but you should pay

15   close attention to the closing arguments, nevertheless.

16          The final part of the trial occurs when I instruct

17   you about the rules of law which you are to use in reaching

18   your verdict.  After hearing my instructions, you will leave

19   the courtroom together to make your decision.  Your

20   deliberations will be secret.  You will never have to explain

21   your verdict to anyone.

22          Now that I have described the trial itself, let me

23   explain the jobs that you and I are to perform during the

24   trial.  I will decide which rules of law apply in this case in

25   response to questions or objections raised by the attorneys as

1    we go along, and also in the final instructions given to you

2    after the evidence and arguments are completed.

3            You must follow the law as I explain it to you,

4    whether you agree with it or not.  You, and you alone,

5    however, are judges of the facts.  Therefore, you should give

6    careful attention to the testimony and exhibits, because based

7    upon this evidence, you will decide whether the government has

8    proved beyond a reasonable doubt that the defendant has

9    committed the crimes charged in the indictment.

10           You must base that decision only on the evidence in

11   this case and my instructions about the law.  You will have

12   the exhibits with you when you deliberate.

13           At this point, I am going to deviate from my notes a

14   little bit here.  Note taking.  This is going to be a

15   relatively short trial with very few witnesses.  If you want

16   to take notes, you, of course, have the right to take notes,

17   and the courtroom security officer can pass you a pad and pen

18   or pencil later, if you would like to take notes.

19           My preference, however, for you, is that you all

20   don't take notes.  The only reason for that is that sometimes

21   we get so involved in the note taking that we are just

22   concentrating on that pad and you are not doing what you are

23   supposed to be doing first and foremost, and that is listening

24   to the testimony from the witness stand, evaluating that

25   testimony, evaluating the credibility of the witness, and I

1    have seen some jurors just get so involved in the note taking.

2          So my preference would be for you all not to take

3    notes, but if you would like to take notes, you can ask the

4    courtroom security officer later for a notepad and one can be

5    provided to you.

6          I will provide you further instructions on note

7    taking at the end of the trial.  But if you do take notes, be

8    careful.  Don't get so involved in the note taking that you

9    become distracted.

10         Your notes are only to be used as a memory aid.  You

11   should not give your notes precedence over your independent

12   recollection of the evidence.  If you do not take notes, you

13   should rely upon your own independent recollection of the

14   proceedings and you should not be unduly influenced by the

15   notes of other jurors.

16         Notes are not entitled to any greater weight than

17   the memory or impression of each juror as to what the

18   testimony may have been.  Whether you take notes or not, each

19   of you must form and express your own opinion as to the facts

20   of the case.

21         The other thing I want to talk to you about is the

22   court reporter.  You notice that he is taking down everything

23   we say, and it is appearing on these computer screens in front

24   of us.

25         That sometimes gives a false impression to the

1    jurors.  They think:  Oh, it is okay if I miss the testimony

2    this first go-round.  When we go back in the jury deliberation

3    room, I will just ask the court reporter to print out that

4    portion for me.

5              That is not the way it works.  Mr. Myers does an

6    excellent job, but what he does is draft, and I can't send

7    draft to the jury deliberation room, so the court reporter's

8    transcript will not be made available to you when you

9    deliberate.  So don't get the false impression that, if I miss

10   it the first go-round, I will catch it later.  That is not the

11   way it happens.

12             It is going to be up to you to decide which

13   witnesses to believe, which witnesses not to believe and how

14   much of any witness's testimony to accept or reject.  I will

15   give you some guidelines for determining the credibility of

16   witnesses at the end of this case.

17             Now, I indicated to you earlier that the defendant

18   was charged with two crimes.  I will give you detailed

19   instructions on the law at the end of this case and those

20   instructions will control your deliberations and your

21   decision, but in order to help you follow the evidence, I am

22   going to give you a brief summary of the elements of the

23   offense which the government must prove to make its case.

24             With regard to the charge contained in Count 1,

25   sexual exploitation of a child, the government must prove

1    three elements.  One, that the defendant knowingly employed,

2    used, persuaded, induced or coerced a minor to engage in

3    sexually explicit conduct.  Two, that the defendant did so

4    with the purpose of producing a visual depiction of such

5    conduct.  And, three, that the visual depiction was produced

6    using materials that had been mailed, shipped or transported

7    in interstate or foreign commerce, including by computer.

8           As to the charge contained in Count 2, possession of

9    child pornography, the government must prove three elements.

10   One, that the defendant knowingly possessed material that

11   contained at least one visual depiction of child pornography.

12   Two, that the defendant knew that the visual depiction or

13   depictions were of a minor engaging in sexually explicit

14   conduct.  And, three, that the visual depictions were produced

15   using materials that had been mailed, shipped or transported

16   in interstate or foreign commerce, including by computer.

17          During the course of this trial, don't talk with any

18   of the witnesses or with the defendant or with any of the

19   lawyers.  I am going to ask you to always wear your juror

20   button while you are around the courthouse.  That will let

21   everybody here know who you are and to maintain a respectful

22   distance from you all.

23          You all have sworn to be fair and impartial jurors

24   in this case, and we want to ensure that there is not even an

25   appearance of impropriety.

1          And what do I mean by that?  You know, if, by

2     chance, you were talking to one side or the other, even about

3     something as innocent as the weather, put yourself in the

4     mindset of the other side.  They probably are wondering, What

5     are they talking about?  What are they saying?  What are they

6     doing?

7          You know, we are trying to avoid even these kind of

8     appearances that something is not right.  So I am going to ask

9     you to maintain your respectful distance from the lawyers.

10    They understand that.

11         If, by chance, you happen to come across one of them

12    in the rotunda or something like that, a respectful nod of a

13    hello is fine, but nothing more than that.

14         Again, be careful about witnesses that might be out

15    there during breaks.  This building is a windowless, circular

16    building, so I am not going to put you in this little

17    deliberation room and lock you in there during breaks.  I am

18    going to let you out when we take our breaks, from time to

19    time.

20         That poses certain problems, however.  You need to

21    be careful about who you are around, who you might overhear

22    saying things and who might try to approach you.

23         When we are out on these breaks, hang around a

24    fellow juror, but don't start talking even innocently with

25    somebody else, because it could very well be a witness that

1    you don't even realize is a witness in this case, so don't

2    talk with anybody about this case.

3           Don't talk about this case with your family, your

4    friends, your coworkers.  At the end of the day or when you

5    take breaks and make phone calls, you can say, "Yes, I have

6    been chosen for a criminal case in federal court.  It is going

7    to last two, three, four days," but don't say anything else.

8           I would not even say what kind of case it is,

9    because all of a sudden, when you make a comment, the other

10   person that you are talking to is going to start making

11   comments, and we don't know what they are going to say that

12   may influence your decision abilities here.

13          Again, all of the evidence comes from the witness

14   stand and the exhibits that I introduce.  You can't receive

15   evidence from any other source.  If you do, it could cause a

16   mistrial.

17          The Internet.  Just a couple of months ago, I was

18   giving these exact instructions to the jurors, and this one

19   juror disregards my instructions, goes on to the Internet --

20   and this was a case where I had previously suppressed a

21   confession that the defendant made, and it was all over the

22   newspaper, and he disregarded my instructions, went on the

23   Internet, found that defendant's name, found out about the

24   suppression of the confession, and then he proceeded to tell

25   other jurors, another juror about what he found in the paper.

1    And that other juror did the right thing.  He came up and told

2    me:  Hey, this is what juror one did.

3            And, thankfully, I had a couple of alternate jurors

4    in there and we were able to continue the case, but just

5    barely.  If you engage in any outside research of any kind, it

6    could cause a mistrial on this case, and all of the resources,

7    time and energy that we have all collectively put in this case

8    could be at risk.

9            One thing great about being a juror is there is

10   absolutely no homework.  Nobody -- and I instruct you and I

11   order you, do not to engage in any Internet research.  Don't

12   type in any phrases, names or anything else that you have

13   heard in this case.  Don't go into any web sites that may be

14   talking about these kind of issues.

15           For the next several days -- and I do see an

16   Express-News reporter here.  For the next several days, you

17   are ordered not to read the Metro section of the newspaper.

18   If -- and the first section of the newspaper, you can read the

19   international news, but if you happen to run across an article

20   related to this case or any other kind of cases similar to

21   that, you are instructed to blow past that article and not

22   even glance at that.

23           Is everybody clear on my instructions to you all?

24           JURORS:  Yes, sir.

25           THE COURT:  Okay.  Technology is now such a problem

1    that I feel almost compelled to overemphasize this point.

2    Don't tweeter or tweet, Google, blog, anything like that about

3    this case.  Don't put on your Facebook -- we have actually had

4    jurors in other courts put on their Facebook that they are a

5    juror in this type of case and then start talking about the

6    case on their Facebook site.  Don't do anything like that

7    regarding this case.

8            Does everybody understand my instructions?

9            JURORS:  Yes, sir.

10           THE COURT:  Okay.  At times during the trial, a

11   lawyer may make an objection to questions asked by another

12   lawyer or to an answer by a witness.  This simply means that

13   the lawyers are requesting that I make a decision on a

14   particular rule of law.

15           Don't draw any conclusion from such objections or

16   from my rulings on the objections.  These relate only to legal

17   questions that I must determine and should not influence your

18   thinking.

19           If I sustain an objection to a question, the witness

20   may not answer it.  Don't attempt to guess what the answer

21   might have been had I allowed the question to be answered.

22   Similarly, if I tell you not to consider a particular

23   statement, you should put that statement out of your mind and

24   you may not refer to that statement in your later

25   deliberations.

1          If an objection is overruled, treat the answer like

2     any other.  During the course of the trial, I may ask a

3     question of a witness.  If I do, that does not indicate that I

4     have any opinion about the facts in this case.

5          Nothing I say or do should lead you to believe that

6     I have any opinion about the facts nor be taken as indicating

7     what your verdict should be.

8          During the trial, I may have to interrupt the

9     proceedings to confer with the attorneys about the rules of

10    law which should apply here.  Sometimes we will talk here at

11    the bench.

12         If it goes on a little longer, I may excuse you.  We

13    will try to keep these interruptions as short as possible, but

14    bear in mind that your patience sometimes is necessary.

15         Finally, there are three basic rules about a

16    criminal case which you should keep in mind.  First, the

17    defendant is presumed innocent until proven guilty.  The

18    indictment against the defendant brought by the government is

19    only an accusation, nothing more.  It is not proof of guilt or

20    anything else.  The defendant, therefore, starts out with a

21    clean slate.

22         Second, the burden of proof is on the government

23    until the very end of the case.  The defendant has no burden

24    to prove his innocence or to present any evidence or to

25    testify.

1          Since the defendant has the right to remain silent,

2    the law prohibits you from arriving at your verdict from

3    considering that the defendant may not have testified.

4          Third, the government must prove the defendant's

5    guilt beyond a reasonable doubt.  And I will give you further

6    instructions on this point later, but bear in mind that in

7    this respect, a criminal case is very different from a civil

8    case.

9          Ladies and gentlemen, at this point, I am going to

10   stop.  We are well into the lunch hour now, and I know some of

11   you have been around since early this morning.  So I am going

12   to send you back to the deliberation room.

13         The courtroom security officer will get you

14   acquainted with that room, give you an idea of what around

15   here may be available for you to grab a bite at.  In the next

16   day or two, if you want to bring your own lunch, you are

17   welcome to do that as well.  The courtroom security officer

18   will be able to provide you all of those kind of instructions.

19         Get to know each other, workplace, those kind of

20   social chats, but do not talk about this case.  Don't talk

21   about the allegations in this case.  Don't talk about the

22   defendant, the government lawyers, the defense lawyer, or my

23   performance.

24         At this point, keep an open mind.  You haven't heard

25   any evidence and you need to hear all of the evidence in the

 1    case before I allow you to start deliberating.  We will return

 2    at 1:30.  If you can get back like five minutes early, so we

 3    can all start on time.  If one of us is late, we are all late,

 4    so I will try to always tell you an exact time to come back

 5    at.

 6              Any questions about my instructions?  Thank you,

 7    ladies and gentlemen.  We will see you back at 1:30.

 8              (Jury leaves courtroom.)

 9              THE COURT:  Anything we need to take up?

10              MR. BASILE:  No, Your Honor.

11              THE COURT:  See you at 1:30.

12              (Lunch recess.)

13              THE COURT:  Please be seated.

14              Ladies and gentlemen, we will now turn to opening

15    arguments.  Again, I remind you, what the lawyers say is not

16    evidence.

17              And with that, I recognize the government.

18              MS. WANNARKA:  Thank you, Your Honor.

19              May it please the Court, defense counsel.  Good

20    afternoon, ladies and gentlemen.  You have heard what the

21    defendant is charged with in this case, production and

22    possession of child pornography.

23              To give you an idea of what I anticipate the

24    evidence is going to show, I will start with talking about

25    adoption.  Adoption is a beautiful thing.  It is a chance for

1    a child to have a new life, to have hope, to have a fresh

2    start, a new beginning, to essentially dream about a family,

3    parents to love them, care for them, and provide them the new

4    life that they have dreamt of, that children all over the

5    world dream of.

6            But for the victim in this case, Amanda Mouton, that

7    dream became a nightmare.  What I anticipate the evidence to

8    show is that the defendant in this case Steven Mouton, and his

9    wife, Margaret, adopted a child from China, two years old,

10   brought her to the United States for her fresh start, for her

11   dream of a family, for parents that love her.

12           They put a roof over her head.  They clothed her.

13   They fed her.  They took her to school.  They put her in music

14   lessons.  They encouraged extracurricular activities.

15           But what I also believe the evidence will show is

16   that beginning at that young age and continuing to the age of

17   twelve, the defendant, Steven Mouton, took pictures of her in

18   various forms of dress, to include completely nude, in sexual

19   positions, when she was asleep and when she was awake.

20           I also believe that the evidence will show that he

21   began to penetrate her, asleep and awake, with his penis, with

22   his fingers and, curiously enough, with a cigar holder.  I am

23   sad to say that the evidence will show all of that in the form

24   of pictures in this case.

25           The only thing that could be possibly worse than the

1    sexual assault of a child is someone taking pictures of it, of

2    capturing the physical and the emotional pain of the

3    devastating humiliation, of essentially the worst, worst times

4    of their lives, to capture that with photography for that

5    person's own sexual gratification.

6          The evidence will show that that is what Steven

7    Mouton did.  He additionally possessed other images of other

8    kids, someone else's kids in sexual positions, various forms

9    of dress and penetration, and various ages, beginning with

10   infant up until young, ten, eleven, twelve years old.

11         The evidence will show overwhelmingly that the

12   defendant essentially ordered up his victim.  The defendant is

13   charged with the production and the possession of child

14   pornography, and that is what the government will prove to you

15   beyond a reasonable doubt, and at the end of the trial, we

16   will ask you to find him guilty.  Thank you.

17              THE COURT:  Mr. Basile.

18              MR. BASILE:  I think I will reserve any opening for

19   after the evidence.

20              THE COURT:  Noted.

21              With that, we turn to the evidence in the case, and

22   your first witness.

23              MS. BRAUN:  Your Honor, the government calls David

24   Gonzales.

25              THE COURT:  Oh.  Before that, does anybody invoke

 1    the rule?

 2              MR. BASILE:  Your Honor, I was going to invoke the

 3    rule.

 4              THE COURT:  The rule has been invoked.  Are there

 5    any witnesses in the courtroom?  All witnesses will need to

 6    step outside and remain outside.  Don't speak with each other

 7    about this case.  You can speak to the lawyers, and we will

 8    call you in when necessary.

 9              MS. WANNARKA:  Your Honor, one of our forensic

10    special agents, Charlie Cox, for the FBI is in the courtroom.

11    We would ask that he be able to remain in the courtroom as an

12    expert witness.  We have already discussed that with defense

13    counsel, and he has agreed to that.

14              THE COURT:  Any objection to that?

15              MR. BASILE:  No objection, Your Honor, since he is

16    an expert witness.

17              THE COURT:  That will be fine, then.

18              MS. WANNARKA:  And then, of course, in addition, our

19    case agent.

20              THE COURT:  And the case agent is excused from the

21    rule.

22              COURTROOM DEPUTY:  Please raise your right hand.

23              (Oath administered to the witness.)

24              COURTROOM DEPUTY:  Thank you.

25              THE COURT:  Please take a seat.

GONZALES – DIRECT

```
 1                   *–*–*–*–*–*–*–*

 2                 DIRECT EXAMINATION

 3   BY MS. BRAUN:

 4   Q.  Please state and spell your name for the record.

 5   A.  David Gonzales.  D-a-v-i-d G-o-n-z-a-l-e-s.

 6   Q.  What is your occupation?

 7   A.  I am a community supervision officer for the 216th

 8   Judicial District in Kendall County, Texas.

 9   Q.  How long have you had that occupation?

10   A.  In Kendall County, I have been an officer for two years,

11   and overall, I have been an officer for ten years.

12   Q.  Other than Kendall County, where have you been a

13   corrections officer?

14   A.  I have been working -- I worked for Medina County and Kerr

15   County as well.

16   Q.  Are you familiar with the defendant in this case, Steven

17   Mouton?

18   A.  Yes, ma'am.

19   Q.  In October of 2007, was Mr. Mouton on probation in Kendall

20   County?

21   A.  Yes, ma'am.  Correct.

22   Q.  Were there certain rules or conditions that he was ordered

23   to abide by?

24   A.  Yes.

25   Q.  As a probation officer, do you have the authority to check
```

GONZALES – DIRECT

1   up on individuals who were on probation?

2   A.  Yes, ma'am.

3   Q.  Does that include visiting their homes?

4   A.  Yes.

5   Q.  Did you conduct a home visit of the defendant on October

6   18th of 2007?

7   A.  Yes, ma'am.  Sure did.

8   Q.  Where was he living at that time?

9   A.  I can't remember the name of the street, but it was in

10  Boerne, Boerne, Texas.

11  Q.  Was it 18 Crystal Circle in Boerne, Texas?

12  A.  Yes.  Correct.

13  Q.  When you conduct a home visit, do you go in teams?

14  A.  Yes.

15  Q.  Why is that?

16  A.  For safety reasons.

17  Q.  Who went with you on October 18th to the defendant's home?

18  A.  Officer Brooke Davis.

19  Q.  Is she also a community supervision officer?

20  A.  Yes, ma'am.

21  Q.  Anybody else accompany you?

22  A.  Investigator Kendall Gebauer from the Kendall County

23  Sheriff's Office.

24  Q.  What time did you arrive at the defendant's house?

25  A.  Approximately about, I would say, around 2:30, 3:00

GONZALES – DIRECT

1   o'clock in the afternoon some time.

2   Q.  Who else was living at the home at that time?

3   A.  From my understanding, it was Mr. -- the defendant's wife

4   and the defendant's daughter.

5   Q.  Do you know how old the daughter was?

6   A.  I know she was under the age of 17, but I am not sure on

7   the exact date.  Maybe twelve years old, I believe.

8   Q.  Okay.  When you arrived at the house, was there anybody

9   home?

10  A.  The defendant, Mr. Mouton.

11  Q.  Did he answer the door?

12  A.  Yes, ma'am.

13  Q.  What happened when he answered the door?

14  A.  He was very surprised to see Officer Davis and I and the

15  investigator were at his house.

16  Q.  Was anybody else home other than the defendant?

17  A.  No, ma'am.

18  Q.  Did you tell Mr. Mouton why you were at his house?

19  A.  Yes, ma'am.

20  Q.  What did you tell him?

21  A.  We just explained to him it was just a routine field

22  visit.  We just want to make sure that -- or confirm that was

23  his actual address and make sure that there weren't any

24  problems.

25  Q.  Did you enter the home?

GONZALES – DIRECT

1    A.  Yes, ma'am.

2    Q.  What happened after you got inside?

3    A.  Well, he just –– he gave us a tour.  He voluntarily

4    decided, hey, you know, look around.  We asked him if we could

5    look around.

6              He said:  Sure.  No problem.

7              And at that time, we kind of –– you know, we kind of

8    make sure that everything is okay.  We entered the home.  The

9    first thing we noticed was in the refrigerator him having some

10   alcoholic beverages.

11   Q.  Is the house one story or two stories.

12   A.  Two stories.

13   Q.  What rooms are on the second story of the house?

14   A.  There was a music room, and that's where we located the

15   laptop.  And Amanda's room, the defendant's daughter.

16   Q.  Are those the only two rooms on the second level?

17   A.  Yes, ma'am.

18   Q.  Did you go into every room in the house?

19   A.  Yes, ma'am.

20   Q.  You mentioned you located the computer.  Were you looking

21   for computers?

22   A.  If the defendant has a computer, we try to make sure that

23   there isn't anything illegal happening on those computers, and

24   we ask the defendants if they have any problem if we can

25   search their computers.

GONZALES – DIRECT

1    Q.  And you found a laptop computer in the music room; is that

2    correct?

3    A.  That is correct.

4    Q.  Was there also a desktop computer in the music room?

5    A.  Yes, ma'am.

6    Q.  When you noticed the computers in that room, what, if

7    anything, did you say to the defendant?

8    A.  We just asked him if it was okay if we could search the

9    computers, if he had any problems with that, and he

10   voluntarily said that was fine.

11   Q.  Did he tell you whose -- who used either or both of the

12   computers?

13   A.  Yes, ma'am.

14   Q.  What did he say?

15   A.  He said that he uses the computers as well as his wife,

16   once in a while, but mostly, it was him.  It was his computer.

17   Q.  Who checked the computer -- well, did you check both

18   computers?

19   A.  Just the laptop.

20   Q.  Who checked the laptop?

21   A.  I did.

22   Q.  And what happened when you checked it?

23   A.  Well, I just kept going through the files and making sure,

24   like I said, there wasn't anything illegal, and I came across

25   an image or a picture of a birthday party.  Amanda was having

GONZALES – DIRECT

1   a birthday party and there were several minor individuals
2   there, minor female individuals.
3   Q.  Did you ask the defendant about that picture?
4   A.  Yes, ma'am.
5   Q.  What did he say about it?
6   A.  He acknowledged that he took the pictures, which posed a
7   red flag for me, because he was under -- he understands that
8   one of the conditions --
9          MR. BASILE:  Your Honor, nonresponsive.  A question
10  wasn't asked of him.
11         THE COURT:  Yes.  You need to wait for a question.
12         THE WITNESS:  Okay.  Yes, sir.
13         THE COURT:  Sustained.
14  BY MS. BRAUN:
15  Q.  After Mr. Mouton admitted taking the birthday party
16  pictures, did you continue looking at the laptop or did that
17  end your search?
18  A.  No.  I continued looking.
19  Q.  What else did you find?
20  A.  I also located another image, which was of Amanda.
21  Q.  And in this other image that you located, was it of a
22  certain body part of Amanda?
23  A.  Yes.
24  Q.  What was it of?
25  A.  The vagina.

GONZALES – DIRECT

1    Q.  What happened when you found that picture on the computer?

2    A.  Well, I asked -- I asked the defendant who this picture

3    was, of whom, and that's where he kind of hesitated and then

4    acknowledged that it may have been Amanda.

5    Q.  Do you remember what exactly he told you?

6    A.  Initially, he said:  I have no idea.  It could be Amanda.

7    And then I kept asking him:  Who is this?  Steve, you know who

8    this is.  And then he eventually he admitted that it was -- it

9    could have been Amanda.

10   Q.  Did you ask him how a picture of Amanda's vagina would end

11   up on his computer?

12   A.  Yes.

13   Q.  What did he say?

14   A.  He said it could have -- she had a slumber party and

15   Amanda could have taken it on her own.

16   Q.  What did you do with that image of Amanda's private part

17   that you found on the computer?

18   A.  I showed it to the defendant and I went ahead and printed

19   it out.

20           MS. BRAUN:  May I approach, Your Honor?

21           THE COURT:  You may.

22   BY MS. BRAUN:

23   Q.  I will show you what has been marked for identification as

24   Government's Exhibit 1.  Do you recognize that?

25   A.  Yes, ma'am.

GONZALES – DIRECT

1   Q.  What is it?

2   A.  That is the image that I located on his computer.

3   Q.  And is this the image that you printed out?

4   A.  Yes, ma'am.

5   Q.  Is it in the same or substantially the same condition now

6   as when you found it and printed it on October 18th of 2007?

7   A.  Yes, ma'am.

8            MS. BRAUN:  The government offers Exhibit 1.

9            MR. BASILE:  Your Honor, I don't think the proper

10  predicate has been laid on this photograph, so I will object

11  on those grounds.

12           THE COURT:  What is the missing predicate?

13           MR. BASILE:  I don't think they asked whether there

14  have been any alterations made to the picture, anything is

15  different in this photograph than there was at the time.

16           THE COURT:  No.  That was laid.  Any other

17  objection?

18           MR. BASILE:  No other objection, Your Honor.

19           THE COURT:  Number 1 is admitted.

20           MS. BRAUN:  Your Honor, I would ask permission to

21  publish Exhibit 1 to the jury.

22           THE COURT:  Yes.

23           COURTROOM SECURITY OFFICER:  Lights out?

24           THE COURT:  No.

25           COURTROOM SECURITY OFFICER:  No.

GONZALES – DIRECT

 1    BY MS. BRAUN:

 2    Q.  After you showed Exhibit 1 to the defendant, what further

 3    conversation was there about that image?

 4    A.  As I recall, he continued to deny saying that it could

 5    have been Amanda -- you know, when she had her slumber party.

 6    And I continued to ask him:  Steve, you know, you have to be

 7    honest with us.  I mean, this is illegal to have on your

 8    computer, and you understand that.

 9           And he said:  Well -- and that's when he started

10    getting nervous and jittery to a point where he starts

11    stuttering.

12    Q.  When you were at the house on October 18th, did he call

13    his wife?

14    A.  Yes.

15    Q.  What did he say to her?

16    A.  He just told her that we were there.  The probation

17    department was there, and that we had located an image of

18    Amanda.

19    Q.  Did he ask her to come to the house?

20    A.  Yes.

21    Q.  And did she eventually arrive at the house?

22    A.  Yes.

23    Q.  Did you have a conversation with her?

24    A.  No.

25    Q.  After you found that image on the computer, what happened

GONZALES – CROSS

```
 1    to the two computers that were there that day, the laptop and
 2    the desktop?  Did you take those with you?
 3    A.  No.  The sheriff's department did, Kendall County
 4    Sheriff's Department.
 5    Q.  Did you have any further conversation with Mr. Mouton?
 6    A.  No.
 7    Q.  Was he left at the house that day with his wife?
 8    A.  Yes.
 9    Q.  Did you have any further involvement in this case?
10    A.  No.
11            MS. BRAUN:  Thank you.  Nothing further.
12            THE COURT:  Any questions?
13            MR. BASILE:  Just a couple, Your Honor.
14                    *-*-*-*-*-*-*-*
15                  CROSS EXAMINATION
16    BY MR. BASILE:
17    Q.  Mr. Gonzales, how are you today?
18    A.  Just fine.  How are you, sir?
19    Q.  You said that you noticed first an image of some girls at
20    a birthday party; is that right?
21    A.  Yes, sir.
22    Q.  There was nothing wrong with those images, were there?
23    A.  Yes, sir.
24    Q.  What is wrong with those images at the birthday party?
25    A.  Well, Mr. Mouton, the defendant, was aware that as a
```

1    condition of probation, he is not to have any contact with a

2    minor, directly or indirectly.

3    Q.  And then this particular photograph -- those pictures were

4    just people at a birthday party?  There was nothing sexual

5    about it, was there?

6    A.  No.

7    Q.  Okay.  And this picture that you located on this -- how

8    did you find them?

9    A.  Just searching through the files.

10   Q.  Just going through the files and opening up all kinds of

11   files?

12   A.  Yes, sir.

13   Q.  Was it just randomly placed somewhere?

14   A.  Yes, sir.

15   Q.  There wasn't any type of a name or group or anything, was

16   there?

17   A.  Yes, but I can't recall the name of the actual file.

18   Q.  And you are not here today to testify that you know that

19   it actually is Amanda, are you?

20   A.  No.

21   Q.  You have no idea who that -- who that is, do you?

22   A.  Only according to what the defendant said.

23   Q.  Okay.  And you have no idea how that picture got on the

24   computer, do you?

25   A.  No.

GONZALES - CROSS

1   Q.  And you have no idea who actually took that photograph, do

2   you?

3   A.  According to the defendant, he said, admitted that it was

4   his.

5   Q.  No.  That's not what you said a few minutes ago.

6   A.  According to the defendant.

7   Q.  When did that -- when did you change your story?

8   A.  Excuse me?

9   Q.  When did you change your story?  When you were asked

10  questions by the government, you said he denied it.

11  A.  Initially, he denied it.

12  Q.  And you said he continued to deny it?

13  A.  Yes.

14  Q.  Again, and he got nervous and continued to deny it, didn't

15  he?

16  A.  Until afterwards, he finally admitted that it could have

17  been Amanda.

18  Q.  It could have been?

19  A.  Yes.

20  Q.  But then you don't know, do you?

21  A.  No.

22          MR. BASILE:  I have no further questions, Your

23  Honor.

24          THE COURT:  Anything based on those?

25          MS. BRAUN:  No, Your Honor.

GEBAUER - DIRECT

```
 1              THE COURT:  You may step down.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  Your next witness.

 4              MS. BRAUN:  Government calls Kendall Gebauer.

 5              COURTROOM DEPUTY:  Would you please raise your right

 6    hand.

 7              (Oath administered to the witness.)

 8              COURTROOM DEPUTY:  Thank you.

 9                        *-*-*-*-*-*-*-*

10                        DIRECT EXAMINATION

11    BY MS. WANNARKA:

12    Q.  Please state your name for the jury.

13    A.  Kendall Gebauer.

14    Q.  How are you currently employed?

15    A.  I am with the Kendall County Sheriff's Office.  I am an

16    investigator.

17    Q.  What are your duties with the Kendall County Sheriff's

18    Department?

19    A.  Right now, I am assigned to the Drug Enforcement

20    Administration as a narcotics investigator.

21    Q.  So do you also have federal law enforcement credentials?

22    A.  Yes, I do.

23    Q.  Prior to your service with Kendall County, how were you

24    previously employed?

25    A.  The Pasadena, Texas Police Department.
```

GEBAUER - DIRECT

1    Q.  And how long were you with Pasadena?

2    A.  Twenty-six years.

3    Q.  When you were in Pasadena, were you also a member of the

4    DEA Task Force?

5    A.  Yes, I was.

6    Q.  I would like to draw your attention back to October 18,

7    2007.

8    A.  Yes.

9    Q.  Had you just started work with Kendall County?

10   A.  I believe that was my third week.  I started on the 1st.

11   Q.  And did you have the occasion to accompany David Gonzales

12   to the home of Steven Mouton?

13   A.  Yes, I did.

14   Q.  Okay.  And when you arrived at the Mouton's home, describe

15   the defendant's demeanor when you all arrived.

16   A.  When we first arrived, he appeared kind of standoffish and

17   nervous.  He just seemed surprised and nervous, I guess I

18   would call it.

19   Q.  Were you present when Probation Officer David Gonzales

20   searched and looked at the defendant's computers?

21   A.  Yes, I was.

22   Q.  And were you there when he found the picture of Amanda?

23   A.  Yes.

24   Q.  And that has been previously admitted as Government's

25   Exhibit 1.

GEBAUER - DIRECT

1          MS. WANNARKA:  But for identification purposes, and

2    without showing the picture again, Your Honor, may I approach

3    the witness?

4          THE COURT:  Yes.

5    BY MS. WANNARKA:

6    Q.  Did you take custody of this picture from David Gonzales

7    after he printed it out?

8    A.  Yes, I did.

9    Q.  And how were you able to tell that?

10   A.  I initialed it, and with the case number and the date and

11   my name.

12   Q.  Okay.  Thank you.  And am going to head back to the

13   podium.  If you will move these computers up here, please.

14          After Government's Exhibit 1 was discovered and

15   printed out, do you recall what the defendant said about that

16   picture and how it could possibly have arrived on his

17   computer?

18   A.  He was --

19          MR. BASILE:  Your Honor, I am going to object to him

20   answering the question as a law enforcement officer.  There

21   has been no mention of any reading of the rights to Mr.

22   Mouton, so any statement he would make would be inadmissible.

23          THE COURT:  Come on up.

24          (Bench conference, as follows:)

25          MS. WANNARKA:  He wasn't in custody, Your Honor.

GEBAUER - DIRECT

1    That is the law when he is not in custody.

2            THE COURT:  Yes.  There is another problem too, is

3    that you are opening the door to the probation.  I mean, it is

4    a term and condition of his probation.  Didn't he give access

5    and then law enforcement and the probation office had access

6    and a right to his computer?

7            MS. WANNARKA:  Yes.

8            MS. BRAUN:  Yes.

9            THE COURT:  Yes.  That is the more serious problem

10   he had.  That is why I brought you to the bench, because I

11   didn't want to start opening up why he is on probation.

12           MS. WANNARKA:  No.  I will move on.

13           THE COURT:  What question are you going to ask?

14           MS. WANNARKA:  I was going to ask him what he said

15   about the vagina picture, just that he tried to deny it and --

16           MS. BRAUN:  And corroborates Stephen Gonzales's

17   testimony.

18           MS. WANNARKA:  I am not asking about the slumber

19   party pictures, which the door kind of has been opened anyway,

20   but --

21           THE COURT:  To rule on the objection, the objection

22   is overruled.

23           (End of bench conference.)

24   BY MS. WANNARKA:

25   Q.  Investigator, restricting your comments to Government's

GEBAUER - DIRECT

1    Exhibit 1, the image of the vagina, what did the defendant say

2    when he was confronted about that particular image?

3    A.   That his daughter Amanda had probably taken the picture at

4    one of her sleepovers or a slumber party and that he hadn't

5    seen it before.

6    Q.   I want to draw your attention to what has been marked as

7    Government's Exhibits 2 and 4.  I believe they are in front of

8    you.

9    A.   Yes.

10   Q.   And I will ask you to take a look at those for a moment

11   and then tell me if you can identify them.

12   A.   Yes, I can.

13   Q.   And how can you identify them?  Please refer to the

14   exhibit --

15   A.   The laptop computer was the one that I took from the

16   residence, and it is marked on the back with my initials and

17   the Kendall County case number.  And the desktop is also

18   marked on the back the same way.

19   Q.   And the laptop is Government's Exhibit 2?

20   A.   Yes, it is.

21   Q.   And the desktop is Government's Exhibit 4?

22   A.   I don't see the sticker --

23   Q.   Possibly on the top --

24   A.   Okay.  Yes, it is.

25   Q.   And when you took custody of those two computers, what did

GEBAUER - DIRECT

1    you do with them?  Did you take them back to secure evidence?

2    A.  Yes.  I returned with them to the Kendall County Sheriff's

3    Office and entered them into our property vault.

4    Q.  And did you later seek search warrants for both of those

5    computers for the forensic analysis?

6    A.  Yes, I did.

7    Q.  At some point, did you contact CPS?

8    A.  Yes, I did.  I contacted CPS that day.

9    Q.  Okay.  And that was -- was that with regard to

10   Government's Exhibit 1?

11   A.  Yes.

12   Q.  The picture?

13   A.  Yes, it was.

14          MS. WANNARKA:  Your Honor, the government offers

15   Government's Exhibits 2 and 4, 2 and 4 into evidence.

16          THE COURT:  Any objection?

17          MR. BASILE:  No objection, Your Honor.

18          THE COURT:  2 and 4 are admitted.

19   BY MS. WANNARKA:

20   Q.  At some point, did you request forensic assistance?

21   A.  Yes, I did.

22   Q.  And, essentially, you need -- did you need someone to look

23   at those computers?

24   A.  Right.  Somebody with the computer expertise to retrieve

25   the evidence that is on the computers, photo images or any

1    other type of items.

2    Q.  Okay.  And who did you contact?

3    A.  Well, I contacted probably ten or fifteen different --

4    Q.  Who did you work with with regard to the forensic

5    analysis?

6    A.  The San Antonio Police Department's computer forensic

7    unit.

8    Q.  Okay.  And when it was time to deliver the computers to

9    the San Antonio Police Department, who did that?

10   A.  I did.

11   Q.  Tell the jury about that.

12   A.  I checked the two computers out of our property vault, and

13   I had already obtained a search warrant that was signed by a

14   judge, and then I transported them to the San Antonio PD's

15   computer forensic unit, which is their technical unit.

16   Q.  And did you work specifically with a particular forensic

17   examiner?

18   A.  I turned the computers directly over to Detective Stark,

19   and he is the one that did the examination of the computers.

20   Q.  Okay.  And did you receive a forensic report back from

21   Detective Stark?

22   A.  Yes.  In April of the next year, I met with Lieutenant

23   Stark.  I received the computer reports of the evidence he

24   found, and I also retrieved the two computers then and took

25   them back to Kendall County, and I entered them into evidence.

GEBAUER – CROSS

1    Q.  Okay.  Did you have the occasion, then, to review the

2    forensic report?

3    A.  Yes, I did.

4    Q.  What was your conclusion -- in other words, what did you

5    decide to do next?

6    A.  Well, once looking at all of the pictures that were on

7    the -- recovered from the computers, and a majority were the

8    victim that I knew was Amanda Mouton, and -- but there were

9    hundreds of other -- I would call them victims that had their

10   pictures on the computer.

11          I had no way to identify them, and so I contacted

12   the FBI for their assistance, that they had a unit that just

13   works these type of cases.

14   Q.  And is that how you have come to work on this case with

15   Special Agent Larry Baker?

16   A.  Yes, it is.

17          MS. WANNARKA:  Thank you.  I will pass the witness.

18          THE COURT:  Any questions?

19          MR. BASILE:  Just a few, Your Honor.

20                  *-*-*-*-*-*-*-*

21                CROSS EXAMINATION

22   BY MR. BASILE:

23   Q.  Is it Detective or --

24   A.  Detective, Investigator, or --

25   Q.  Okay.  And it's Gebauer, correct?

1    A.   Gebauer.

2    Q.   Gebauer.   Sorry.   All right.   So you -- the information

3    that you received on the computer was prepared by someone

4    else; is that right?   The photographs?

5    A.   The evidence recovered from the computer was prepared,

6    yes.

7    Q.   Okay.   So you are not here to testify about any

8    expertise -- any expertise in computers and getting anything

9    off of them, are you?

10   A.   No.

11   Q.   All right.   And before this time happened, before -- had

12   you met Amanda?

13   A.   Before, before October --

14   Q.   October --

15   A.   October eight --

16   Q.   -- 2007?

17   A.   No.

18   Q.   When is the first time you actually met Amanda?

19   A.   The 19th.

20   Q.   The next day?

21   A.   (Witness nods head.)

22   Q.   At that time, you didn't have any of the information you

23   just testified about from the photographs, did you?

24   A.   The only picture I had seen from the computer that was

25   recovered was the one of the paper printout, and then I had

GEBAUER – CROSS

```
1    seen the pictures on the computer as Mr. Gonzales was going

2    through the computer.

3    Q.  And that's the other pictures you testified about, right?

4    Pictures of birthday parties and things like that?

5    A.  I haven't mentioned that, but, yes.  It was a slumber

6    party or birthday party.

7               MR. BASILE:  I have no further questions, Your

8    Honor.

9               THE COURT:  Anything further?

10              MS. WANNARKA:  Nothing further.

11              THE COURT:  You may step down.  Thank you, sir.

12              MS. WANNARKA:  Next witness is Mike Stark, Detective

13   Mike Stark.

14              THE COURT:  Do you want this still up there?

15              MS. WANNARKA:  Yes.

16              COURTROOM SECURITY OFFICER:  Can't see the

17   witnesses --

18              THE COURT:  It is blocking the witness's view of

19   the -- or the juror's view of the witness, rather.

20              COURTROOM DEPUTY:  Could you please raise your right

21   hand.

22              (Oath administered to the witness.)

23              COURTROOM DEPUTY:  Thank you.

24                   *-*-*-*-*-*-*-*

25
```

STARK – DIRECT

```
 1                         DIRECT EXAMINATION
 2   BY MS. WANNARKA:
 3   Q.  Detective, please tell the jury your name.
 4   A.  Michael Stark.
 5   Q.  How are you currently employed?
 6   A.  I am employed by the City of San Antonio Police
 7   Department.
 8   Q.  What are your duties?
 9   A.  I am a detective investigator in computer crimes.
10   Q.  Have you received training and do you conduct computer
11   examinations?
12   A.  Yes, ma'am.
13   Q.  Tell the jury about your training and your experience in
14   that regard.
15   A.  I started in May of 2000.  I have done several hundred
16   hours of computer training at the Federal Law Enforcement
17   Academy, just a little training all over the country, but I do
18   have several hundred hours of training in computer forensics.
19   Q.  Are you certified with EnCase software?
20   A.  Yes.
21   Q.  And is that a software that is recognized in the forensic
22   community as reliable and commonly used to analyze computers
23   and digital media?
24   A.  Yes.
25   Q.  Tell the jury basically what computer forensics is.
```

STARK – DIRECT

1    A.   Computer forensics is the examination of digital media

2    without changing anything on that media.  Basically, you

3    just -- you do it in a sterile environment.  As far as

4    sterile, I don't mean like a doctor's office, but it is an

5    environment that keeps anything from writing to that drive.

6    You don't want to contaminate that drive at all, so we use

7    special software and hardware to keep from doing that.

8    Q.   And building on that, what is the procedure with examining

9    a hard drive from a computer?

10   A.   Normally, we will take the hard drive out of the computer

11   and we will put it in our computer, which is a forensic

12   computer that has the hardware that I just explained, and we

13   will make a copy of this -- of the evidence drive, and we will

14   take that and we will make -- like I say, we will make a copy

15   of it, and then we will take the original and we will put it

16   back in our evidence or back into the computer, and we will

17   use the copy as something that we use to retrieve evidence off

18   of.  We never -- we don't use the original after we make the

19   copy.

20   Q.   And how are you able to verify or confirm that your copy

21   or mirror image is a true and accurate copy of the original

22   piece of evidence?

23   A.   We use two different methods.  We use what is called an

24   MD5 hash, which is a mathematical algorithm, mathematical --

25   it is like a check sum.  We use them -- we compare the

STARK – DIRECT

 1   original and then we compare our copy, and as long as those

 2   two match with the MD5 hash, then it is like a DNA

 3   fingerprint.  It's -- and then we also use what is called a

 4   CRC, a cyclical redundancy check sum on each block of

 5   information that we retrieve off of the hard drive.

 6   Q.  When you analyzed Government's Exhibits 4 and 2, did you

 7   use that procedure?

 8   A.  Yes.

 9   Q.  And when you mirrored both of those hard drives, did you

10   verify that the mirror image that you tested was a true and

11   exact copy of the original evidence?

12   A.  Yes, I did.

13   Q.  I would like to draw your attention first to Government's

14   Exhibit 2, which is the laptop there in front of you.  What is

15   the brand name of that laptop?

16   A.  It is an Acer.

17   Q.  Okay.  And with regard to the hard drive that you tested,

18   where is the hard drive manufactured?

19   A.  It is manufactured in Thailand.

20   Q.  Okay.  And then drawing your attention to Government's

21   Exhibit 4, which is the desktop, I believe, on the floor, the

22   computer system there, when you analyzed that hard drive,

23   where did you discover that it was manufactured?

24   A.  It was manufactured in Malaysia.

25   Q.  I would like to move on to the results of your forensic

STARK – DIRECT

1    analysis.  Beginning first with Government's Exhibit 4, the

2    desktop that is there on the floor.  When you looked at this

3    computer, other than -- well, how were you able to link that

4    particular computer to this defendant?

5              MR. BASILE:  Your Honor, I am going to object to any

6    testimony about "link."  I don't think he has been qualified.

7    He just mentioned briefly his background, some classes.  He

8    didn't go into detail to show he is an expert.

9              THE COURT:  He hasn't been tendered as an expert

10   yet.

11             MS. WANNARKA:  Your Honor, I believe that we have

12   established enough to -- that he is qualified as an expert

13   with regard to his education and his time of analyzing

14   computers, and we would tender him as an expert.

15             THE COURT:  Any opposition to the tender?

16             MR. BASILE:  Yes, Your Honor.  I don't think his

17   testimony that he has taken lots of classes since 2000 is

18   sufficient.  He hasn't given us information of what classes

19   and how they relate, what he is doing, and how they would help

20   him in doing what he has been asked to do by the government.

21             THE COURT:  That is sustained.  You need to work

22   that up further.

23             MS. WANNARKA:  Great.

24   BY MS. WANNARKA:

25   Q.  Detective, would you please go into some detail about your

STARK – DIRECT

1    training and your classes, the EnCase software training, what

2    is required for that, and start from the beginning and take us

3    to present day.

4    A.   Okay.  I have taken EnCase training.  I have taken the

5    basic, the intermediate and the advanced training for EnCase.

6    We have other forensic software that we use called FTK, which

7    is Field Toolkit.  I have taken the basic and intermediate

8    classes on that.  It is basically just another piece of

9    software that we use.

10          I have taken several hundred hours of training at

11   the Federal Law Enforcement Academy, starting with how a hard

12   drive works, all the way up to taking them apart and examining

13   them.  And I mean, there are just several -- I have just taken

14   several hundred hours of different classes.  I have had

15   cellphone forensic classes; any kind of digital -- all kinds

16   of digital media.

17   Q.   Have you received training on advanced Internet

18   investigations?

19   A.   Yes.

20   Q.   And computer forensic, money laundering and financial

21   investigations?

22   A.   Yes.

23   Q.   Seized computer and evidence recovery training in Glencoe,

24   Georgia?

25   A.   Yes.  That is the Federal Law Enforcement Academy.

STARK - DIRECT

1    Q.   Have you also achieved being a master peace officer?

2    A.   Yes.  I have been a police officer for 21 years.

3    Q.   Did you receive some training from the United States Air

4    Force Office of Special Investigations?

5    A.   Yes, I have.

6    Q.   Describe that training.

7    A.   That was a long time ago.  It was at the Randolph Air

8    Force Base.  It was just a class on digital media and

9    forensics.

10   Q.   It appears -- or have you been to several trainings with

11   the Department of Homeland Security?

12   A.   Yes.  I have been to a few.

13   Q.   And what were those trainings, specifically?

14   A.   Without --

15   Q.   Interagency computer forensic programs --

16   A.   I'm sorry, ma'am.

17           MR. BASILE:  Your Honor, I object to the leading of

18   the witness.

19           THE COURT:  Sustained.

20           MS. WANNARKA:  Your Honor, I would again tender him

21   as an expert.  He has received extensive training from all

22   over the country, from the military, from the Department of

23   Homeland Security, hundreds of hours.

24           THE COURT:  Any response?

25           MR. BASILE:  Your Honor, while he might be an expert

1    on computers, and might agree with that on certain issues, but

2    as far as identifying who actually did something and who puts

3    something in a computer, I don't think he has been qualified

4    to that.

5            He may be able to testify to what is in the

6    computer, but I think the other is outside of the realm of the

7    expertise, so I will object to him on that.

8            THE COURT:  He is accepted by the Court as an expert

9    in computer forensics.  Now, that being established, I will

10   wait for the next question that you are going to ask him and

11   see whether it falls within the expertise.

12   BY MS. WANNARKA:

13   Q.  During your -- or as a result of your forensic examination

14   with regard to Government's Exhibit 4, the desktop, did you

15   discover child pornography?

16   A.  Yes.

17   Q.  How many images did you discover?

18   A.  There were sev --

19           MR. BASILE:  Your Honor, I will have to object.  I

20   don't think he has been qualified as to what is child

21   pornography and what is not.  Him testifying about how many

22   images he found is something that is outside of his expertise

23   as a forensic computer scientist.

24           He may be able to testify what is in the computer,

25   but I don't think he can make that conclusion on what it

STARK - DIRECT

```
 1   actually entails on that --
 2           MS. WANNARKA:  I will rephrase the question, Your
 3   Honor.
 4   BY MS. WANNARKA:
 5   Q.  Detective, during your training and in your experience
 6   with working these types of cases, are you familiar with what
 7   child pornography is?
 8   A.  I believe so, yes.
 9   Q.  And have you worked on cases, on child pornography cases
10   in the past?
11   A.  Yes.
12   Q.  How many?
13   A.  Several hundred.
14   Q.  And during that time, have you, as part of your training
15   and experience, seen and dealt with numerous images of child
16   pornography?
17   A.  Yes.
18   Q.  Back to Government's Exhibit 4, did you find child
19   pornography?
20           MR. BASILE:  Your Honor, again, I am going to
21   object.  He is still making a conclusion on what these images
22   are without any evidence that has been presented as to what is
23   in the images, whether it meets them all; he is making a
24   conclusion on a legal basis, and I don't think he is qualified
25   for that.
```

STARK − DIRECT

```
 1              THE COURT:  That is overruled.
 2   BY MS. WANNARKA:
 3   Q.  Did you find images of young children?
 4   A.  Yes.
 5   Q.  And were they exhibiting or displayed in sexually explicit
 6   conduct?
 7   A.  Yes.
 8   Q.  As a part of your forensic examination, did you create a
 9   report or a printout of your findings?
10   A.  Yes, I did.
11   Q.  And does that report reflect the child pornography images?
12   A.  Yes.
13   Q.  Now, specifically, with regard to the Dell laptop,
14   Government's Exhibit -- I mean, the desktop, Government's
15   Exhibit 4, how many images of children displaying sexually
16   explicit conduct did you find?
17   A.  The exact number, without referring to a report, I could
18   not -- I could not tell you.  There are several.
19   Q.  And that's a good lead-in.
20              MS. WANNARKA:  Your Honor, may I approach?
21              THE COURT:  You may.
22   BY MS. WANNARKA:
23   Q.  Detective, I have just handed you what has been marked
24   Government's Exhibit 5, and I will ask you to review that for
25   a moment, please.
```

STARK – DIRECT

1    A.   Okay.

2    Q.   Do you recognize what that is?

3    A.   Yes.   This is my EnCase forensic report.

4    Q.   And is that a printout, essentially, of your computer

5    findings?

6    A.   Yes, it is.   The computer creates the report.

7    Q.   And has that report been altered or changed in any way?

8    A.   No.

9    Q.   Is that the report essentially that you printed out and

10   provided?

11   A.   Yes.

12         MS. WANNARKA:   Your Honor, the government offers

13   Government's Exhibit 5.

14         THE REPORTER:   And, Counsel, if you will keep your

15   voice up, that will help me out.

16         MR. BASILE:   Okay.   I have no objection, Your Honor.

17         THE COURT:   5 is admitted.

18   BY MS. WANNARKA:

19   Q.   Detective, in looking at your report, Government's Exhibit

20   5, are you able to say how many images of child pornography

21   are on Government's Exhibit 4?

22   A.   It shows that I found ten.

23   Q.   Now, with regard to those images, were they deleted

24   images?

25   A.   Yes.

STARK - DIRECT

1    Q.  What does that mean, exactly?  Explain that to the jury.

2    When it says "deleted" or it shows that it is deleted, what

3    does that mean?

4    A.  Deleted, a deleted file or image, it doesn't matter what

5    it is, but once it is deleted, it is put in an area on the

6    computer that is unused, basically.  It is called an

7    unallocated cluster.  It is an area on the computer that has

8    not been used and could be used again.

9    Q.  And how were you able to retrieve those images?

10   A.  EnCase pretty much does it.  You run -- we run a script

11   and it looks for -- it looks for a unique header, and it is

12   actually called -- it is a little YOYA with a little tilde on

13   top that actually goes through all of the areas on the hard

14   drive looking for those headers, and if it finds those

15   headers, it will mark the beginning and the end of that file,

16   and then it will place it in an area in the report for you to

17   view at a later time.

18   Q.  Now, so we do not have to show these images, are there

19   children in that report that are under the age of twelve?

20   A.  Yes.

21   Q.  Substantially under the age of twelve?

22   A.  Yes.

23   Q.  Are there children engaged in sadomasochistic behavior,

24   conduct, with regard to penetration?

25   A.  Yes.

STARK - DIRECT

1   Q.  I would like to turn your attention now to Government's

2   Exhibit 2, the Acer laptop.  Did you also create a report with

3   regard to your examination of that laptop?

4   A.  Yes, I did.

5           MS. WANNARKA:  Your Honor, may I approach?

6           THE COURT:  You may.

7   BY MS. WANNARKA:

8   Q.  I am showing you what has been marked as Government's

9   Exhibit 3 and ask you to review that report.

10  A.  Okay.

11  Q.  Is that a similarly printed-out report from your EnCase

12  examination?

13  A.  Yes.

14  Q.  Do you recognize that report?

15  A.  Yes.  It is a copy.

16  Q.  And is that a copy of the report from, Government's

17  Exhibit 2, the Acer laptop with the hard drive in it?

18  A.  Yes.

19  Q.  Does it appear to be altered or changed or -- in any way?

20  A.  No, ma'am.

21  Q.  Does it appear to be essentially the exact report that was

22  generated from your EnCase examination?

23  A.  Yes.

24          MS. WANNARKA:  Your Honor, the government offers

25  Government's Exhibit 3.

STARK – VOIR DIRE

1                MR. BASILE:  May I ask a couple of questions, Your

2    Honor?

3                THE COURT:  Yes.

4                       *–*–*–*–*–*–*–*

5                    VOIR DIRE EXAMINATION

6    BY MR. BASILE:

7    Q.  Detective Stark, in this report that you provided here,

8    Government's Exhibit 3, is this a report that you prepared

9    personally?

10   A.  That report, it is a copy of my report.

11   Q.  Okay.  But the information that is contained in here, is

12   this information that you did yourself, or did your own from

13   an exam of the computer?

14   A.  Yes.

15   Q.  Is there any information that is provided by any other

16   person?

17   A.  Any information –– no.  Not in that report, no, sir.

18   Q.  Has anything changed in this since the time you did it?

19   Have you had a chance to look at it?

20   A.  Not that I know of, no.

21   Q.  Have you had a chance to look at this to make sure?

22   A.  Yes.

23                MR. BASILE:  Then I have no objection, Your Honor.

24                THE COURT:  3 is admitted.

25                       *–*–*–*–*–*–*–*

STARK – DIRECT

```
 1                CONTINUED DIRECT EXAMINATION
 2    BY MS. WANNARKA:
 3    Q.  Detective, I first would like to ask you about, with
 4    regard to that report, the account name, the profile path, the
 5    computer account name, the registered owner fields that --
 6    with regard to those categories.
 7                Did your EnCase examination reveal whose name was
 8    entered into all of those categories?
 9    A.  Yes.
10    Q.  And what name is that?
11    A.  Operating system information, registered owner is Steve.
12    Q.  Now, with regard to that report, and Government's Exhibit
13    2, did you find child pornography?
14    A.  Yes.
15    Q.  How many images of child pornography did you find?
16    A.  428.
17    Q.  Well, of those images, were any of them deleted or saved?
18    A.  It appears all of them in this report were deleted.
19    Q.  Was there one image that was saved?
20    A.  Yes.  That's in another report.
21                MS. WANNARKA:  Thank you.  May I approach?
22                THE COURT:  You may.
23    BY MS. WANNARKA:
24    Q.  I am showing you what has been marked as Government's
25    Exhibit 6, and I will ask you to look at this report.  Do you
```

STARK – DIRECT

1    recognize that?

2    A.   Yes.

3    Q.   How is that report generated?

4    A.   It is also an EnCase report.

5    Q.   And what does that report reflect?

6    A.   It reflects one image that was taken -- used a digital

7    camera to be taken.

8    Q.   Okay.

9    A.   With.  Excuse me.

10   Q.   Is that report essentially in the same condition as when

11   it was printed out?  In other words, has it been changed or

12   altered in any way?

13   A.   No, it has not.

14   Q.   That's the exact report that EnCase generated?

15   A.   Yes.

16           MS. WANNARKA:  The government offers Government's

17   Exhibit 6.

18           MR. BASILE:  I have no objection, Your Honor.

19           THE COURT:  6 is admitted.

20   BY MS. WANNARKA:

21   Q.   Let's start with Government's Exhibit 6.  What image --

22   what is that image of?

23   A.   It is a picture of a vagina.

24   Q.   And that was the one image that was saved on the computer?

25   A.   Yes, the one that I found saved.

STARK - DIRECT

1    Q.  Now, with regard to that image, were you able to determine

2    what type of camera took that picture?

3    A.  Yes.

4    Q.  And what camera?

5    A.  It is a Canon EOS Digital Rebel.

6    Q.  Now, turning your attention back to Government's Exhibit

7    3, you had testified that there were 428 images and that they

8    were all deleted; is that correct?

9    A.  Yes.  It appears that way, yes.

10   Q.  Now, for an image to be deleted, does that mean it had to,

11   at one time, be on the computer?

12   A.  Yes.

13   Q.  Explain that a little bit more.

14   A.  I mean, you would have to -- it would have to be on the

15   computer for it to be deleted.  I mean, it had to get there,

16   one way or another.  Somebody had to either put it there or it

17   would be on the Internet and be downloaded and deleted off the

18   physical hard drive itself.

19   Q.  And, again, to -- to not show those pictures, if you would

20   just provide testimony whether or not there are pictures of a

21   child engaged in sadomasochistic conduct, penetration.

22   A.  Yes, there is.

23           MS. WANNARKA:  I will pass the witness.

24           THE COURT:  Anything?

25           MR. BASILE:  Yes, Your Honor.

```
1                          *–*–*–*–*–*–*–*

2                        CROSS EXAMINATION

3    BY MR. BASILE:

4    Q.  Detective Stark, as far as the computer, when someone

5    deletes a computer file, what actually happens to it?

6    A.  It goes into an area on the computer called an unallocated

7    cluster.  It is an area that has not been used on the

8    computer.  It is an unused area on the computer's hard drive.

9    Q.  And when that -- what basically happens when someone

10   deletes something off a computer, they delete off the access

11   to that file, don't they?

12   A.  In a normal environment, yes.

13   Q.  Unless you have special software that you have?

14   A.  Yes.

15   Q.  Is that correct?  You would have to have some special

16   software to be able to access those files once they are

17   deleted; isn't that correct?

18   A.  You would have to have software in order to retrieve the

19   data, yes.

20   Q.  And you found no evidence of that type of software in this

21   computer, did you?

22   A.  Not that I recall, no, sir.

23   Q.  And all the images that you found and everything but the

24   one image had all been deleted; is that correct?

25   A.  Yes.
```

STARK – CROSS

1   Q.  And can you tell by your report when they were deleted?

2   A.  No.  That information is gone.

3   Q.  Can you tell by your report how long they were on the

4   computer before someone deleted it?

5   A.  No.

6   Q.  So it could have been on a computer for a matter of just a

7   minute or two and deleted; isn't that correct?

8   A.  It is possible.

9   Q.  And you testified that the operator in this operating

10  system -- what do you mean by "operating system"?  That would

11  be like the Windows system on the computer?

12  A.  Yes.  There is an operating system listed on here.

13  Actually, there are two, but the operating system on the -- is

14  a Windows Vista. (sic)

15  Q.  And whoever basically sets up the computer, when you open

16  up Windows Vista or XP, they usually ask you for a name of

17  someone?  Is that what you are talking about, an operating

18  system?

19  A.  Are you asking about the registered owner?

20  Q.  Well, you said that there was an operating system by the

21  name of Steve?

22  A.  She asked me if there was a registered owner on the OS,

23  and it shows a registered owner of Steve.

24  Q.  And when someone starts up a computer, which they would go

25  buy a new computer at Best Buy and they are buying a new

1  computer, when you first start it up, it asks you to list a

2  name of someone who is going to be using the computer, doesn't

3  it?

4  A.  It can, yes.

5  Q.  And it asks you for a name, and you put your name in?

6  A.  Yes.

7  Q.  And then you become the registered operator of that

8  computer, don't you?

9  A.  Yes.

10  Q.  So anything that would happen on that computer would be

11  under that name, wouldn't it?  As long as there is not another

12  file opened somewhere, it could be under that registered

13  operator's name, wouldn't it?

14  A.  I would have to disagree with that, if I am following you

15  correctly.  Just because there is a file on the computer, it

16  doesn't necessarily have to be under that name.  I mean,

17  there's -- I mean, I don't think I am following you, actually,

18  correctly.

19  Q.  Well, let me rephrase it.  When you open up a computer and

20  you start the computer and it boots up, it usually shows who

21  the -- the person's name is on the front.  It has, say, his

22  name, and there may be another one that is called guest or

23  someone else, right?  There could be more than one registered

24  operator, couldn't there?

25  A.  Yes.

1    Q.  So did you find any other names on this computer as a

2    registered operator?

3    A.  There is an administrator and Steve-PC.  And there was

4    also one that is generic that is created by Microsoft

5    automatically.  It is a network connection.

6    Q.  And sometimes they have one that is called guest, right?

7    A.  Sometimes, yes.

8    Q.  But usually, you just have the one.  So anybody that did

9    anything on that computer would have been doing it under the

10   name of Steve, wouldn't they?

11   A.  It could have been done under the administrator.

12   Q.  And you can't tell by your report who did that?

13   A.  No.  Unfortunately, when you -- when it is in unallocated,

14   you lose that information.

15   Q.  Okay.  "Unallocated" just means parts of the hard drive

16   that aren't being used; is that correct?

17   A.  Correct.

18   Q.  And basically, when we are talking about a hard drive, we

19   are talking about a bunch of switches, aren't we?  That's how

20   a computer works?

21   A.  Switches.

22   Q.  Like a binary system?

23   A.  It is more like a platter, yes.

24   Q.  So those are particular places that have not had anything

25   saved on them; is that what you are talking about,

1    "unallocated"?

2    A.  Not necessarily.  But, yes, it is an area that is being

3    unused at that time.

4    Q.  Now, you also did a report on a digital camera; is that

5    correct, a Canon?

6    A.  No, I did not do that.

7    Q.  Okay.

8    A.  On the camera itself?

9    Q.  Or just maybe on the image from the camera.

10   A.  Yes.

11   Q.  All right.  And I am assuming the same principles apply to

12   that, because it is digital media, as it does to a computer?

13   As far as, is there any way of actually finding out who took

14   that photograph off of that digital media?

15   A.  The media itself, this picture was on the computer's hard

16   drive.  I don't know if you are confusing the camera with the

17   hard drive.

18   Q.  Let me rephrase the question.  So this photograph that you

19   are talking about had been saved on a computer hard drive,

20   correct?

21   A.  Yes, sir.

22   Q.  And that had been saved as a digital -- like a JPEG or

23   something like that?

24   A.  Yes, it was.

25   Q.  All right.  And there is no way of telling exactly who did

1    that by looking at the computer, is there?

2    A.  No.  Just the directory that it is under.

3    Q.  And that directory would be, what, like my pictures or

4    something like that?

5    A.  It is under Steve application data, Windows photo gallery,

6    original images, and the image name is IMG-3375.

7    Q.  IMG means image, doesn't it?

8    A.  Image.  That is created -- that is created normally by the

9    camera or the program that you are using to import the

10   picture.

11   Q.  All right.  And the original part with the name Steve is

12   on there because that's the name that the operating system is

13   named after; is that correct?

14   A.  User Steve, yes.

15   Q.  All right.  So everything in that computer that is used

16   through Steve would have his name on there somewhere?

17   A.  If it is in an allocated area on the computer, it may.  I

18   mean --

19           MR. BASILE:  May I have just a minute, Your Honor?

20           THE COURT:  You may.

21           MR. BASILE:  I have no further questions at this

22   time, Your Honor.

23           MS. WANNARKA:  Nothing further, Your Honor.

24           THE COURT:  You may step down.  Thank you, sir.

25           THE COURT:  Your next witness.

MARTIN – DIRECT

```
 1              MS. WANNARKA:  Captain Greg Martin.

 2              COURTROOM DEPUTY:  Could you raise your right hand.

 3              (Oath administered to the witness.)

 4              COURTROOM DEPUTY:  Thank you.

 5                      *-*-*-*-*-*-*-*

 6                      DIRECT EXAMINATION

 7    BY MS. WANNARKA:

 8    Q.  Captain, please tell the jury your name.

 9    A.  Greg Martin.

10    Q.  How are you currently employed?

11    A.  I am the captain of security operations at the Guadalupe

12    County Adult Detention Center.

13    Q.  Are you also a certified peace officer?

14    A.  I am.

15    Q.  How long have you been the captain for the Guadalupe

16    County Jail?

17    A.  I have been the captain at a year.

18    Q.  As part of your duties, are you also the point of contact

19    for all issues regarding inmate mail?

20    A.  I am.

21    Q.  Has a Stephen Mouton been housed at your jail?

22    A.  He has.

23    Q.  Why would a federal inmate be housed at the Guadalupe

24    County Jail?

25    A.  We have a 600-bed facility, with our current county
```

MARTIN – DIRECT

1    population being about 300, so what we do is, to offset that,

2    we sell out bed space.  The U.S. Marshals are one of our

3    clients.

4    Q.  Now, with regard specifically to inmate mail, is it

5    subject to search and inspection?

6    A.  Yes.  All mail that is not considered privileged is

7    subject to search and inspection.

8    Q.  What would privileged mail be?

9    A.  Mail to their attorneys, mail to the courts, the

10   president, places like that.

11   Q.  Is mail coming in to them searchable as mail going out

12   from them?

13   A.  Yes.  Both inbound and outbound mail is subject to the

14   same rules.

15   Q.  Now, if law enforcement wants copies of inmate mail, would

16   they go to you to make that request?

17   A.  Yes.  The sheriff has given me a directive that anybody

18   who wishes, any of our agents that wish to can contact me.

19   They request it in writing, he gives approval and we photocopy

20   that and forward it to the requesting agency.

21   Q.  Let me show you what has been marked as Government's

22   Exhibit 18, 19, 20 and 22 and 23.

23          MS. WANNARKA:  Your Honor, may I approach?

24          THE COURT:  You may.

25

MARTIN - DIRECT

```
 1    BY MS. WANNARKA:
 2    Q.  And I will ask that you look at those letters to see if
 3    you recognize them, please.
 4    A.  Yes.  These are letters that were -- that came through the
 5    facility.
 6    Q.  How are you able to identify them specifically?
 7    A.  In this particular case, we have a specific indigent
 8    envelope that has a date on it, as well as on the reverse side
 9    of the envelope, we also have the inmate's name, their
10    sheriff's office number and our information here as well, and
11    that is photocopied with the letters when we forward them on
12    to agencies, and all of these appear to have that stamp.
13    Q.  So all of those exhibits were copied by you and your staff
14    at the request of law enforcement?
15    A.  They were, correct.
16              MS. WANNARKA:  Your Honor, the government offers
17    Government's Exhibits 18, 19, 20, 22 and 23.
18              MR. BASILE:  18, 19.  What --
19              MS. WANNARKA:  18, 19, 20, 22 and 23.
20              MR. BASILE:  Your Honor, I would have some
21    objections to some of the content of these letters, pursuant
22    to prior discussions with the Court.
23              THE COURT:  Come on up.
24              (Bench conference, as follows:)
25              THE COURT:  Which exhibit number are you referring
```

MARTIN - DIRECT

1   to?

2          MR. BASILE:  Your Honor, there is some mention in

3   some of these letters about proceedings by CPS, which I think

4   would be -- they are prior bad acts --

5          THE REPORTER:  Counsel, if you could speak closer to

6   the mike.

7          MR. BASILE:  I would object to certain portions.

8   They have redacted out some portions, but other portions

9   specifically left, 22, if I remember right, that talks about

10  CPS and dealings with CPS, doctrines of CPS and court

11  proceedings, which I think would be highly prejudicial, under

12  404(b), and I would object under that, and under 609, to show

13  that he acted in conformity with what the allegations are.  To

14  those things, I object, to have those portions redacted out of

15  the letters before they go to the jury.

16         THE COURT:  Okay.  Let's do one at a time.

17  Exhibit 18.  I don't see anything in there; am I right?

18         MR. BASILE:  That is correct, Your Honor.

19         THE COURT:  18 is admitted.

20         THE COURT:  Number 19?

21         MR. BASILE:  I don't think there is anything in that

22  letter.

23         THE COURT:  19 is admitted.  Number 20?

24         MR. BASILE:  There is nothing in 20, Your Honor.

25         MS. WANNARKA:  22 and 23.

MARTIN – DIRECT

```
 1                THE COURT:  20 is admitted.
 2                MR. BASILE:  22, as I mentioned, the first part
 3     about CPS -- FBI, sheriff's department, other accusations,
 4     first part --
 5                THE REPORTER:  Counsel, closer to the mike, please.
 6                MR. BASILE:  Okay.  I'm sorry.  That is starting
 7     really with the second paragraph, Your Honor, but mainly the
 8     third paragraph, it talks about CPS being involved -- maybe a
 9     year, maybe later -- CPS representative --
10                THE COURT:  It doesn't refer to anything in the
11     past.
12                MR. BASILE:  No, that is correct.
13                THE COURT:  So the jury can walk away believing all
14     of this was as a result of them finding this stuff, and then
15     the first witness contacting the CPS.
16                MS. WANNARKA:  There is testimony that the
17     Investigator Gebauer contacted CPS.
18                MR. BASILE:  There is nothing else in that letter
19     that I have a problem with, Your Honor, on Number 22.
20                THE COURT:  Yes.  Your objections are noted on 22
21     and are overruled.
22                MR. BASILE:  Okay.
23                THE COURT:  22 is admitted.  23?
24                MR. BASILE:  I have no objection on that one.  There
25     is nothing in that one, Your Honor.  Just 22.
```

MARTIN – DIRECT

1          THE COURT:  23 is admitted.

2          (End of bench conference.)

3          MS. WANNARKA:  Your Honor, with those letters

4    admitted at this time, I would like to publish small portions

5    of a few of them.

6          THE COURT:  Granted.

7          Now you can hit the lights.

8          MS. WANNARKA:  God, Kinsey was in a coma!  Please

9    don't take this wrong because it is not directed at anyone in

10   particular, but please allow their kids to get -- but people

11   allow their kids to get so obese that their health is in

12   jeopardy and self-esteem is changed for life.  Nothing is

13   said.  I take a few pictures of A and am prosecuted to no end.

14   A would have no memory of it, and surely no adverse effects

15   had the government bullies not stepped in and raped us.

16          That was from Government's Exhibit 19.

17          From Government's 20.  I don't know what you've been

18   told but I will just give you a short synopsis.  Basically, I

19   had some pictures on my computer of Amanda and the FBI

20   deemed -- that the FBI deemed inappropriate.  I had deleted

21   them from my computer some years ago, but the feds, as if the

22   bastards don't have anything better to do, were able to

23   reconstruct those old files and come and get me.

24          Also from Government's Exhibit 20.  Margarite is

25   petitioning for divorce and is trying to take everything.

MARTIN – DIRECT

1    Rod, what I did is technically wrong, but my God, not that
2    wrong that I should lose daughter, wife, and everything else.
3    Not to mention how much time they'll want to put me away for.
4    Amanda and I were closer than I have ever been with another
5    person in my whole life and was thriving in my care.  She was
6    straight A's, a brilliant violinist, concertmaster in the
7    junior high orchestra and All City orchestra, great at tennis,
8    gymnastics, and lots of other sports that she and I would
9    play.  These were no accidents as I was closely involved in
10   all of her school and sports activities and projects.  She
11   had/has tons of common sense and a joy to be around.  She
12   always made me laugh, almost like my own private court jester.
13   Yes, she loved me, and I do her, with no reserve.  Now they've
14   taken her away.  Margarite's relationship with her was
15   extremely tumultuous.  I was the buffer between the two of
16   them.
17          From Government's Exhibit 22.  This is the main
18   reason I am writing to communicate to you both and Amanda the
19   lies the FBI and sheriff's department concocted and
20   perpetrated.  They made up things about me and M.  Basically,
21   there were some pictures.  That is all.  I deleted these
22   pictures some years ago and the FBI was able to reconstruct
23   them.  As far as Amanda and I were concerned, they were
24   destroyed.  The FBI made copies and dispersed them to many,
25   many departments and CPS, sheriff's department and so on.

MARTIN – DIRECT

1    Completely uncalled for.  I don't know what you all have been

2    told, but the pictures are all I have done, nothing more.

3            As I mentioned, the only truth is a handful of old,

4    deleted pictures.  That's all.  As you well know, Amanda and I

5    enjoyed a wonderful, wholesome relationship.  She always knew

6    I was there for her and supported her in every way.  She is

7    brilliant, talented, witty and many other things.  This was no

8    accident.  She had a father that loved her and cared.  You

9    know that!  You can only imagine the pain and sorrow I am

10   going through.  I cry for Amanda every day.  I would give my

11   whole world to be with her again.  I hope you communicate this

12   to her as well as telling her about the lies FBI and CPS told

13   her.

14           And lastly, from Government's Exhibit 23.  Okay,

15   guys.  Time to get very serious.  You will have to act on the

16   very -- act on this the very minute you receive this letter.

17   I wanted to do this on page 2 of this letter to keep prying

18   eyes away.  I am starting to shake so bear with me.

19           Fact.  The DA is hell-bent on putting me away for

20   life.  Fact.  I have been covering to protect A and M,

21   especially A, thinking I would get a short sentence and be

22   done.  As you can see, this is not to be.  Now I need

23   protection and a savior, in the name of you, B and W and A.

24   This is extremely important.

25           Fact.  A needs to tell the truth and my lawyer

MARTIN - DIRECT

1   agrees, namely, that -- asterisks -- that the young man who

2   took the pictures of her no longer lives in Boerne.  No longer

3   lives in Boerne.  It has been more than four years and she

4   can't remember his name.

5           When asked by me who he was, she would not tell.

6   Her daddy did not take the pictures.  Asterisk.  This is all

7   she needs to say.  After saying what will clam up and say

8   nothing more.

9           This is very important.  She is a minor and cannot

10  be forced to say more.  It is very important that she

11  remembers the truth, what is written between the asterisks

12  above.

13          The FBI, sheriff's department and CPS has built a

14  case against me based on scores of lies.  We will have to pull

15  together as a family and fight back.  You saw what they did to

16  you and me, all of us.  They pulled no punches with their

17  brute bullying, destruction and lies.  It is important we

18  fight back.

19          B and W have to talk to A about this immediately and

20  memorize the truth above.  They will probably retain custody

21  and I will lose my rights, but most important of all, I do not

22  need to go to prison for life.  A needs to be ready to testify

23  immediately.  Read this several times.  Call B and W, and even

24  do a conference call with B, W and A.

25          Your Honor, I will pass the witness.

HILER – DIRECT

1              THE COURT:  Any questions?

2              MR. BASILE:  I have no questions of this witness,

3    Your Honor.  Just the option to be able to introduce other

4    portions of these letters.

5              THE COURT:  You may at the time you see fit.

6              You may step down.

7              Ladies and gentlemen, at this time, let's go ahead

8    and take our afternoon break.  Again, I instruct you not to

9    deliberate about this case.  We are not anywhere near the

10   deliberation stage.

11             Don't talk about this case at all amongst

12   yourselves.  Don't talk about the evidence you have seen or

13   heard so far.  Talk about other things, take a break, and we

14   will come back in 15 minutes after the hour.

15             All rise for jury.

16             (Brief recess.)

17             THE COURT:  Please be seated.

18             MS. BRAUN:  Government calls Sean Hiler.

19             COURTROOM DEPUTY:  Could you please raise your right

20   hand.

21             (Oath administered to the witness.)

22             COURTROOM DEPUTY:  Thank you.

23                       *–*–*–*–*–*–*–*

24                     DIRECT EXAMINATION

25   BY MS. BRAUN:

HILER - DIRECT

1   Q.  Please state and spell your name for record.

2   A.  Sean Hiler.  S-e-a-n H-i-l-e-r.

3   Q.  Where are you employed?

4   A.  Texas Department of Family and Protective Services.

5   Q.  What is your occupation there?

6   A.  I am a child abuse investigator.

7   Q.  How long have you had that occupation?

8   A.  Since April of 2007.

9   Q.  Describe your educational background for the jury.

10  A.  I have bachelor's degrees in sociology, psychology and

11  criminal justice.  I have completed a master's degree in

12  business administration with emphasis on organizational

13  psychology.

14  Q.  Prior to working as a child abuse investigator, were you

15  employed as a juvenile court case manager?

16  A.  Yes, I was.

17  Q.  Where was that?

18  A.  In Clark County, Ohio.

19  Q.  What were your duties and responsibilities in that

20  occupation?

21  A.  Case management of juvenile sex offenders.

22  Q.  When you came to Texas and got a job as a child abuse

23  investigator, in that position, have you obtained any

24  specialized training?

25  A.  Yes, I have.

HILER - DIRECT

1    Q.  Describe that, please.

2    A.  I've completed the basic skills development training and I

3    have also completed advanced specialist certification -- or

4    specialist certification, not advanced specialist.

5    Q.  What does that entail?

6    A.  Various trainings on child and adolescent development.  I

7    have taken specifically sex offender classes, behavioral

8    analysis classes.  Excuse me.  Just continued education in the

9    field.

10   Q.  As a child abuse investigator, what are your duties and

11   responsibilities?  What do you do?

12   A.  My job is to investigate allegations of child abuse or

13   neglect when it comes in and to determine whether there is a

14   preponderance of the evidence to support the allegation.

15   Q.  If you are not able to support the allegation by a

16   preponderance of the evidence, what happens to those cases?

17   A.  Then we come to what is called a ruled-out finding, which

18   is essentially a civil version of not guilty, as I understand

19   it.  Then we have -- we can either close the case out with no

20   significant risk factors, close the case out with what we call

21   risk factors controlled, and, thirdly, we can continue to keep

22   the case open, if there is risk indicated to the child.

23   Q.  Okay.  If you are able to determine by a preponderance of

24   the evidence that the allegations are supported, what happens?

25   A.  We would come to a reason to believe finding, and we would

HILER - DIRECT

1    have essentially, more or less, the same options.  We could

2    close the case with risk factors controlled.  We could forward

3    the case on to our Family-Based Safety Services Unit, which is

4    up to one year of voluntary case management.  Or if the child

5    is not protected by either parent and we do not have someone,

6    a family member or relative that we feel safe placing the

7    child with, at that point, we could request that the Court

8    grant us custody, and then we would place the child in foster

9    care or at a residential treatment facility or shelter.

10   Q.  Are you familiar with the defendant in this case, Steve

11   Mouton?

12   A.  Yes, I am.

13   Q.  How are you familiar with him?

14   A.  I was the investigator on the case involving the sexual

15   abuse by him of his daughter, Amanda Mouton.

16   Q.  Were you -- was a referral made to Child Protective

17   Services on October 18th of 2007?

18   A.  Yes, there was.

19   Q.  Where did the referral come from?

20   A.  It came from our statewide intake department.

21   Q.  Was the referral made by Kendall Gebauer from the Kendall

22   County Sheriff's Office?

23   A.  I am not allowed to say where the referral was made.  That

24   is confidential.

25   Q.  Okay.  Is that when you became involved in investigating

HILER - DIRECT

1    this case?

2    A.  Yes, it is.

3    Q.  Did you contact anybody to obtain background information?

4    A.  Well, I looked through our records as to -- if -- to

5    see -- we do background checks, criminal background checks,

6    and we also do our own background checks for our agency to

7    determine if there is a case history with the family.

8    Q.  In October of 2007, were you given information that a

9    pornographic picture was located on the defendant's computer?

10   A.  Yes, I was.

11   Q.  Did that allow you to open up an investigation involving

12   Mr. Mouton?

13   A.  Yes, it did.

14   Q.  How did that investigation conclude in the fall of '07?

15   A.  It was, found reason to believe that Steven Mouton did

16   sexually abuse Amanda Mouton.  The case was closed with risk

17   factors controlled, because of the bond conditions that had

18   been set for Steven Mouton, forbidding him to have contact

19   with Amanda Mouton.

20   Q.  So Investigator Hiler, if I understand you correctly, at

21   this time, in October of 2007, it is determined that

22   Mr. Mouton can no longer live or have -- live with or have

23   contact with his daughter, Amanda?

24   A.  That was correct.  There was a period of time that the

25   Court allowed him to be at the home during the day to fix

HILER – DIRECT

1    heating and air conditioning equipment at the home, but he was

2    not to be there when she was there, and it was, I believe, for

3    only five days he was allowed to complete those projects.

4    Q.  And then with Mr. Mouton out of the home, that was

5    sufficient protection of Amanda, correct?

6    A.  Correct.

7    Q.  In April of 2008, specifically, on April 7 of 2008, were

8    you contacted again regarding Mr. Mouton?

9    A.  Yes, I was.

10   Q.  Were you asked to assist the Kendall County Sheriff's

11   Department and the FBI?

12   A.  Yes, I was.

13   Q.  What were you asked to assist with?

14   A.  I was asked to assist in possibly taking custody of Amanda

15   Mouton, because of information that Steve Mouton had been

16   allowed back in the home.

17   Q.  Did you work with the FBI and the Kendall County Sheriff's

18   Department on April 9th of 2009, (sic) when the defendant was

19   arrested and search warrants were executed?

20   A.  Yes.

21   Q.  What involvement did you have?

22   A.  My involvement during the actual -- excuse me -- raid on

23   the family's residence, I just actually just sat in the patrol

24   car while the FBI and the sheriff's department actually went

25   into the home and brought Amanda Mouton out.

HILER – DIRECT

```
 1              I went -- after she was brought out, the FBI took
 2    her down to San Antonio to Child Safe for a forensic
 3    interview, and I followed with Officer Gebauer, and we went
 4    down to the forensic interview.
 5    Q.  What is a forensic interview?
 6    A.  A forensic interview is an interview that is audio
 7    recorded and video recorded, for the purposes of allowing a
 8    child to only tell her story or his story one time, so that
 9    the victim is not repeatedly interviewed time and time again
10    during the course of the criminal or civil proceedings.
11    Q.  Was Amanda Mouton forensically interviewed on April 9th of
12    2008?
13    A.  Yes, she was.
14    Q.  After she had a forensic interview, was she returned to
15    either her mother, Margarite Mouton, or her father, Steve
16    Mouton?
17    A.  I do not believe she was.
18    Q.  Did you interview Amanda Mouton?
19    A.  I interviewed her separately with our special
20    investigator, Dennis Paez.
21    Q.  And did that take place on April 10th of 2009? (sic)
22    A.  I believe so, yes.
23    Q.  Where did that interview take place?
24    A.  At the Child Protective Services office in Boerne, Texas.
25    Q.  What was the purpose of that interview?
```

HILER - DIRECT

1    A.  We had, at this point, taken -- the State had taken

2    custody of Amanda Mouton at that point.  She was brought to us

3    so that we could take her to her foster home.  And while she

4    was there, we asked her if Steven Mouton had actually been at

5    her home and if her mother knew that he had been at the home.

6            She had answered that, yes, he had been at the home

7    for the week preceding the time that she was taken into

8    custody, and that her mother knew that he was in the home

9    during that time, that she had seen them speaking together.

10   Q.  So you mentioned earlier that there was a reason-to-

11   believe finding made that sexual abuse had occurred between

12   Mr. Mouton and his daughter Amanda, correct?

13   A.  That is correct.

14   Q.  So he would not be allowed to have custody or even contact

15   with her?

16   A.  That is correct.

17   Q.  And then with regard to her mother, Margarite Mouton, you

18   received information that Margarite Mouton allowed Mr. Mouton

19   to have contact with Amanda, therefore, putting her in danger?

20   A.  That is correct.

21   Q.  And so at that time, Amanda was taken into CPS custody and

22   put into foster care?

23   A.  That is correct.

24   Q.  Did you interview Margarite Mouton?

25   A.  Yes, I did.

HILER - DIRECT

1   Q.   When did that interview take place?

2   A.   I do not -- I do not recall the date that it took place.

3   Q.   Could it be April 11th of '09, a day after you interviewed

4   Amanda?

5   A.   Yes.

6   Q.   Do you recall where the interview of Margarite Mouton took

7   place?

8   A.   I met with her at her home, to pick up Amanda's belongings

9   to take down to the foster care.  I also spoke with her at her

10  attorney's office on a later date.

11  Q.   I'm sorry.  I said 2009.  I meant 2008.

12  A.   Oh.  2008.

13  Q.   Was it 2008?

14  A.   It was 2008.

15  Q.   Sorry.  Once I make that shift to the next year, I have a

16  hard time going back.  Did you also interview the defendant,

17  Steve Mouton?

18  A.   Yes, I did.

19  Q.   Did that interview take place on April 15th of 2008?

20  A.   Yes, it did.

21  Q.   Where did that interview take place?

22  A.   At the Central Texas detention facility.

23  Q.   Specifically, what type of room did it take place in?

24  A.   It was a visiting room.  There were multiple windows and

25  stalls set up, and Mr. Mouton and I spoke to each other

HILER - DIRECT

1   through a glass window.

2   Q.  Who was present during the interview between you and

3   Mr. Mouton?

4   A.  When I was interviewing him, it was just Mr. Mouton and

5   myself, but Warden Proctor did go and get Mr. Mouton's glasses

6   for him, so that he could read the paperwork that I handed

7   him.

8   Q.  How long did that interview with the defendant last?

9   A.  I would say approximately a half hour to 45 minutes.

10  Q.  How did you introduce yourself to him?

11  A.  I introduced myself as the investigator on the case and

12  explained to Mr. Mouton that I had a waiver of service, so

13  that I could serve him with the CPS court paperwork, and also

14  for relinquishment of parental rights, if he chose to

15  relinquish his parental rights at that time.

16  Q.  Explain that.  What do you mean, the waiver of service for

17  the CPS paperwork?

18  A.  When you file -- when the State is awarded custody of a

19  child, temporary managing conservatorship and we take custody

20  of the child, there is a hearing set within 14 days after the

21  child is taken into custody called the adversary hearing, and

22  paperwork has to be served to the plaintiffs in the case, so

23  that they know when to appear in court.

24        Normally, this is done by a process server.  That

25  can be done by CPS personnel, if the plaintiff is willing to

HILER – DIRECT

```
 1   sign a waiver of service.  That means that they are not
 2   requiring a process server to actually serve them.  They are
 3   accepting the paperwork that we give them as the paperwork.
 4   Q.  And did you explain all of that to Mr. Mouton?
 5   A.  Yes, I did.
 6   Q.  You also had with you the voluntary relinquishment of
 7   parental rights paperwork.  What is that?
 8   A.  That is paperwork where Mr. Mouton would be able to sign
 9   away his parental rights.  At that point, he would no
10   longer -- if he signed the paperwork, he would no longer be
11   considered Amanda Mouton's parent.  I explained to him that
12   our agency was going to seek aggravating circumstances and
13   seek to terminate his parental rights, and that by signing the
14   voluntary relinquishment papers, it would save Amanda from
15   having to go to a possible hearing to testify in that.
16   Q.  What does it mean to seek aggravated circumstances?  Did
17   you explain -- did you explain to him what that meant, and
18   then can you explain to the jury what that means?
19   A.  Okay.  Aggravating circumstances are circumstances that we
20   deem beyond the normal, I guess, scope of child abuse or child
21   neglect, in this case, being the pornography that was made
22   with his daughter.  In cases like that, we seek to, if there
23   are aggravating circumstances, we seek to terminate parental
24   rights, because of the egregiousness of the act.
25   Q.  And did you explain to him that this is what was happening
```

HILER – DIRECT

1   and that the State was going to seek to terminate his parental

2   rights?

3   A.  Yes, I did.

4   Q.  What did he say, if anything, about relinquishing his

5   parental rights?

6   A.  He asked to review the paperwork.  And when his glasses

7   were brought to him by Warden Proctor, he reviewed the

8   paperwork, and then he said he would have to think about it.

9   Q.  When you interviewed Mr. Mouton, did you read him or

10  advise him of his rights against self-incrimination?

11  A.  Yes, I did.

12  Q.  Why?  Are you obligated to?

13  A.  No, I am not.  I am a civil investigator, not a criminal

14  investigator, but I understood that he had an attorney that

15  was representing him in another matter, and I had spoken to

16  that attorney before I went to see if he would sign the

17  relinquishment papers or be served, and he stated that he was

18  not representing Mr. Mouton on the civil case or the federal

19  case.

20          And so when I went to speak with Mr. Mouton, I

21  explained to him that he did not need to speak to me, if he

22  did not want to, that he was entitled to have an attorney in

23  the civil litigation, and that it would require that he file

24  as an indigent, if he did not have the money for an attorney,

25  and after an indigency trial, he would be appointed an

HILER - DIRECT

1    attorney at that time.

2    Q.  Did he appear to understand what you were telling him?

3    A.  Yes, he did.

4    Q.  Did he indicate whether or not he still wanted to speak

5    with you?

6    A.  At the onset of our conversation, that was -- speaking to

7    me further was not necessarily brought up.  When I explained

8    to him that we were going to be terminating or seeking to

9    terminate his parental rights, he asked if we would also be

10   seeking to terminate Margarite Mouton's parental rights, and I

11   stated that that was a possibility.

12          At that point, he stated that he wanted to put in a

13   good word for Margarite Mouton.  And I, once again, told him

14   he didn't need to speak to me, if he didn't have an attorney.

15   And he said:  No.  He said:  You are only looking at the legal

16   aspect of this.  You don't understand the emotional aspect of

17   it.  At that point, I sat down and he began to tell me what he

18   thought the emotional aspect was.

19   Q.  What do you recall him telling you?

20   A.  He stated that I did not understand the relationship that

21   he and Amanda Mouton had.  He stated that it was a beautiful

22   relationship and that the pictures that he took of her, she

23   enjoyed having them taken.  I told him that from having seen

24   her reaction to having seen the pictures, she did not seem to

25   appreciate it.

HILER - DIRECT

1    Q.  When he talked about it being beautiful, did he tell you

2    what he and Amanda called their picture-taking sessions?

3    A.  Yes.  He called it -- he said that they called it sexy

4    time and sexy pictures.

5    Q.  Did he tell you how long he had been taking pictures of

6    this little girl?

7    A.  He stated that he had been taking pictures of her

8    essentially since the time they adopted her and that he had

9    documented her growth into a woman with these pictures.

10   Q.  Did he indicate to you whether or not he had stopped

11   taking pictures of Amanda?

12   A.  Yes, he did.  He stated that he had stopped taking

13   pictures in the recent past, at the point of my interview with

14   him, because he felt that it was wrong and that she would not

15   like having those pictures being around as she grew older.

16   Q.  When you indicated to Mr. Mouton that Amanda didn't seem

17   to have a good reaction when she saw the pictures, what

18   specifically do you recall telling him?

19   A.  I believe I told him that she did not -- when he said that

20   she enjoyed having the pictures taken, I said that she did not

21   appear as though she enjoyed it when the pictures were shown

22   to her at the forensic interview.

23   Q.  What was his reaction?

24   A.  He stated, they didn't show her the pictures where I

25   penetrated her, did they?  And I stated that they had, and he

HILER - DIRECT

1    said that -- he said something about calling the FBI bastards.

2    "I hate the FBI, those bastards," I believe is what he said.

3    Q.  Did he indicate anything else about Amanda's condition

4    when he would sexually penetrate her?

5    A.  Yes.  He stated that she was always asleep during this

6    time and that she did not know that it was going on.

7    Q.  Did Mr. Mouton give you any indication as to the amount of

8    knowledge, if any, his wife, Margarite Mouton, had that -- of

9    Mr. Mouton either taking pornographic pictures of Amanda or

10   having sex with Amanda?

11   A.  He stated that she had no idea that it was going on, that

12   it either happened while she was at work or out of the home

13   for some other reason.

14   Q.  Did you talk to Mr. Mouton also about whether he had had

15   recent contact with Amanda, whether he had been in the home in

16   the last week?

17   A.  Yes, I did.  And he stated that he had, indeed, been in

18   the home and that Margarite Mouton had asked him to come

19   into -- come back into the home.  He stated that he moved back

20   into the home as soon as the safety plan that CPS, that I had

21   made with Margarite Mouton expired, when the case was -- the

22   first case that I had with the family was closed.

23        He stated that shortly after the safety plan had

24   ended, Margarite Mouton asked him to come back into the home,

25   because she felt that it was in Amanda's best interests that

HILER - DIRECT

1    her father be in the home.

2    Q.  After Mr. Mouton admitted to you that he had sexually

3    penetrated his daughter and that there were pictures of it,

4    did he talk about the relationship -- how Amanda felt about

5    him or how he thought Amanda felt about him?

6    A.  Yes.  He stated that, he told me -- let me see.  He told

7    me that if I were to ask Amanda if she wanted to go back home,

8    she would say yes, that she enjoyed the time that they had

9    together, taking the pictures and life in general at the home.

10   Q.  How did you respond to that?  Well, based on your training

11   and experience, were you surprised to hear that?

12   A.  No.  Because of Stockholm Syndrome, children that are

13   abused generally do not like the abuse when it first begins,

14   but they begin to grow comfortable with it, accepting it as a

15   normal part of life, and I stated that it was not uncommon for

16   this to happen in children or victims of sexual abuse.

17           Mr. Mouton told me that she was a very well-adjusted

18   young girl, that she was doing well in school and was a

19   virtuoso on the violin.  And I stated that, yes, that she was

20   doing well in school, and that she was very talented, but her

21   excelling in school and just the wonderful job that -- that

22   she has made out of her life has been due to her resiliency,

23   not to her love for the relationship.

24   Q.  Did the interview end shortly after that?

25   A.  Yes, it did.  It ended just a couple of minutes after

1    that, and he had asked me on –– as I was getting ready to

2    leave, he asked me if I would tell Amanda something for him.

3    And I said:  What is that?

4              And he said:  Will you tell her I like pie?

5              And he said there is no sexual connotation to it.

6    He said it is just something between me and her.  She will

7    know what I am talking about.  It is a line from SpongeBob

8    SquarePants.  And that was the –– I believe the last thing

9    that we said to each other.

10   Q.  Did you have any further contact with Mr. Mouton after

11   April 15th of '08?

12   A.  No, I did not.

13             MS. BRAUN:  Thank you.  Nothing further.

14             THE COURT:  Any questions?

15             MR. BASILE:  Just a couple, Your Honor.

16                      *–*–*–*–*–*–*–*

17                    CROSS EXAMINATION

18   BY MR. BASILE:

19   Q.  Is it Hiler; is that correct?

20   A.  Hiler.  That is correct.

21   Q.  And you are the CPS investigative worker; is that correct?

22   A.  That is correct.

23   Q.  So was there ever any type of legal proceedings filed on

24   this particular case?

25   A.  Yes, there were.  Once I had requested the order to remove

HILER – CROSS

1    from the Kendall County judge and that was given to me, at

2    that point, there is the adversary hearing.  Once a child is

3    taken into custody, they have the adversary hearing within 14

4    days after CPS takes custody.  The case was forwarded on to

5    our conservatorship unit and that was assigned to another

6    worker.

7    Q.  So after the adversary hearing, or what is called the 262

8    hearing, it proceeded on to the other phase; is that correct?

9    A.  That is correct.

10   Q.  All right.  And isn't it true, ultimately, in the case,

11   Mr. Mouton signed his rights away to his child?

12   A.  I believe that is the case.  I wasn't involved after the

13   investigation.  I am not sure.

14   Q.  So after the 262 hearing, the adversary, you were not

15   involved in the case anymore?

16   A.  That is correct.

17              MR. BASILE:  I have no further questions, Your

18   Honor.

19              THE COURT:  Anything further?

20              MS. BRAUN:  Nothing further.  Sorry.

21              THE COURT:  You may step down.  Thank you.

22              MS. BRAUN:  Government calls Susan Landrum.

23              COURTROOM DEPUTY:  Could you raise your right hand.

24              (Oath administered to the witness.)

25              COURTROOM DEPUTY:  Thank you.

LANDRUM - DIRECT

```
1                    *-*-*-*-*-*-*-*

2                 DIRECT EXAMINATION

3    BY MS. BRAUN:

4    Q.  Please state your name, and spell your last name for the

5    record.

6    A.  My name is Susan Landrum, L-a-n-d-r-u-m.

7    Q.  What is your occupation?

8    A.  I am a Child Protective Services caseworker.

9    Q.  How long have you been a Child Protective Services

10   caseworker?

11   A.  For two and a half years.

12   Q.  Who is your employer?

13   A.  The State of Texas, Department of Family and Protective

14   Services.

15   Q.  What is your educational background?

16   A.  I have a finance degree, a bachelor's degree from Austin

17   College.

18   Q.  As a Child Protective Services caseworker, do you have any

19   specialized training in how to perform those job functions?

20   A.  The State has a very rigorous training program.  I have

21   over 600 hours of training, most of which I received before

22   taking any cases.

23   Q.  What are your duties and responsibilities as a caseworker?

24   A.  I am what is called a legal caseworker, and my

25   responsibilities include working with the children who have
```

LANDRUM - DIRECT

1   been brought into the custody of the State.  I work with the

2   foster families, who are placements for the children who have

3   been removed from their parents, and I work with the parents,

4   to help in any way that I can to help them with their services

5   in an effort to be reunified with their children.

6   Q.  So CPS has different types of caseworkers?

7   A.  That's right.

8   Q.  There is the legal caseworker, which you are?

9   A.  Yes.

10  Q.  And then there are investigative caseworkers?

11  A.  Yes.

12  Q.  And what does an investigative caseworker do?

13  A.  An investigative caseworker is the caseworker who goes out

14  when we receive a referral.  We have a statewide database and

15  800 number, so if a call comes in where there is abuse or

16  neglect that has been alleged, the investigator gets that case

17  and then works the case, goes out to meet with the families,

18  goes out and talks to the children, talks to any collaterals

19  that may have, you know, called the referral in.  And the

20  investigator then, along with the supervisor and program

21  director, makes a decision, ultimately, whether or not to

22  recommend that the child is removed from the parent's care.

23          Sometimes a child isn't removed and they discover

24  that the call didn't warrant abuse or neglect, and sometimes

25  the investigator makes a recommendation that the case goes to

LANDRUM - DIRECT

 1   Family-based Services, where the children remain in the
 2   custody of their parents, but we give them services to
 3   perform -- to help them do better, you know, address the
 4   issues that were discovered in their families that led us to
 5   get into their lives.
 6   Q.  Is it safe to say the investigative caseworker
 7   investigates the case and then develops a safety plan, finds a
 8   safe place for this child, whether it is with one parent, both
 9   parents or none of their parents?
10   A.  Correct.
11   Q.  And so if -- as a legal caseworker, you are not involved
12   in every case that comes in through CPS?
13   A.  Correct.
14   Q.  If there -- are you only involved if the child is removed
15   from both parents?
16   A.  No.
17   Q.  I'm sorry.  Or are there times when you are involved in a
18   case even when a child is left with one or both parents?
19   A.  You are right.  The second one.  And the way that works --
20   I'm sorry.  Right.  The way that works is, in cases where the
21   child is brought into state custody, but we place the child
22   with one parent or the other, I would work -- I would work
23   with both parents that way, and I would have the child on my
24   case load.
25   Q.  Do you know Amanda Mouton?

LANDRUM – DIRECT

1    A.  I do.

2    Q.  How do you know her?

3    A.  She is one of the children on my case load.

4    Q.  And when did you become involved in her case?

5    A.  In November of last year.

6    Q.  November of 2008?

7    A.  Yes.

8    Q.  Amanda Mouton was assigned a CPS caseworker in April of

9    2008, correct?

10   A.  That is correct.

11   Q.  Why?

12   A.  She was assigned a caseworker because she was removed from

13   the custody of her parents and was taken into the custody of

14   the State.

15   Q.  So from April of 2008, the State of Texas had custody of

16   her?

17   A.  Correct.

18   Q.  And was there another legal caseworker, someone who has

19   the same job responsibilities you do, that had her case from

20   April until November, when you took over?

21   A.  Yes.

22   Q.  When you became involved with Amanda in November of 2008,

23   what do you do first?

24   A.  I meet with Amanda.  I talk to therapists, read the --

25   read the case files, so that I know exactly what has been

LANDRUM - DIRECT

1    alleged to have happened to her.  I speak with the parent -- I

2    spoke with the parents.  I didn't speak with Mr. Mouton in

3    November, but I did with Mrs. Mouton.

4    Q.  As part of your investigation or research into the file,

5    did you obtain a copy of Amanda Mouton's birth certificate?

6    A.  We do have a birth certificate, yes.

7                MS. BRAUN:  May I approach, Your Honor?

8                THE COURT:  You may.

9    BY MS. BRAUN:

10   Q.  I am showing you what has been marked for identification

11   as Government's Exhibit 9 and ask that you take a look at it.

12   Do you recognize that?

13   A.  I do.

14   Q.  Is that a certified copy of -- excuse me -- the birth

15   certificate for Amanda Mouton?

16   A.  Yes, it is.

17               MS. BRAUN:  Government offers Exhibit 9.

18               THE COURT:  Any objection?

19               MR. BASILE:  I have no objection, Your Honor.

20               THE COURT:  9 is admitted.

21   BY MS. BRAUN:

22   Q.  Where was Amanda Mouton born?

23   A.  She was born in China.

24   Q.  And what is her birthdate?

25   A.  Her birthdate is February 4 -- no.  Excuse me.  February

LANDRUM – DIRECT

1    16th, 1995.

2    Q.   Did you learn how Amanda Mouton came to the United States

3    from China?

4    A.   I did.

5    Q.   How did she?

6    A.   She was --

7    Q.   Under what circumstances did she get here?

8    A.   Mr. and Mrs. Mouton adopted her through an adoption agency

9    in the state of Colorado.

10   Q.   And was she adopted in 1997?

11   A.   Yes.

12   Q.   And from 1997 until April of 2008, did she live with both

13   Steve Mouton and Margarite Mouton?

14   A.   Yes.

15   Q.   Is Amanda Mouton a United States citizen now?

16   A.   No, she is not.

17   Q.   Why not?

18   A.   I don't know why not.  I mean, the short answer would be

19   that her parents did not seek citizenship for her.

20   Q.   Is that something they would normally be given information

21   about from the adoption agency?

22   A.   Yes.  As a matter of fact, I called the adoption agency.

23   We were trying to get a passport for Amanda to travel with her

24   aunt and uncle, and we were having difficulty getting a

25   passport, so I ended up calling the adoption agency, who had

LANDRUM - DIRECT

```
1    sponsored the adoption, and they said that they had given the
2    Moutons the information to attain citizenship for their
3    adopted child and had never, according to their records, had
4    not followed through.
5            They said typically, adoptive parents, they ask the
6    adoptive parents to get back with them so they can complete
7    their records regarding the adoption and the citizenship, and
8    they did not contact the adoption agency after -- after taking
9    Amanda.
10   Q.  Is this -- have you recently found out that she is not a
11   U.S. citizen?
12   A.  Very recently.
13   Q.  You were trying to get a passport for her only in the last
14   few weeks; is that correct?
15   A.  Within the last month, month and a half.
16   Q.  Have you been able to speak to either Margarite Mouton or
17   Steve Mouton about why they didn't file or why they didn't
18   secure her citizenship?
19   A.  I have not spoken with Mr. Mouton.  Mrs. Mouton, I spoke
20   with her on two occasions.  One was to find the passport,
21   because she -- somehow, we were under the impression that one
22   existed.
23           And she said that Mr. Mouton kept all of their
24   records and she didn't know where they were.  When I called
25   her subsequently, she -- she seemed to realize, when I was
```

LANDRUM - DIRECT

1   explaining what I was looking for, in terms of a citizenship

2   card, it has got specific lettering and coloring, she said

3   that she had never seen that before, and I asked her

4   specifically if they had gone through the process, and she

5   said she didn't -- didn't think that they had.

6   Q.  Have you ever met with Mr. Mouton?

7   A.  I have on one occasion.

8   Q.  And what was the purpose of that meeting?

9   A.  I found out that he was -- we had thought he was

10  incarcerated in another facility.  I found out that he was

11  incarcerated in Seguin, which is close, and I -- although he

12  had not elected to work any services on his service plan, it

13  is customary for a caseworker to meet with the parents, so I

14  went to the jail and talked to him for probably 45 minutes.

15  Q.  Have you worked with Margarite Mouton?

16  A.  Yes.

17  Q.  What was the purpose of that?

18  A.  The purpose was to try to help Margarite work her services

19  on her family plan of service that was developed, to help her

20  to be able to be reunified with the child.

21  Q.  From the time Amanda was taken out of the house in April

22  of 2008, was there a plan to reunify her with Mr. Mouton?

23  A.  Let me -- let me explain how the CPS works.  We always

24  have a plan initially, unless we get some aggravated

25  circumstances, which we didn't in this case.  We always begin

LANDRUM - DIRECT

1   the case with the thought to reunify.

2           Certainly, because Mr. Mouton was incarcerated, you

3   know, a reasonable thought would be that she would not be able

4   to return to him, but we did offer him the service plan, and

5   we actually have a lot of fathers who are in prison who seek

6   services through prison or jail.  So while I don't think we

7   thought we would be able to reunify, just based on his

8   incarceration, the plan began that way, that we would reunify

9   her with the family.

10  Q.  And he was offered services?

11  A.  He was.

12  Q.  But he opted not to take any of them?

13  A.  Yes.

14  Q.  So for a while, you worked on possible reunification

15  between Amanda and her mother, Margarite Mouton?

16  A.  Yes.

17  Q.  At some point, did that plan for reunification end?

18  A.  Yes.

19  Q.  When was that, if you remember?

20  A.  I am going to say it was around April or May.  Maybe

21  earlier than that, in the spring.

22  Q.  And what is the status of Steven Mouton's parental rights

23  right now?

24  A.  They have been terminated.

25  Q.  Did he voluntarily relinquish those?

LANDRUM - DIRECT

```
 1   A.  Yes, he did.

 2   Q.  What about Margarite Mouton?  What about her parental

 3   rights?

 4   A.  Her parental rights have been terminated as well.

 5   Q.  Did she voluntarily relinquish those?

 6   A.  Yes, she did.

 7   Q.  When Amanda was first removed from the Mouton's home in

 8   April of 2008, she was placed in foster care, correct?

 9   A.  Correct.

10   Q.  How long did she stay in foster care?

11   A.  She was in a foster home from April until -- of '08 until

12   August 15th of '08.

13   Q.  And in August of '08, where did she get moved to?

14   A.  She was moved to her paternal aunt and uncle's home.

15   Q.  And is she currently living there?

16   A.  Yes.

17   Q.  How is she doing?

18   A.  She is doing very well.  She is doing very well.

19   Q.  Have you met with Amanda on a number of occasions?

20   A.  Yes.

21   Q.  Do you talk to her on a regular basis?

22   A.  Yes.

23   Q.  Would you recognize her in photographs?

24   A.  Yes.

25          MS. BRAUN:  May I approach, Your Honor?
```

LANDRUM – DIRECT

```
 1              THE COURT:  You may.

 2              MS. BRAUN:

 3    Q.  I am going to show you what has been marked for

 4    identification as Government's Exhibits 10 through 15 and ask

 5    that you take a look at those.

 6    A.  That is Amanda.

 7    Q.  You recognize those?

 8    A.  I do.  I do.

 9    Q.  All right.  And that is Amanda Mouton in each one of the

10    photographs?

11    A.  In each one, yes.

12              MS. BRAUN:  Government offers Government's Exhibits

13    10 through 15.

14              THE COURT:  Any objections?

15              MR. BASILE:  I have no objection, Your Honor.

16              THE COURT:  10 through 15 are admitted.

17              MS. BRAUN:  Your Honor, I would ask to briefly

18    publish Government's Exhibits 10 through 15.

19              THE COURT:  You may.

20              MS. BRAUN:  Exhibit 10, 11, 12, 13, 14, and

21    Exhibit 15.

22              I have no further questions.

23              THE COURT:  Any questions?

24              MR. BASILE:  Just a couple, Your Honor.

25                        *–*–*–*–*–*–*–*
```

LANDRUM – CROSS

```
 1                    CROSS EXAMINATION
 2   BY MR. BASILE:
 3   Q.  Is it Ms. Landrum?
 4   A.  It is.
 5   Q.  And you said you have been a case worker for a couple of
 6   years; is that correct?
 7   A.  Yes.
 8   Q.  Now, you mentioned when they went to the final on this, on
 9   this matter with the court, in the state courts, Mr. Mouton
10   signed a voluntary relinquishment; is that correct?
11   A.  Yes.
12   Q.  Isn't it true that in a voluntarily relinquishment, the
13   only grounds listed is that it is for the best interests of
14   the child; is that correct?
15   A.  I don't think that is correct, but I -- the grounds would
16   be relinquishment of rights.
17   Q.  Okay.  And that is done voluntarily, right?
18   A.  Correct.
19   Q.  And that is done because the parent thinks that is what is
20   best for the child --
21   A.  Yes.
22   Q.  -- is that correct?
23   A.  Yes.
24   Q.  It is not done because the courts made any finding that
25   the parents have done anything wrong; is that correct too?
```

LANDRUM – REDIRECT

1   A.  That is correct, yes.

2   Q.  And, in fact, you stated that no aggravating circumstances

3   were found in this case; is that correct?

4   A.  We didn't pursue that.

5          MR. BASILE:  I have no further questions, Your

6   Honor.

7          THE COURT:  Anything further?

8          MS. BRAUN:  Yes, Your Honor.

9                        *–*–*–*–*–*–*–*

10                    REDIRECT EXAMINATION

11  BY MS. BRAUN:

12  Q.  You said you didn't pursue the aggravated circumstances in

13  this case.  Is that because both parents did voluntarily

14  relinquish their parental rights?

15  A.  No.  I honestly do not know why.  It wasn't my case at

16  that time.  We would have had to ask the judge to pursue that

17  line at the adversary hearing within the first month of --

18  about the first month of the case, and I don't know why they

19  didn't -- they chose not to.

20  Q.  So in this case, both parents voluntarily relinquished

21  their parental rights.  Had they not, what would have

22  happened?

23  A.  We would have gone to trial.  We have -- it is called a

24  trial on merits, where the State presents its evidence as to

25  why we believe it is in the child's best interests to have the

LANDRUM - RECROSS

1    judge grant termination of rights, or a jury, if they've

2    elected for a jury trial.  And then the defendants, you know,

3    get to give evidence as to why that isn't in the best

4    interests, and then a decision is made.

5              MS. BRAUN:  Thank you.  Nothing further.

6              THE COURT:  Anything further?

7              MR. BASILE:  Just one or two, Your Honor, just as

8    follow-up.

9                        *-*-*-*-*-*-*-*

10                     RECROSS EXAMINATION

11   BY MR. BASILE:

12   Q.  At a trial that is done, there have to be actual grounds

13   shown as to why a child's -- or a parent's rights should be

14   terminated; isn't that correct?

15   A.  Correct.

16   Q.  And there were no actual grounds in this matter because

17   they signed an authorization voluntarily giving up their

18   rights; is that correct?

19   A.  Well, it didn't go to trial, because they voluntarily

20   relinquished their rights before they went to trial.

21   Q.  So there were no grounds found why the rights were

22   terminated by any court?

23   A.  No, because we didn't have a trial, correct.

24              MR. BASILE:  No further questions, Your Honor.

25              MS. BRAUN:  Nothing further.  Thank you.

COX – DIRECT

1              THE COURT:  You may step down.  Thank you.

2              THE WITNESS:  Thank you.

3              THE COURT:  Your next witness.

4              MS. WANNARKA:  Special Agent Charlie Cox.

5              COURTROOM DEPUTY:  Could you raise your right hand.

6              (Oath administered to the witness.)

7              COURTROOM DEPUTY:  Thank you.

8              MS. BRAUN:  Your Honor, may Ms. Landrum stay in the

9    courtroom now, that she has been excused from the testimony?

10             THE COURT:  Any opposition to that?

11             MR. BASILE:  If she is not going to be recalled as a

12   witness, I have no problem with that.

13             MS. BRAUN:  She will not be.

14             THE COURT:  She is excused from the rule.

15             MS. WANNARKA:  Thanks.

16                    *–*–*–*–*–*–*–*

17                  DIRECT EXAMINATION

18   BY MS. WANNARKA:

19   Q.  Special agent, good afternoon.

20   A.  Good afternoon.

21   Q.  Please tell the jury your name.

22   A.  My name is Charles Cox.

23   Q.  How are you currently employed?

24   A.  I am currently a special agent with the Federal Bureau of

25   Investigation here in San Antonio, Texas.

COX - DIRECT

1   Q.  What are your duties?

2   A.  I am assigned as a computer forensic examiner for the San

3   Antonio Division of the FBI.  In those duties, I am charged

4   with basically providing forensic analysis of digital media

5   for the FBI cases that are -- as requested.

6   Q.  Tell the jury a little bit about your educational

7   background with regard to your current certifications as a

8   computer examiner.

9   A.  I have a bachelor of arts in economics from Vanderbilt

10  University.  Prior to joining the FBI, I was employed as a PC

11  hardware and software support analyst, providing hardware --

12  basically maintenance and repair for corporations, until I

13  started with the FBI in 1998.

14          After my employment with the FBI as a special agent,

15  I was tasked with investigating crimes of cyber and

16  counter-terrorism investigations.  As part of that, I was also

17  then tasked or actually requested to join the computer

18  analysis response team, which is the Bureau's forensic

19  analysis division.

20          Back -- that was in 2000.  Subsequent to that,

21  enrollment in the program, I have attended over 500 hours of

22  training in computer forensics, hardware, computer hardware,

23  software design, the forensic analysis, preservation and

24  presentation of digital data in a readable manner to the case

25  agents and investigators.

COX – DIRECT

1          I have also obtained certification through the FBI

2    as a certified forensic examiner in computers, cellphones,

3    personal digital assistants, and other digital media, as

4    presented in investigation.  I have testified in -- I believe

5    this would be my fifth testimony in federal court as an

6    expert.

7    Q.  Have you also participated in the training of new computer

8    examiner agents?

9    A.  Yes.  Part of our certification process, I have on-the-job

10   trainees that are entering into the program.  I am tasked as a

11   coach, basically.  We have a very rigorous certification

12   process, that it took me approximately two years to obtain the

13   certification, once I had begun the process.

14          We have basically -- beyond the technical classes,

15   we also have, basically, presentations, sort of how to relate

16   technical terms in more of an understandable format.  We also

17   have yearly proficiency examinations, where we are tested by

18   our FBI headquarters to make sure that we are following our

19   standards and quality assurance manual.

20          MS. WANNARKA:  Your Honor, at this time, the

21   government tenders Special Agent Cox to the Court as an expert

22   in computer forensics.

23          THE COURT:  Any opposition?

24          MR. BASILE:  No opposition, Your Honor.

25          THE COURT:  He is so recognized.

COX – DIRECT

1    BY MS. WANNARKA:

2    Q.  Special Agent, I would like to turn your attention to the

3    case at hand.  Were you asked to analyze some media cards in

4    this case regarding Stephen Mouton?

5    A.  Yes, ma'am.  I was.

6    Q.  What is a media card or a camera card?

7    A.  Basically, a media card, in this instance, is a digital

8    storage device.  It is -- some people would refer to it as a

9    memory stick, a small card used to store digital data, in this

10   instance, from a digital camera, primarily, in this case.  A

11   digital camera takes a picture, no longer using film, as we

12   used to know it, and stores the digital file on this digital

13   card, enabling us to transfer it between the camera, the

14   computer, store it for future use, in that manner.

15   Q.  What is the procedure for analyzing a media card?

16   A.  As part of our standard operating procedures and quality

17   assurance, our first step, we will inspect and inventory all

18   of the evidence that is presented to us.  We will then, using

19   write-blocking software and hardware devices to make sure we

20   do not change the original evidence in any way, we will make a

21   digital image or a copy of the data contained on these media

22   devices.

23        And as part of that copying, yes, we generate an

24   MD5 hash.  It is a digital signature, if you will, of the data

25   contained on that device.  Any change or if the data is

COX - DIRECT

1    altered in any way, that MD5 hash will not match anymore, and

2    we will know something has happened.  But we will obtain this

3    MD5 hash at the beginning of our examination.

4            We will then return the original evidence back to

5    our evidence storage, and we will then examine the digital

6    copy that we have, that we have identified, to make sure that

7    the MD5 hashes match, so that it is an exact copy of the

8    original.

9    Q.  How many media cards were you asked to analyze?

10   A.  I was asked to analyze three digital media cards in this

11   examination.

12   Q.  And when you did so, did you follow the procedure that you

13   just told the jury?

14   A.  Yes, ma'am.  I did.

15   Q.  When you received the evidence in this case, who did you

16   receive the evidence from?

17   A.  I received the evidence from the case agents, Larry Baker,

18   and that was how I obtained the evidence in this matter.

19   Q.  And had they just seized that evidence from a search

20   warrant from the defendant's home?

21   A.  I really don't know what time they got it.  I just know

22   that I received it in our chain of custody from Special Agent

23   Baker.

24   Q.  When you received that property, what all did you receive?

25   A.  I received a camera bag, a black, leather camera bag that

COX - DIRECT

1    has one main compartment that contained a camera, power

2    supply, I think an extra battery, some lenses, and on the

3    outside had two pockets, one on either side, one down the long

4    side.

5            And inside the bag was the digital camera.  Inside

6    that camera was a digital media card, and then one of the side

7    pockets was two media card holders containing a media card in

8    each one.

9    Q.  I would like to call your attention to the camera that is

10   there on the witness stand, which has been marked Government's

11   Exhibit 32, and I will ask you to look at that camera and then

12   tell the jury if you recognize it.

13   A.  Yes, ma'am.  I do.  This is the camera that was contained

14   in the camera bag.  As a part of our inventory process, we

15   place a label identifying with our laboratory number, in this

16   instance, QSA-1, with the case number, a date and also my

17   initials.

18   Q.  Where was that camera manufactured?

19   A.  This camera was made in Taiwan.

20   Q.  And also, I believe on the witness stand is Government's

21   Exhibit No. 7, and I will ask you to look at that.

22           Was that one of the media cards that you analyzed in

23   the grouping of three?

24   A.  Yes, ma'am.  This was one of the cards, in its container,

25   in the side pocket.  It also has the labeling that I was

COX – DIRECT

```
 1   using.  I used QSA-1.  I used an underscore 2.  The three

 2   media cards were underscore 1, underscore 2, and underscore 3,

 3   and this one is underscore 2.  And, once again, it contains

 4   our case number, the date, and my initials on it as well.

 5   Q.  Where was that camera card, Government's Exhibit 7,

 6   manufactured or made?

 7   A.  This card was manufactured in China.  It actually has

 8   China on the side.

 9           MS. WANNARKA:  Your Honor, the government offers

10   Government's Exhibits 32 and 7.

11           THE COURT:  Any objection?

12           MR. BASILE:  No objection, Your Honor.

13           THE COURT:  7 is admitted.  32 is admitted.

14   BY MS. WANNARKA:

15   Q.  Of the three media cards you analyzed, did one of them

16   contain child pornography?

17   A.  Yes, ma'am, it did.

18   Q.  And is that Government's Exhibit 7?

19   A.  Yes, ma'am.  It is.

20   Q.  Did you create a report or was a report generated by

21   virtue of the FTK software you used to conduct the analysis?

22   A.  Yes, ma'am.  In order for me to complete this analysis,

23   the digital image that I made of this media card was processed

24   using a software, one of our approved tools from a company

25   called Access Data, named Forensic Toolkit, which will
```

COX – DIRECT

1    retrieve deleted files, will also retrieve files that are in

2    the drive free space, and basically presents it in a more

3    readable format, that we can then create a report from that,

4    so that we can provide it to the investigator, and that is the

5    tool I used for this exam.

6    Q.  I am showing you -- or I will be showing you what has been

7    marked Government's Exhibit 8, and I will ask you to take a

8    look at that and tell us if you recognize it.

9    A.  Yes, ma'am.  That is my report.

10   Q.  That is the report that you created from Government's

11   Exhibit 7?

12   A.  Yes, ma'am.  On the report itself, it actually, as part of

13   the path of the individual images, it has QSA-1 underscore 2,

14   which actually matches up to my labeling and identification of

15   that card.

16   Q.  And in your review of that report, is it the original

17   report as it was generated?  Has it been altered in any way?

18   A.  I have not seen any altercation -- I mean, alterations.

19   It is my report and my original report, yes, ma'am.

20          MS. WANNARKA:  Your Honor, government offers

21   Government's Exhibit 8.

22          MR. BASILE:  May I have a minute, Your Honor?  I

23   would object to the report.  It is not same report that was

24   provided to me.  The front part is not the same.

25          THE COURT:  Why don't you come on up.

COX - DIRECT

```
 1              (Bench conference, as follows:)

 2              MS. WANNARKA:  This report has never been provided,

 3     because it is a report of child pornography.  It is a report

 4     of the images that were taken from the media card.

 5              THE COURT:  It doesn't contain this part which --

 6              MR. BASILE:  It doesn't contain this part.

 7              MS. WANNARKA:  I am -- going to offer this part

 8     also.  I was just interested in offering the images.

 9              THE COURT:  Which part are you trying to offer?  Are

10     you trying to offer the images?

11              MS. WANNARKA:  The images.

12              THE COURT:  Okay.

13              MS. WANNARKA:  I can specify that it is the images.

14              THE COURT:  So what part are you objecting to?

15              MR. BASILE:  Well, it is not a complete report, if

16     it doesn't have the information that shows how he got the

17     images --

18              MS. WANNARKA:  If I would have offered that, you

19     would have objected to that as hearsay, because that is what

20     he just testified to.  I mean, I will be happy to offer that.

21              THE COURT:  Six, seven, and eight is consisting of

22     what?

23              MS. WANNARKA:  Eight are the images of child --

24              THE COURT:  I know that, but what is confusing me is

25     you are wanting to also now add on to this or not?
```

COX - DIRECT

1              MS. WANNARKA:  No, I do not want to.

2              THE COURT:  Okay.

3              MS. WANNARKA:  I am just trying to appease --

4              THE COURT:  What is your objection?

5              MR. BASILE:  My objection is that the report is not

6     a complete report that he has.  It is just bits and pieces,

7     just images here, which -- this is the actual report that I

8     was provided.

9              THE COURT:  So you believe the more accurate

10    representation of 8 is plus this?

11             MR. BASILE:  Yes, Your Honor.

12             THE COURT:  What is your response to that?

13             MS. WANNARKA:  Your Honor, my response would be I

14    would like to reword what the images are.  I don't need that

15    in.  I need the images in, so I would reword or have him

16    clarify that the report is of the child pornography images and

17    the metadata.

18             THE COURT:  Why don't you go back and let's clean it

19    up.

20             MS. WANNARKA:  Okay.  Thank you.

21             (End of bench conference.)

22    BY MS. WANNARKA:

23    Q.  Special Agent Cox, with regard to Exhibit 8, this report

24    is essentially a listing of the child pornography images that

25    you recovered during your forensic analysis; is that correct?

COX - DIRECT

1   A.  Yes, ma'am.

2   Q.  It is not a detailed script of every step you took and

3   every time you checked evidence out?  It is merely just a

4   report or a culmination of the images you recovered?

5   A.  Yes, ma'am.  That report, as submitted, is basically the

6   compilation of the images that came from that forensic

7   analysis.  The forensic analysis actually can generate --

8   recover documents, things like that nature, which were not in

9   this event.  But for presentation in a more readable format to

10  the case agent, I basically print out a report of the images,

11  which were the child pornographic images and others recovered

12  from that media card.

13  Q.  And so if I represented it as a general report, that would

14  have been maybe an overstatement?  That is, in fact, just the

15  images and the data regarding the images?

16  A.  Correct.

17          MS. WANNARKA:  Your Honor, government offers

18  Government's Exhibit 8 into evidence.

19          THE COURT:  Any objection?

20          MR. BASILE:  No objections, with the clarification,

21  Your Honor.

22          THE COURT:  8 is admitted.

23  BY MS. WANNARKA:

24  Q.  Special Agent Cox, when you discovered the child

25  pornography on the media card, Government's Exhibit 7, did you

COX – DIRECT

1    find whether or not those images were deleted?

2    A.  Yes, ma'am.  I did.  All of the images on the media card

3    were deleted.

4    Q.  Did they have a single deletion date you were able to

5    recover?

6    A.  Yes, ma'am.  They do show a -- all of the -- there are 134

7    graphic images that were recovered on this card that were

8    deleted, and they all show a final access date, which is

9    basically the last time they were accessed to be deleted,

10   because no other action would be taken by the computer once

11   they are deleted.  But the final date is October 16th, 2007.

12   Q.  Were you able to determine what camera took those pictures

13   on Government's Exhibit 7?

14   A.  Yes, ma'am.  As part of these images -- and whenever you

15   take a picture with a digital camera now, the camera actually

16   will include in the graphic file basically sort of the

17   information about the camera.  It will store the camera's

18   make, the type of camera.

19          It will actually tell the date, the time the

20   photograph was taken, even the aperture, all of the camera

21   settings.  And a lot of this is used as people share digital

22   pictures to try and -- photography buffs do that.

23          So all of this information is automatically encoded

24   into the files, and they were on these files as well.  Each

25   and every one of them had the same, as we call it -- you may

COX − DIRECT

1    have heard of metadata.  In this information, it is EXIF data,

2    that contained all of the same information, which all pointed

3    to a Canon EOS Digital Rebel camera.

4    Q.  And by the way, what kind of camera is Government's

5    Exhibit 32?

6    A.  This is a Canon Digital, Digital Rebel EOS camera.  It's

7    that same type.

8    Q.  Of the images that you recovered on Government's Exhibit

9    7, how many of them were child pornography or children engaged

10   in sexually explicit conduct?

11   A.  There were 73 images of children and sexually explicit.

12   Q.  What is a child pornography series?

13   A.  Child pornography series is generally a collection of

14   photographs taken -- the easiest way to sort of explain it is

15   where you will start with a child starting possibly clothed,

16   or basically sort of like a time lapse photography series, a

17   general act.  So starting with a child possibly clothed and

18   then in various stages of unclothing and then the various sex

19   acts.

20   Q.  In your training and experience, were the 73 pictures of

21   child pornography that you recovered from Government's Exhibit

22   7 part of the same child pornography series?

23   A.  There were a couple of indicators that indicated to me

24   that they were part of a couple of distinct series.  Number

25   one is that they did represent the progression of a child in

 1    various states of undress, from being partially clothed to

 2    nude, and then also the sex acts at the end.  But also, the

 3    dates, the modification dates or the dates of the photographs

 4    were showing basically about -- different times, but within

 5    seconds of being taken from each other.

 6              So all of the times and dates are very close, and I

 7    believe there are three distinct dates, but each of those

 8    dates, the times are very close together, and they seem to be

 9    sequential and, of course, the camera will also number the

10    images automatically, and these images also have a sequential

11    photo number.

12    Q.  And without showing those photos at this time, are there

13    images of a young girl being penetrated?

14    A.  Yes, there are.

15              MS. WANNARKA:  I will pass the witness.

16              THE COURT:  Mr. Basile?

17              MR. BASILE:  Yes, Your Honor.

18                   *-*-*-*-*-*-*-*

19                 CROSS EXAMINATION

20    BY MR. BASILE:

21    Q.  Is it Agent Cox; is that correct?

22    A.  Yes, sir.

23    Q.  All right.  And you were asked to look at, I think you

24    said, three media cards; is that right?

25    A.  Yes, sir.

COX - CROSS

1  Q.  All right.  And the media card that you just finished

2  testifying about was -- which is marked as Government's

3  Exhibit No. 7?

4  A.  7, yes, sir.

5  Q.  Is that also shown on the report that you prepared?

6  A.  Yes, sir.

7  Q.  It is not on that report, but the other one?

8  A.  Not on this one right here.

9  Q.  Did you prepare a different report or an additional

10  report?

11  A.  Those -- well, the overall report, I believe that you

12  have, is my final report of the examination of the three media

13  cards, but there are -- there were printouts of the graphics

14  from each of those other cards as well, yes.

15  Q.  So there is a report prepared that explains what you did

16  and how you did it?

17  A.  Yes, sir.

18  Q.  And then the report you have there is basically the

19  information that you say you found on the card; is that

20  correct?

21  A.  Well, this is a printout of my -- a portion of my complete

22  report, because this actually even has the heading of

23  bookmark.  As part of the preparation of the report, we go

24  through and we can bookmark different sections of the graphics

25  or images, data or documents, however we want, and then we

COX - CROSS

1   will include that all into our final product, which is a CD or

2   DVD, that we will then provide back to the case agent, as well

3   as the written report, which has more of a process of how we

4   obtained our results and the steps we took.

5   Q.  And that report would show what you looked at, which is a

6   Canon camera; is that right?

7   A.  Correct.

8   Q.  And then three different media cards?

9   A.  Correct.

10  Q.  And what kind of media cards are these called?

11  A.  These are -- the form factor is a compact flash card,

12  which is the size -- they were all compact flash cards.  This

13  was a Sandisk.  I can't remember the other two types.  This

14  one is a 256-megabyte.  I know one of them was a one-gigabyte

15  card.

16  Q.  And if I was to tell you it shows on here you have two 256

17  megabytes and one gigabyte card --

18  A.  Correct.

19  Q.  -- would that refresh your memory?

20  A.  Yes, sir.

21  Q.  And you said out of the three that you examined, you found

22  images on one of them?

23  A.  Correct.

24  Q.  And all of those images, as far as you could tell, had

25  been deleted by the time you looked at them, or shown to you;

1    is that correct?

2    A.  On this card specifically -- I would have to look at my

3    report for the other ones, but on this card specifically, yes,

4    all of those images were deleted.

5    Q.  And are you able to give us a date?

6    A.  By looking at the last access date, which was 10/16 of

7    2007, that would have been the last time that the computer

8    would have accessed or time stamped those.  After that, once

9    the files were marked as deleted, then the operating system

10   would basically -- it is not going to do anything.  So that,

11   by taking that date as the last date that those files were

12   actually touched in the process of the deletion.

13   Q.  Can you tell by that whether they were actually deleted

14   while they were still in the camera?

15   A.  No, I cannot.

16   Q.  So you don't know whether those actually were ever loaded

17   up to any type of computer, do you?

18   A.  Correct.

19   Q.  There is no way of telling by looking at the disk, is

20   there?

21   A.  Correct.

22   Q.  And it is possible in the camera to delete them directly;

23   isn't that correct?

24   A.  Yes, sir.  It is.

25   Q.  Can you tell by looking at the photographs whether any

COX - CROSS

1   pictures were taken out of sequence?  Let me rephrase the

2   question.

3   A.  Well, okay.

4   Q.  When you have a camera, a digital camera to take

5   pictures --

6   A.  Correct.

7   Q.  -- and you delete a few of the pictures, isn't it true

8   that they aren't always -- the new pictures you take don't

9   always stay in the same order?

10  A.  Generally, they will start up wherever the next number is.

11  Even if you have deleted them, they will start back up again.

12  Q.  But that spot that is deleted on the card, is that --

13  there is still an open spot on the card; isn't that correct?

14  A.  Correct.

15  Q.  And the new picture could then be put into that spot when

16  you take a picture, right?

17  A.  Correct.

18  Q.  So is there any way of telling you on that digital card

19  you have --

20  A.  Uh-huh.

21  Q.  -- whether or not any of those photographs had been taken

22  out of order?

23  A.  Basically, the only way I would be able -- well, there is

24  no way for me to tell, other than looking -- looking at the

25  file names.  Once again, the file names, because they have

1   been deleted, the actual first character of the file name is

2   now an exclamation point, but it then continues MG underscore,

3   and here are the first file numbers, 3103, and then it

4   continues sequentially, so possibly looking at some of the

5   different ones -- if it possibly gets out of sequence, maybe.

6   It is sort of hard to tell exactly what you are asking, but --

7   Q.  And is there any way of telling -- you told us the date

8   that they were deleted.  Is there any way of telling us the

9   date that they were taken?

10  A.  Well, the only other date that is stored on this, these

11  files are a modified date, which is -- like I said, there are

12  three separate dates and times.  They are stored March of

13  2007, August the 9th of -- it is March 7th, 2007, August 9th

14  of 2007, August 29th of 2007.

15       Those are the only ones I was able to get actual

16  time and date information off of.  Some of the other files are

17  what we call carved files.  Those are files that have been

18  retrieved from an area that has been previously used but is no

19  longer used, and that is, once again, where we look at the

20  header information.

21       The first few bites of a file basically tells the

22  computer what kind of a file it is, so even if you change the

23  extension of the file, it will always know that it is a

24  picture or a document or something like that, and so our -- as

25  part of our process, the software will go through and retrieve

COX - CROSS

1    those files, but no date or time information is retrieved with

2    those.

3              MR. BASILE:  May I have just a minute, Your Honor?

4    BY MR. BASILE:

5    Q.  In your report, I see that you mentioned some other type

6    of storage.  One was a DVD media that you just testified to,

7    is that correct, when you were talking about derivative

8    evidence detailed in the report?

9    A.  Derivative evidence is basically how I store the evidence

10   that I have derived from the camera and the card.  Those are

11   the ones that I make, so derivative evidence is my CD that I

12   copied --

13   Q.  So that is nothing you were looking at, as far as anything

14   with Mr. Mouton?

15   A.  No, sir.  Those were the derivative of the -- so,

16   basically, what I do is I copy them off of here, so that I

17   have a means to preserve it, as part of our derivative

18   evidence, not original evidence.  It becomes derivative

19   evidence, and that would be that CD or DVD.

20             MR. BASILE:  If I could have a minute with my

21   client, Your Honor.

22             THE COURT:  You may.

23   BY MR. BASILE:

24   Q.  While you were viewing and looking through the media

25   cards, there is no way to actually tell who actually took the

COX - CROSS

1   photographs, is there?

2   A.  No, sir.

3   Q.  So anybody who had access to that camera could have used

4   that to take photographs?

5   A.  Yes, sir.

6   Q.  And anybody, of course, who had access could have deleted

7   them too; is that right?

8   A.  Yes, sir.

9           MR. BASILE:  I have no further questions, Your

10  Honor.

11          THE COURT:  Anything further?

12          MS. WANNARKA:  No, Your Honor.

13          THE COURT:  You may step down.  Thank you.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  Why don't the lawyers come on up.

16          (Bench conference, as follows:)

17          THE COURT:  Just one more witness?

18          MS. WANNARKA:  One more.

19          THE COURT:  How long do you think it is going to

20  last?

21          MS. WANNARKA:  It is going to take a while.

22          THE COURT:  Okay.  Because somebody told the

23  courtroom security office that they have to leave by 5:00.

24          MS. WANNARKA:  Just one more --

25          THE COURT:  Let's take a break, and I will let them

1   go and -- now, while you are up here -- and we will talk about

2   that in just a minute.  Okay.

3            (End of bench conference.)

4            THE COURT:  Ladies and gentlemen, we are going to

5   take an early break today.  Someone told the courtroom

6   security officer you have to be out of here by 5:00.  This

7   next witness will take a little longer, so I don't want to

8   push us past 5:00.

9            Ladies and gentlemen, I anticipate that we may be

10  finished as early as by tomorrow, so we are going to go ahead

11  and stop now.  I want to repeat my instructions to you, just

12  so there is no misunderstanding.  Do not do any homework of

13  any type.

14           Don't get on the Internet and type in any words or

15  phrases or names or anything like you have heard here in this

16  case.  Just go about your normal business.  You know, do

17  whatever you normally do on the computer, but don't do

18  anything related to this case.

19           Don't engage in any chats or conversations with

20  anybody, your loved ones, family members, coworkers about this

21  case.  It is not so much I am worried about what you are going

22  to say, but I am more worried about what they may tell you,

23  and all of a sudden, you are hearing things that are coming

24  from outside of the testimony in this case that will cause a

25  mistrial.  So don't have any discussions with folks about this

1    case.

2            Your only job is to leave here safely and come back

3    tomorrow morning, and we will start up at 9:00 o'clock in the

4    morning, so if you will just arrive a couple of minutes before

5    9:00.  That is your only assignment is to come back.

6            Does anybody have any questions regarding my

7    instructions?  Okay.  We will see you all in the morning.

8            All rise for the jury.

9            (Jury leaves courtroom.)

10           THE COURT:  Please be seated.

11           Will you do me a favor?  That door doesn't close.  I

12   am waiting to hear the click.  Ensure that.  Thank you.

13           Okay.  I am expecting one more witness from the

14   government?

15           MS. BRAUN:  That is correct, Your Honor.

16           THE COURT:  And how long do you think that will

17   last?

18           MS. BRAUN:  He is our longest witness.  Maybe 45

19   minutes.

20           THE COURT:  Okay.  You are not required to say

21   anything, but I mean, just in terms of presentation time, do

22   you think you are going to place any witnesses on the stand?

23           MR. BASILE:  I don't think so, Your Honor.

24           THE COURT:  Okay.

25           MR. BASILE:  But I will discuss this with my client

1  some more.

2          THE COURT:  And the only reason I am asking that is

3  I want to sort of figure out where we are at in terms of the

4  charge, and so let's -- this is not the jury charge, so this

5  is -- I just want to go with this charge in a draft format

6  with you, and then we will take formal objections to the

7  charge tomorrow.

8          But considering what you are both telling me, then

9  as I make edits tonight, it looks that on page 2, stipulated

10  facts, there will be no stipulated facts in this case; is that

11  correct?

12          MR. BASILE:  I don't know of any stipulated facts,

13  Your Honor.

14          THE COURT:  Okay.  Yes.  So I will take out the

15  paragraph regarding stipulated facts.  I will go through the

16  charge with the expectation that the defendant is not going to

17  testify; is that correct?

18          MR. BASILE:  That is where we are right now, Your

19  Honor.  I will confirm it some more.  If I need to let the

20  Court know before I leave, I will.

21          THE COURT:  I might do version 1 and version 2, just

22  to be on the safe side there.

23          With regard to character evidence, are we going to

24  hear any evidence of good character?

25          MR. BASILE:  No, Your Honor.

1            THE COURT:  Okay.  So the character evidence is

2      going to be deleted.  I did not hear any evidence of

3      impeachment by prior inconsistencies; is that correct?

4            MS. BRAUN:  That is correct.

5            THE COURT:  And I guess I will not hear any evidence

6      of impeachment by prior inconsistencies; is that correct?

7            MR. BASILE:  That is probably correct, Your Honor.

8            THE COURT:  Yes.  Okay.  I am going to take that

9      paragraph out.  Impeachment by prior conviction, I didn't hear

10     anything, and we won't hear anything tomorrow, I am assuming.

11           MR. BASILE:  That is correct, Your Honor.

12           THE COURT:  Okay.  So that is coming out.  And then

13     the next paragraph, witnesses other than defendant, that also

14     will come out.

15           Impeachment by evidence of untruthful character.  I

16     didn't hear anything like that either, so that is coming out.

17           Okay.  Similar acts, that gets deleted.

18           And then page 8, confessions, statements,

19     voluntariness.  There was no confession, so that paragraph

20     comes out.

21           MR. BASILE:  Well, Your Honor, there might be more

22     to that tomorrow.

23           THE COURT:  Okay.  Hold on.  What --

24           MS. BRAUN:  With regard to the confession, it is

25     government's position that the defendant confessed both to

1   Special Agent Larry Baker and to Sean Hiler.

2           THE COURT:  And the letters.  Oh.  And the verbal

3   admissions.  That's right.  Yes.

4           MS. BRAUN:  And in the letters.  There are multiple

5   confessions.

6           THE COURT:  Yes.  Okay.  That stays in.  On page 8,

7   at the top, the knowingly instruction, my highlighted language

8   there, the second part of that, I don't believe that is

9   appropriate to this case.  I am contemplating just having the

10  first sentence.

11          MS. BRAUN:  No objection from the government, Your

12  Honor.

13          THE COURT:  Yes.  The other one is more related to

14  drug issues.  Okay.  Okay.  So I will make those edits and

15  then we pick up at 9:00.

16          Anything else we need to talk about before we

17  adjourn for the day?

18          MS. BRAUN:  Nothing from the government.

19          MR. BASILE:  Not at this time, Your Honor.  I may

20  have some objections to the wording on some things in the

21  charge and some suggestions.

22          THE COURT:  Right.  Yes.  This is not the formal

23  charge, so I suggest that both of you all, in light of what I

24  just did here, then also look at the remainder of this charge

25  to make sure that you are satisfied that it is correct, and I

1    will hear any comments or suggestions or edits or deletions

2    that you want tomorrow.

3              MR. BASILE:  Yes, Your Honor.

4              THE COURT:  So your homework is to read this.  Okay.

5    We will see you in the morning.

6              *-*-*-*-*-*-*-*

1                    *-*-*-*-*-*-*-*-*

2    UNITED STATES DISTRICT COURT )

3    WESTERN DISTRICT OF TEXAS    )

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that the transcript fees and format comply

7    with those prescribed by the Court and the Judicial Conference

8    of the United States.

9    Date signed:  April 22, 2010.

10

11                          /s/ Karl H. Myers

12                          _____
                            **KARL H. MYERS, CSR, RMR, CRR**
                            Official Court Reporter
13                          655 East Durango Blvd., Suite 315
                            San Antonio, Texas 78206
14                          (210) 212-8114

15

16

17

18

19

20

21

22

23

24

25