```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,      )
          Plaintiff,                )
 4                                  ) No. SA:08-CR-301
             vs.                    )
 5                                  ) San Antonio, Texas
     STEVEN LYNN MOUTON,            ) October 6, 2009
 6        Defendant.                )
     ----------------------------

 7
                            VOLUME 2 OF 2
 8
                       TRANSCRIPT OF JURY TRIAL
 9           BEFORE THE HONORABLE XAVIER RODRIGUEZ
                    UNITED STATES DISTRICT JUDGE
10
     A P P E A R A N C E S:
11
     FOR THE PLAINTIFF:
12
     United States Attorney's Office
13   Ms. Tracy Thompson Braun
     Ms. Sarah Wannarka
14   601 N.W. Loop 410, Suite 600
     San Antonio, Texas 78216
15
     FOR THE DEFENDANT:
16
     Mr. Karl A. Basile
17   Attorney at Law
     Greatview Building
18   8207 Callaghan Road, Suite 100
     San Antonio, Texas 78230
19
     COURT REPORTER:
20
     Karl H. Myers, CSR, RMR, CRR
21   Official Court Reporter
     655 E. Durango Blvd., Rm. 315
22   San Antonio, Texas 78206
     Telephone:  (210) 212-8114
23   Email:  karlcsr@yahoo.com

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1                                  INDEX

2                        VOLUME 2 – OCTOBER 6, 2009

3    GOVERNMENT'S WITNESS:

4    LARRY BAKER:

5    Direct examination by Ms. Braun ------------------ 145
     Cross examination by Mr. Basile ----------------- 189
6    Redirect examination by Ms. Braun --------------- 197

7

8                              EXHIBIT INDEX

9    Government's Exhibit 26 was admitted on Page 165.
     Government's Exh. 26-A through C were admitted on Page 157.
10   Government's Exh. 28-30 were admitted on Page 175.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BAKER – DIRECT

```
 1                 (October 6, 2009, defendant present.)

 2                 THE COURT:  Please be seated.  Your next witness.

 3                 MS. BRAUN:  Your Honor, the government calls Special

 4     Agent Larry Baker.

 5                 COURTROOM DEPUTY:  Would you raise your right hand.

 6                 (Oath administered to the witness.)

 7                 COURTROOM DEPUTY:  Thank you.

 8                          *–*–*–*–*–*–*–*

 9                          DIRECT EXAMINATION

10     BY MS. BRAUN:

11     Q.  Please state and spell your last name for the record.

12     A.  Larry Baker, B-a-k-e-r.

13     Q.  Where are you employed?

14     A.  I am employed in San Antonio as a special agent with the

15     FBI.

16     Q.  How long have you had that employment?

17     A.  In January, it will be eleven years.

18     Q.  Describe your educational background, please.

19     A.  I have a bachelor's of science degree in mechanical

20     engineering.

21     Q.  What assignments have you had with the FBI since you

22     started as a special agent?

23     A.  I have been assigned as an investigator on public

24     corruption matters, civil rights matters, white-collar, which

25     is predominantly bank fraud cases, and also crimes against
```

BAKER – DIRECT

1    children via the Internet.

2    Q.   What is your current assignment?

3    A.   The latter, crimes against children via the Internet.

4    Q.   How long have you had that assignment?

5    A.   Approximately five years.

6    Q.   What are your duties and responsibilities in the Cyber

7    Crime Unit?

8    A.   I am assigned almost exclusively to investigate matters

9    involving child pornography, the production of, possession,

10   receipt, predominantly focuses on activities via the Internet.

11   That is my primary responsibility.  I have collateral duties

12   as a SWAT team operator and also as a fitness coordinator for

13   the San Antonio division.

14   Q.   What type of specialized training, if any, have you

15   received in relation to your duties and responsibilities in

16   the Cyber Unit?

17   A.   Cyber specific, I have received training with regard to

18   computer systems, how they operate, how they function.  I have

19   received child forensic interview training and numerous

20   training courses related to investigative techniques for the

21   Internet.

22   Q.   In your capacity as a special agent with the FBI in the

23   Cyber Crimes Unit, do you also provide training to other law

24   enforcement officers in how to investigate cyber crimes?

25   A.   I do.  I recently concluded a training session in Dallas

BAKER - DIRECT

1   for almost, I think approximately 200 individuals related to

2   an investigation we had here in San Antonio.

3   Q.  Are you the case agent in the case of the United States

4   versus Steven Mouton?

5   A.  I am.

6   Q.  What does it mean to be the case agent?

7   A.  Case agent means that the FBI has tagged you with lead

8   responsibility for taking a particular matter to its

9   investigative conclusion, determining if a violation of

10  federal law has occurred, when it occurred, where it occurred

11  and, ultimately, who committed that act.

12  Q.  And having to sit at counsel table with Ms. Wannarka and

13  I?

14  A.  Yes.

15  Q.  How was this case initiated?

16  A.  This case was initiated upon receipt of information from

17  my squad supervisor, at the time, Chuck Lucas on April 2nd,

18  2008, advising me that the Kendall County Sheriff's Office had

19  provided the FBI with a request for investigative assistance

20  on a matter involving a Boerne resident named Steven Mouton.

21  He provided me with contact information for the Kendall County

22  Sheriff's Office and requested that I contact them and see if

23  the FBI could assist in this matter.

24  Q.  Did you do that?

25  A.  I did.

BAKER - DIRECT

1    Q.  When did that take place?

2    A.  That took place, I believe, the afternoonof April 2nd,

3    2008, shortly after receiving that information from my

4    supervisor.

5    Q.  Who did you meet with?

6    A.  Well, at that time, I spoke telephonically with Inspector

7    Kendall Gebauer of the Kendall County Sheriff's Office.  He

8    provided me with a brief overview of their investigation, and

9    we set a time to meet in the early morning hours of April 3rd,

10   2008.

11   Q.  And did you meet with Investigator Gebauer on the 3rd?

12   A.  Yes, ma'am.  The early morning hours.

13   Q.  What happened during that meeting?

14   A.  During that meeting, Inspector Gebauer and other members

15   of the Kendall County Sheriff's Office detailed at length

16   their investigation into Steven Lynn Mouton, specifically,

17   with regard to potential criminal activities involving the

18   production and possession of child pornography, so they

19   provided me with an extensive overview.

20           Specifically, Inspector Gebauer advised that on or

21   about October 18th, 2007, he accompanied two individuals,

22   probation officers to Mr. Mouton's residence at 18 Crystal

23   Circle, Boerne, Texas.

24           And during that meeting, he and the probation

25   officers had observed an image on a laptop computer utilized

BAKER – DIRECT

1    by Mr. Mouton that they believed depicted the vagina of

2    Mr. Mouton's then twelve-year-old daughter, Amanda Mouton.

3    And that subsequently, after discovering that image, Mr.

4    Gebauer had obtained the computers and obtained the search

5    warrant for the contents of those computers.  He then

6    transported those computers to the San Antonio Police

7    Department for forensic review.

8    Q.  The image that they showed you that they found on October

9    18th on the defendant's computer that they believed was Amanda

10   Mouton's private part, is that what is contained in Exhibit 1

11   that has already been entered?

12   A.  Yes, ma'am.  It is.

13   Q.  And did they also go through with you the other images of

14   child pornography that were found both on the defendant's

15   laptop computer and the desktop computer?

16   A.  Yes, ma'am.  They provided me with a disk, which we

17   examined; actually, two disks, which we examined at that time,

18   which housed all potential suspected child pornography images

19   from both computers, and we reviewed each image.

20   Q.  And the images of child pornography that were found on the

21   defendant's desktop computer, are those the ones contained in

22   Exhibit 5?

23   A.  I would have to look at that.

24          MS. BRAUN:  May I approach, Your Honor?

25          THE COURT:  You may.

BAKER - DIRECT

1              THE WITNESS:  Yes, ma'am, they are.

2    BY MS. BRAUN:

3    Q.  And those images are not of Amanda Mouton but other

4    children?

5    A.  Yes, ma'am, that is correct.

6    Q.  And the images of child pornography that you were shown by

7    Kendall County that were found on the defendant's laptop

8    computer, are those images contained in Government's Exhibit

9    3?

10   A.  Yes, ma'am, they are.

11   Q.  And the images on the laptop computer contained visual

12   depictions, many, of Amanda Mouton, as well as many other

13   children, minor children; is that correct?

14   A.  That is correct.

15              MR. BASILE:  Your Honor, I object to the leading

16   questions.

17              THE COURT:  That is sustained.

18   BY MS. BRAUN:

19   Q.  The images found on the laptop computer, are there images

20   of Amanda Mouton found on the laptop computer?

21   A.  Yes, ma'am.  Dozens.

22              MR. BASILE:  Your Honor, I object to the leading

23   question.

24              THE COURT:  She rephrased that.  That is overruled.

25              THE WITNESS:  Yes, ma'am.  There were dozens of

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

BAKER – DIRECT

1   images on the laptop computer of Amanda Mouton, clothed, in a

2   partially clothed state and in a nude state, some of her being

3   sexually assaulted.

4   BY MS. BRAUN:

5   Q.  Are there also images of other children besides Amanda

6   Mouton on the laptop computer?

7   A.  Yes, ma'am, there are.

8   Q.  Do you know approximately how many children are depicted?

9   A.  How many different children?  I am not aware.  I know

10  there are approximately 428 images of suspected child

11  pornography removed from the laptop.

12  Q.  What concerns, if any, did Investigator Gebauer express to

13  you when he was asking for your assistance?

14  A.  The concerns that he expressed --

15       MR. BASILE:  Your Honor, I am going to object under

16  Crawford and under the Sixth Amendment.  He testified about

17  what someone else said.  That is hearsay.  Object to it on

18  those grounds.

19       THE COURT:  It is hearsay.  Is there any exception?

20       MS. BRAUN:  It is not offered for the truth of the

21  matter asserted, only to establish whether or not the FBI was

22  going to provide assistance and in what manner.

23       THE COURT:  You are still asking him to have him

24  repeat what Gebauer said.  That is sustained.  Rephrase your

25  question.

BAKER – DIRECT

1    BY MS. BRAUN:

2    Q.  What information did you provide to Investigator Gebauer

3    at this meeting on April 3rd about what assistance the FBI

4    could provide?

5    A.  After reviewing the images from the laptop computer, a

6    number of the images housed a background that was consistent,

7    according to Inspector Gebauer, of Ms. Mouton's current

8    bedroom, at her 18 Crystal Circle residence.  It was my belief

9    that potentially sexual assault was ongoing, as that residence

10   had not been lived in for a very long time.  And so we

11   expressed to Inspector Gebauer our absolute intent to pursue

12   the matter federally and to act quickly, so as to prevent any

13   future sexual assaults of Amanda Mouton.

14   Q.  And, Agent Baker, is that because, not only were there

15   images of Amanda Mouton found in clothed, partially clothed

16   and in a nude state, but on the defendant's computer, were

17   there images of Amanda Mouton being sexually assaulted by an

18   adult male?

19   A.  That is correct.  With both -- with a male -- an adult

20   male's penis and what appeared to be an adult male's hand.

21   Q.  And based on the FBI's review of the copy of the hard

22   drive, did you have any idea of when those images of Amanda

23   Mouton being sexually assaulted by an adult male were created?

24        MR. BASILE:  Your Honor, I am going to object.  I

25   don't think he is qualified.  He has not been qualified as an

BAKER – DIRECT

```
1    expert in computers to make an opinion with regards to any

2    information contained in that.

3              THE COURT:  That is sustained.

4    BY MS. BRAUN:

5    Q.  Are you familiar with exif data?

6    A.  Yes, ma'am, exif or metadata.

7    Q.  What is it?

8    A.  It is data that is related to a particular -- to the

9    manufacture of a particular digital image by a photograph.  It

10   is data that is not apparent to the naked eye, but with

11   software programs, you can actually extract that information

12   that dictates or -- excuse me -- details what camera made an

13   image, when it was made, potentially, when it was deleted or

14   modified.

15   Q.  Does the FBI have that type of software?

16   A.  Yes, ma'am.

17   Q.  Have you used it?

18   A.  Yes, ma'am.

19   Q.  When you click on -- technical term, if you have an image

20   on your computer, can you click on properties of that image

21   and receive that metadata?

22   A.  At times, yes, ma'am.

23   Q.  Did you and other agents do that with some of the images

24   depicting Amanda Mouton in this case?

25   A.  We did it with one image that Inspector Gebauer had
```

BAKER – DIRECT

1    believed to be that of an image of Amanda Mouton's vagina that

2    that was discovered on October 18, 2007.

3    Q.  Is that the image that is Exhibit No. 1?

4    A.  Exhibit No. 1, yes, ma'am.

5    Q.  And what information, if any, did you discover when you

6    did that?

7    A.  We discovered that a Canon EOS --

8           MR. BASILE:  Again, Your Honor, I am going to

9    object.  Is this basic information on the computer or is it

10   metadata?  He has not had any training or anything that would

11   qualify him as an expert.  If the information that he is

12   testifying to is general knowledge, anybody who works on

13   computers knows that information, but not specific to forensic

14   examination of a computer.

15          THE COURT:  Come on up.

16          (Bench conference, as follows:)

17          THE COURT:  I am confused now by your objection.  At

18   first, I understood your objection to be saying that he is not

19   an expert to testify, and I sustained that, and then she laid

20   a predicate for just how a regular FBI agent determines the

21   data of a photo, and she was ready to ask him for the date, I

22   believe, but now your objection was:  Well, anybody can do

23   that.  So I am kind of confused what the objection is.

24          MR. BASILE:  My objection, Your Honor, is that what

25   he is testifying to really requires more than just general

BAKER – DIRECT

1    information or basic information of a computer.  He has not

2    been qualified as a forensic computer expert.  He is giving

3    information as far as files, where they come from, and the

4    questions by Ms. Braun were just general computer information

5    that anybody that has taken Computer 101 would know that, so

6    it is not specific to forensic examinations of computers,

7    which I think is important.  His testimony was that these

8    images, all but one were deleted, and that is not something

9    that is rarely accessible to anybody else.

10              MS. BRAUN:  This one was not deleted.

11              THE COURT:  Yes.  We are talking about Exhibit

12   No. 1, I believe.

13              MS. BRAUN:  Correct.

14              THE COURT:  And what I thought you were going to be

15   asking him is:  With regard to Exhibit 1, what is the date of

16   Exhibit 1?  And he was going to establish that through the

17   exif program that he ran.

18              MS. BRAUN:  Correct.  Which, technically, is already

19   in evidence in Exhibit 6, but he also looked at the image and

20   found the data in the manner he just described.

21              THE COURT:  Yes.  That is overruled.

22              (End of bench conference.)

23   BY MS. BRAUN:

24   Q.  Special Agent Baker, what information did you acquire by

25   looking at the metadata of Exhibit No. 1?

BAKER - DIRECT

1    A.   The information that I acquired is that a Canon EOS

2    Digital Rebel camera had been used to manufacture the image,

3    and that it was manufactured on or about August 2007.

4    Q.   In the information that was given to you by the Kendall

5    County Sheriff's Office -- that is the disk they gave you --

6    A.   Yes, ma'am.

7    Q.   -- did you find any evidence that the defendant, at that

8    time, that the defendant had a Canon EOS Rebel digital camera?

9    A.   Actually, we -- myself and Special Agent Ethan Cumming,

10   who was a co-case agent on the case, obtained copies of the

11   hard drives that had been seized from Mr. Mouton's computers

12   by Kendall County in October of 2007.

13        We obtained copies of those hard drives from the San

14   Antonio Police Department and conducted a review of all images

15   present on the laptop.  Excuse me.  On the hard drives, both

16   the Dell and the laptop.  And through those copies of the hard

17   drives, we were able to obtain digital images depicting

18   Mr. Steven Mouton wearing a Canon EOS Digital Rebel camera and

19   associated camera strap around his neck.

20             MS. BRAUN:  May I approach, Your Honor?

21             THE COURT:  You may.

22   BY MS. BRAUN:

23   Q.   Agent Baker, I am showing you what has been marked for

24   identification as Government's Exhibit 27-A, 27-B and 27-C.

25   Do you recognize those?

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

BAKER - DIRECT

1    A.  Yes, ma'am.  I do.

2    Q.  What are they?

3    A.  They are three digital images that were present on one of

4    the hard drives that we reviewed that depict Steven Mouton

5    wearing a Canon EOS Digital Rebel and/or associated camera --

6    camera strap.

7    Q.  With the exception of the exhibit sticker, are they in the

8    same or substantially the same condition now as when you

9    located them on the hard drive, except they are in hard paper

10   form?

11   A.  Yes, ma'am.  They are.

12          MS. BRAUN:  The government offers Government's

13   Exhibit 27-A through C.

14          MR. BASILE:  I have no objection, Your Honor.

15          THE COURT:  27-A through C are admitted.

16          MS. BRAUN:  May I publish them to the jury, Your

17   Honor?

18          THE COURT:  You may.

19   BY MS. BRAUN:

20   Q.  Special Agent Baker, this is Exhibit 27-C.  Is that the

21   camera that has been entered into evidence as Exhibit No. 32?

22   A.  Yes, ma'am, it is.

23   Q.  And Government's Exhibit 27-B, what does that depict?

24   A.  That depicts the associated the camera strap for this

25   camera, Government's Exhibit 32.

BAKER – DIRECT

1    Q.  And is that the defendant, Steven Mouton, in the image?

2    A.  Yes, ma'am, it is.

3    Q.  What about Exhibit 27-A?  What does that depict?

4    A.  It depicts Mr. Steven Mouton wearing Government's Exhibit

5    32, which is the Canon EOS Digital Rebel camera and associated

6    camera strap.

7    Q.  Can you tell what is in his hand?

8    A.  It appears that it is a plastic sleeve that contains a

9    media card associated with a camera such as this.

10   Q.  Similar to the media card that is sitting in front of you

11   that has been introduced into evidence?

12   A.  Yes, ma'am.  Very similar to Government's Exhibit 7.

13   Q.  After your meeting with Inspector Gebauer on April 3rd,

14   what did you do?

15   A.  Immediately following the meeting, I contacted the U.S.

16   Attorney's Office and spoke to you, Ms. Braun, and provided

17   you with a short summary of my meeting with Kendall County,

18   and a short summary of the evidence that had been obtained to

19   that point, and some concerns I had regarding the safety of

20   Amanda Mouton.  I requested the United States Attorney's

21   Office's concurrence to move forward in an investigation and

22   requested that you open up a prosecutor file.

23   Q.  Was that done?

24   A.  That was.

25   Q.  Was an arrest warrant for Mr. Mouton then obtained?

BAKER – DIRECT

1   A.  Yes, ma'am.  On or about April 8th, 2008, a federal arrest

2   warrant was obtained via criminal complaint.  At that time, a

3   search warrant was obtained for Mr. Mouton's 18 Crystal

4   Circle, Boerne, Texas residence, and a search warrant was

5   obtained for his parents' residence in Devine, Texas.

6   Q.  Why were two search warrants obtained at those locations?

7   A.  The Devine, Texas search warrant was obtained because

8   Mr. Mouton had been staying at that residence, as was required

9   by another agency, and we also had belief that he was

10  returning to the 18 Crystal Circle, Boerne, Texas residence.

11  So we obtained, "we" being the FBI and the federal system,

12  obtained a search warrant for Boerne, and the state

13  investigators obtained a search warrant for the Devine, Texas

14  location.

15  Q.  Were you able to locate the defendant at either one of

16  those residences on the morning of April 9th of 2008?

17  A.  No, we were not.

18  Q.  Describe what happened that morning.

19  A.  On April 9th, 2008, all search warrants and the arrest

20  warrant was attempted to be executed.  At approximately 6:00

21  a.m., a search and arrest team traveled to Devine, Texas,

22  where Mr. Mouton was required to be as part of his conditions.

23  He was not --

24          MR. BASILE:  Your Honor, I am going to object on

25  that.  It is a violation of the motion, Your Honor.

BAKER – DIRECT

```
 1              THE COURT:  Overruled.
 2   BY MS. BRAUN:
 3   Q.  You may continue.
 4   A.  Okay.  He was required to be at that residence.  He was
 5   not at that residence, and so the search warrant was executed,
 6   but the arrest warrant could not be executed.  A short time
 7   later, after failing to locate Mr. Mouton, by either the
 8   Boerne or the Devine search and arrest teams, I telephonically
 9   contacted Mr. Mouton.
10   Q.  What did you say to him?
11   A.  I advised Mr. Mouton of my identity, advising that we had
12   a federal arrest warrant for him and requested that he provide
13   me with his current location.
14   Q.  What did he tell you?
15   A.  He provided no information at first, was reluctant to tell
16   me where he was located, and I advised him that if he didn't
17   provide me with that information, I would consider him a
18   fugitive attempting to flee from justice.
19   Q.  Did he then tell you where he was located?
20   A.  Yes.  He advised that he was at his place of employment, a
21   farm, whose name I cannot recall, but a farm in Boerne, Texas.
22   Q.  Were agents able to locate him there?
23   A.  No.  The efforts to locate him there proved that Mr.
24   Mouton had not been there, was not there and had not been
25   there the morningof April 9th, 2008.
```

BAKER - DIRECT

```
 1   Q.  What happened then?
 2   A.  A short time later, I received a telephonic call from
 3   Mr. Mouton, which went to voice mail.  I listened to the voice
 4   mail.  It advised that he was currently with his wife at his
 5   lawyer's office outside in a parking lot in Boerne, Texas.
 6   And after receiving that message, I was able to establish
 7   telephonic contact with Mr. Mouton, and he reiterated the same
 8   information.  I advised him again to stay put and that I would
 9   dispatch FBI agents to his location to effect the arrest.
10   Q.  Did that happen?
11   A.  That did.
12   Q.  When he was arrested at that office, did -- was he asked
13   any questions?
14   A.  No.  The agents, arresting agents were specifically
15   instructed by me not to ask him any questions, other than
16   questions related to his identity, just so the arrest could be
17   executed effectively.
18   Q.  And the FBI agents were instructed to arrest him and then
19   do what with him?
20   A.  Special Agent Cumming, the co-case agent, and myself were
21   approximately 45 minutes away at the time of arrest.  They
22   were instructed to, again, ask him only identifying questions
23   and then to transport him to the offices of the FBI in San
24   Antonio.
25   Q.  Did that happen?
```

BAKER – DIRECT

1   A.  That did happen.

2   Q.  What happened when he got to the FBI?

3   A.  Myself and Agent Cumming greeted Mr. Mouton, identified

4   ourselves, and then placed him in an interview room.

5   Q.  How did you identify yourself?

6   A.  With credentials that have my picture and -- as well as my

7   title and other verbiage that identifies myself as a special

8   agent with the FBI.

9   Q.  And how were you and Agent Cummings dressed when this

10  happens?

11  A.  Much like I am today, probably not in pink, but much like

12  I am today, in business attire, as is almost always the case.

13  Q.  And was Mr. Mouton brought to an interview room?

14  A.  Yes, ma'am, he is.

15  Q.  Describe that room.

16  A.  Sparsely decorated, has a desk, three chairs, maybe four.

17  It is approximately twelve feet wide, 15 feet long.

18  Q.  Describe where people are sitting in the room.

19  A.  As you walk in, there is a desk immediately to your left.

20  There is a chair associated with that desk.  There a chair

21  placed in front of the desk, where the interviewee is

22  typically placed, and there is a chair to the right, where the

23  co-case agent or co-interviewer typically sits.

24  Q.  After you introduce yourself to Mr. Mouton, what do you

25  tell him?

BAKER - DIRECT

1   A.  I explain to Mr. Mouton that I would like to have an
2   information exchange with him.
3   Q.  Do you explain what that is?
4   A.  Yes, ma'am.  I explain -- the verbiage that I use was, I
5   am going to lay all of my cards out on the table, and I
6   further explained that that meant that I would give Mr. Mouton
7   an opportunity to review all of the evidence that the FBI in
8   Kendall County had amassed in this matter and that, in return,
9   I requested that Mr. Mouton provide an honest answer, if you
10  will, to all of the evidence that we would provide to him,
11  that it would not be adversarial at all, that it would be a
12  respectful exchange of information.
13  Q.  How did he respond to that?
14  A.  He provided a nod of his head.  And then I advised him
15  that I could not speak to him or engage in this information
16  exchange without first reading him his Miranda rights.
17  Q.  And before we get to that, what was his demeanor like when
18  you first encountered him, and then as you explained that you
19  are going to lay everything out on the table and you would
20  like some information from him as well?
21  A.  He appeared to me to be very calm, very measured,
22  calculated, not jittery, not visibly upset.  That was my first
23  interaction with him, so I don't have a lot of data points,
24  but relative to other individuals that we typically interview
25  in this -- these type of matters, he was very calm.

BAKER – DIRECT

1   Q.  When you told him you couldn't talk to him without

2   advising him of his Miranda rights, those are his rights

3   against self-incrimination; is that correct?

4   A.  That is correct.

5   Q.  How do you -- does the FBI have a policy on how they

6   advise people of their rights against self-incrimination?

7   A.  Yes, ma'am.  We are required to read aloud or have the

8   individual read aloud a form that is named FD-395, advice of

9   rights forms, and on that form, it details each Miranda

10  warning.

11  Q.  What did you do in this case?

12  A.  In this case, we read it to Mr. Mouton.

13  Q.  Did he appear to understand what you were reading to him?

14  A.  Yes, ma'am, he did.

15  Q.  Is there a place on the form for him to sign,

16  acknowledging that he understands his rights?

17  A.  Yes, ma'am.

18  Q.  And did he do that?

19  A.  Yes, ma'am.  He did.

20          MS. BRAUN:  May I approach, Your Honor?

21          THE COURT:  You may.

22  BY MS. BRAUN:

23  Q.  I am showing you what has been marked for identification

24  as Government Exhibit 26.  Do you recognize that?

25  A.  Yes, ma'am.  This is the FD-395, advice of rights form

BAKER - DIRECT

1  that was read aloud to Mr. Mouton and then subsequently signed

2  by Mr. Mouton, myself and Special Agent Cumming.

3  Q.  Is it in the same condition now, with the exception of the

4  exhibit sticker, that it was when he signed it on April 9th?

5  A.  Yes, ma'am, it is.

6       MS. BRAUN:  Government offers Exhibit 26.

7       MR. BASILE:  I have no objection, Your Honor.

8       THE COURT:  26 is admitted.

9  BY MS. BRAUN:

10  Q.  As you went over the rights that Mr. Mouton had and was

11  waiving by agreeing to speak with you, did he ask you any

12  questions about them?

13  A.  Yes, ma'am.  Mr. Mouton, when we got to the warning where

14  it says, "You may stop answering questions at any time," he

15  looked up and me and said, "So I can, indeed, stop questioning

16  at any moment?"

17       I said:  Yes, you can.  You never lose that right.

18  Even if you sign the form, you can stop at any time that -- to

19  use the exact words that I gave him:  This is not like you see

20  on NYPD Blue, where Andy Sipowicz is using a telephone book

21  to -- during an interview.  That the moment you say it's over,

22  it's over.

23  BY MS. BRAUN:

24  Q.  How did he react to that?

25  A.  He seemed comforted by that and then reached -- leaned

BAKER - DIRECT

1    forward and signed the document.

2    Q.  How did the conversation start?

3    A.  The conversation, like most interviews, started with very

4    innocuous questions, background information regarding

5    Mr. Mouton and his family.  He provided me with his

6    educational background, his former places of employment, and

7    then he detailed his family members and their ages.

8    Q.  And what information did he give you about his wife and

9    child?

10   A.  He advised he was currently married to Margarite or

11   Margarita Mouton, had been for approximately 14 and a half

12   years, that those two had adopted a female named Amanda Mouton

13   in 1997 from an adoption agency in Littleton, Colorado, that

14   Ms. Mouton was originally from China and that her date of

15   birth was February 16th, 1995.

16   Q.  Did Mr. Mouton provide information about other children --

17   without getting into any information, does Mr. Mouton have

18   other children?

19   A.  Yes, ma'am.  He has two adult children.

20   Q.  And are those from a previous marriage?

21   A.  Yes, ma'am.

22   Q.  After going through the background information about his

23   family history and education, did you talk to him about the

24   home visit that was conducted at his Boerne residence in

25   October -- on October 18, 2007?

BAKER – DIRECT

1   A.  Yes, ma'am.  I specifically asked him to explain those

2   events to me, how Kendall County came into possession of his

3   computer systems.

4   Q.  What did he tell you?

5   A.  He advised me that some time in October of 2007, a female

6   probation officer named Brooke Davis had telephonically

7   contacted him, advising him that it was her intent to engage

8   in a home visit at 18 Crystal Circle, Boerne, Texas, his

9   residence.

10          And then two weeks subsequent to that call,

11  Ms. Davis, a male probation officer, and an individual that he

12  referred to as the Kendall County sheriff actually did visit

13  his residence for an in-home visit.

14  Q.  So he explained to you that he got a phone call saying,

15  "We are going to do a home visit," and then shortly thereafter

16  that, a home visit occurred?

17  A.  Yes, ma'am.  Approximately two weeks after.

18  Q.  Did he describe for you what happened during the home

19  visit?

20  A.  Yes, ma'am.  He advised that the probation officers and

21  the Kendall County sheriff had reviewed his computer systems,

22  and during the review of the laptop computer, an image of a

23  female's vagina appeared.

24          As the male probation officer was reviewing the

25  laptop computer, it appeared, and that he believed that image

BAKER – DIRECT

1    to be that of an adult female, as the vagina was, in his

2    words, hairy and swollen.

3              He further advised that the probation officers and

4    the Kendall County sheriff believed that it was Amanda Mouton,

5    but he did not share that belief as, to use his words, Amanda

6    is not that adult-looking.

7    Q.  Did he indicate whether or not he had ever seen that image

8    before?

9    A.  He advised that --

10   Q.  At that time?

11   A.  Yes, ma'am.  I'm sorry.  He advised that he had never seen

12   that image before the male probation officer made it pop up,

13   if you will, on the screen, and that he had no idea how the

14   image had been manufactured.

15   Q.  Did he give you, during the interview, at that time, any

16   indication of how he thought it got onto his computer?

17   A.  Yes, ma'am.  He attributed the appearance of the image

18   potentially to that of the male probation officer, that he --

19   the male probation officer may have even placed it on the

20   laptop computer.

21   Q.  Did he indicate to you that his computers, both the laptop

22   and the desktop, were then taken from his house?

23   A.  Yes.

24   Q.  And as a result of the image being found and the computers

25   being taken, is that when his living conditions changed?

BAKER - DIRECT

1    A.   Yes.  He advised that he was no longer allowed to stay in

2    that residence, and that he had subsequently inhabited a

3    trailer park in the Boerne, Texas area before moving to his

4    parents' residence in Devine, Texas.

5    Q.   Did you inquire with Mr. Mouton about any cameras that the

6    family owned or used?

7    A.   Yes, ma'am.  I specifically asked Mr. Mouton to detail the

8    cameras that the family owned and utilized.

9    Q.   And what information did he give you at that time?

10   A.   He advised that the family only owned and utilized a Nikon

11   brand Coolpix model camera.

12   Q.   Did that comport with information you already had?

13   A.   No, ma'am, it did not.

14   Q.   Why not?

15   A.   I had digital images of Mr. Mouton wearing a Canon EOS

16   Digital Rebel from his hard drives, so --

17   Q.   Were you able to determine, Agent Baker, if any of the

18   pornographic images were taken with a Nikon camera?

19   A.   I was not able to establish that, no, ma'am.

20   Q.   Now, at the time that you are interviewing Mr. Mouton on

21   April 9th, are the search warrants still being executed, both

22   at the house on Crystal Circle that his daughter lived in and

23   his parents' house in Devine, Texas?

24   A.   Yes, ma'am, they are.

25   Q.   And are you in communication with other agents who are at

BAKER - DIRECT

1    those two scenes?

2    A.  Yes, ma'am.  Myself and Agent Cumming are receiving

3    updates from each of the search sites via our Blackberry

4    communication devices.

5    Q.  And during that timeframe, what information are you

6    provided about cameras?

7    A.  I am provided with information from the Boerne search team

8    that a Canon EOS Digital Rebel camera had been seized from the

9    18 Crystal Circle residence.

10   Q.  Did you pass that information along to Mr. Mouton during

11   the interview?

12   A.  Not in that regard.  I asked Mr. Mouton if he owned a

13   Canon model or Canon brand camera, and he advised, at that

14   time, that he did, indeed, own one.

15   Q.  Did you ask him why he didn't tell you that at the

16   beginning?

17   A.  Yes, ma'am.  I asked him why he provided false statements

18   to the FBI regarding such an innocuous question.  He advised

19   that he did not think that that matter was of importance and

20   that he did not want the FBI to actually seize that camera.

21   Q.  Was Mr. Mouton shown Exhibit 27-A during the interview?

22   A.  Yes, ma'am, he was.  Shortly after advising myself and

23   Agent Cumming that he did, indeed, own a Canon EOS Digital

24   Rebel, he was shown that image.

25   Q.  And what conversation took place as you are showing him

BAKER - DIRECT

1    the picture of him wearing the Canon EOS camera?

2    A.   The conversation that took place was that -- after

3    affirming that it was him wearing that -- a camera, a Canon

4    EOS Digital Rebel camera and associated strap around his neck,

5    the inquiry was made:  Is that the same camera that we are

6    going to find at your 18 Crystal Circle residence?  And he

7    affirmed that it was.

8    Q.   Did he indicate to you who used that camera?

9    A.   Yes.  He advised that he is the only individual that

10   utilized that camera to manufacture digital photos.

11   Q.   Did you indicate to him the significance of that camera?

12   A.   Yes, ma'am.  We did.  We turned the attention back to the

13   image that Inspector Gebauer had located at his residence on

14   the laptop computer on October 18th, 2007.  I advised Mr.

15   Mouton that I was aware that a Canon EOS Digital Rebel had

16   been used to manufacture that image and that it had been

17   manufactured on or about August of 2007.

18   Q.   As you are explaining the significance of that to him, do

19   you also explain what metadata is?

20   A.   Yes, ma'am.  I asked him if he understood what metadata

21   was, if he was familiar with it.  He advised that he was not,

22   so we go through an explanation on how we were able to

23   ascertain that -- how that -- or when that image was made and

24   what device was actually used to make that image, so that he

25   understood that I was not in any way bluffing him, but

BAKER – DIRECT

1   actually providing him with real information.

2   Q.  What was his reaction to that?

3   A.  He nodded.  I don't believe, at that moment, that he spoke

4   any words related to that information, but then I asked him a

5   follow-up question which was:  Did he now know how the image,

6   that he had advised earlier that he had no idea how it had

7   been manufactured or had never seen the image that Inspector

8   Gebauer had, indeed, printed or had printed on October 18th,

9   2007, I asked him if he now knew how it was manufactured.  And

10  he advised that he did, but provided no further information at

11  that time.

12  Q.  So he just said, "Yes," and sat there?

13  A.  Yes, ma'am.  He advised, "Yes, I know," and left it at

14  that, so we continued the interview.

15  Q.  Did he volunteer information, other information about the

16  production of that picture?

17  A.  Did he volunteer, at that time, any information?

18  Q.  Yes.  At that time, did he say anything about his wife?

19  A.  Unsolicited, he advised that Margarite Mouton would not

20  have been involved in the manufacture of that image, yes,

21  ma'am.

22  Q.  You stated that you continue with the interview.  What

23  happens next during the interview?

24  A.  The next step of the interview was I actually -- Agent

25  Cumming produced and I provided to Steven Mouton a series of

BAKER – DIRECT

1    digital images or printouts from digital images that had been

2    recovered from his laptop computer.  The images are of Amanda

3    Mouton in a clothed, partially clothed, clothed -- excuse

4    me -- and nude state, and some of the images depict her sexual

5    assault.  It was approximately three dozen images.

6             MS. BRAUN:  May I approach, Your Honor?

7             THE COURT:  You may.

8    BY MS. BRAUN:

9    Q.  Special Agent Baker, I am showing you what has been marked

10   for identification as Government's Exhibit 28, which consists

11   of eleven pages with four pictures per page.  Do you recognize

12   that?

13   A.  Yes, ma'am, I do.

14   Q.  What is it?

15   A.  These are images that were recovered from Steven Mouton's

16   Acer laptop computer.  They are images, they are printed

17   images from digital images that were once housed on that

18   system, and they are images of Amanda Mouton clothed,

19   partially clothed, fully nude, and being sexually assaulted by

20   what appears to be an adult male.

21   Q.  Are those -- is Exhibit 28 in substantially the same

22   condition now as when you showed it to him during your

23   interview on April 9th?

24   A.  Yes, ma'am.  They are.

25   Q.  I am showing you what has been marked for identification

BAKER – DIRECT

1    as Government's Exhibit 29 and ask that you take a look at

2    that.  It is four pages of pictures with four pictures per

3    page.

4    A.  Yes, ma'am.

5    Q.  Do you recognize it?  What is it?

6    A.  These are, again, printed images from digital images that

7    were housed on Steven Mouton's Acer brand laptop computer.

8    They are images that depict Amanda Mouton wearing a cowboy

9    hat, a brown leather belt, cowboy boots, and at times a red

10   handkerchief, and other than that, she is completely nude.

11   Q.  Did you discuss those images with the defendant during the

12   interview on April 9th?

13   A.  I discussed Government's Exhibit 28, but -- I did discuss

14   Government's Exhibit 29 with Mr. Mouton, but he, at that point

15   in the interview, refused to look at them.

16   Q.  Are they in the same or substantially the same condition

17   now as they were during the interview?

18   A.  Yes, ma'am.  They are.

19   Q.  I am showing you what has been marked for identification

20   as Government Exhibit 30 and 31 and ask you to take a look at

21   those.  Do you recognize those?

22   A.  Yes, ma'am, I do.

23   Q.  Are those also images that were shown to and discussed

24   with the defendant during your interview on April 9th of 2008?

25   A.  Yes, ma'am, these are.

BAKER - DIRECT

1    Q.  And are they in the same condition now as they were on

2    that date?

3    A.  Yes, ma'am.

4         MS. BRAUN:  Government offers Exhibits 28 through

5    31.  Do you want to see them?

6         MR. BASILE:  Yes, if I could.

7         I have no objection, Your Honor.

8         THE COURT:  28, 29, 30 and 31 are admitted.

9    BY MS. BRAUN:

10   Q.  Exhibit No. 28 is a series of images depicting Amanda

11   Mouton; is that correct?

12   A.  That is correct.

13   Q.  Did you show those to the defendant during the interview?

14   A.  Yes, ma'am.  We did.

15   Q.  Explain how that was done.

16   A.  At that point in the interview, again, sticking to the --

17   to my promise to Mr. Mouton to lay all of the cards on the

18   table, if you will, we provided the images to Mr. Mouton for

19   review and asked for a response on how the images had been

20   created and what he knew about the images.

21   Q.  What was his reaction when he looked at them?

22   A.  Much like it was at the onset of the interview, very calm,

23   very measured.  No obvious response.

24   Q.  What did he tell you about the images depicted in

25   Exhibit 28?

BAKER – DIRECT

1   A.  He advised that he had manufactured each of the images

2   with a Canon EOS Digital Rebel, that the images were

3   manufactured at his 18 Crystal Circle, Boerne, Texas

4   residence, and that he had no reason to believe, at least most

5   of the images -- the images were actually shown to him in

6   parts.

7   Q.  Explain that.

8   A.  Well, the first 34 or so images that are printed on

9   Government's Exhibit 28 appear to be from the same event.  The

10  background is the same.  The clothing on Amanda Mouton in some

11  of the images is the same.  And it was our belief at the time

12  that the images were probably manufactured on or about the

13  same date.  The images depict a nightgown, a floral nightgown

14  in a number of the images, and that was our belief, that they

15  had potentially been manufactured at the same time.

16  Q.  So the first 34 images in Exhibit 28 are, in your opinion,

17  a series taken at about the same time and the same location of

18  the same person?

19  A.  Approximately the same 34.  I would have to count each

20  one.  But, yes, ma'am, that is approximately 34 images.

21  Q.  And is the nightgown that is seen on Amanda Mouton in the

22  first few images and then taken off the same one that she is

23  depicted in in Government's Exhibit 10?

24  A.  Is that what is being displayed in Government's Exhibit --

25  Q.  Yes.

BAKER – DIRECT

1   A.  Yes, it is.

2   Q.  And is that the same nightgown that she is wearing in

3   Government's Exhibit 11?

4   A.  Yes, ma'am, it is.

5   Q.  And then does Government Exhibit 12 show Amanda in the

6   same nightgown in her bed, which is the same location that

7   Exhibit 28 were produced?

8   A.  Yes, ma'am.  It appears to be.

9           MS. BRAUN:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MS. BRAUN:

12  Q.  Special Agent Baker, in the 30-some pictures that you just

13  described that depict Amanda Mouton, is Exhibit No. 1 included

14  in that series?

15  A.  Yes, ma'am, it is.

16  Q.  Was the defendant specifically shown Government's Exhibit

17  30, which is image 428?

18  A.  Yes, ma'am.  I believe that is an image of an adult male's

19  penis penetrating Amanda Mouton's vagina.

20  Q.  Correct.

21          MS. BRAUN:  May I publish that image, Your Honor?

22          THE COURT:  Yes.

23  BY MS. BRAUN:

24  Q.  What was the defendant's reaction to seeing that image?

25  A.  His reaction was much like most of the interview.  It was

BAKER - DIRECT

1   just acknowledgment, calm, collected.  No statement at that

2   moment.

3   Q.  What did you ask him about that picture?

4   A.  I asked him if that was his penis penetrating Amanda

5   Mouton's vagina, and he advised that it was.

6   Q.  Did you also show him image 328, which is at the top

7   right -- which is this image right here?

8   A.  Yes, ma'am.  I did.

9   Q.  Did you show him that image during the interview?

10  A.  Yes, ma'am.  I did.

11  Q.  What did you ask him about that image?

12  A.  I asked him if those were his fingers and if that was his

13  hand that was penetrating Amanda Mouton's vagina, and he

14  advised that it was.

15  Q.  Did you ask or was there conversation about where those

16  images were produced?

17  A.  Yes, ma'am.  I again asked with what device did he use to

18  manufacture those images and where, and he advised a Canon EOS

19  Digital Rebel, his camera, was utilized by him to produce

20  those images at 18 Crystal Circle, Boerne, Texas.

21  Q.  And did he indicate when they were produced?

22  A.  He advised that he had no reason to believe that they were

23  not produced at any other time other than August 2007 on a

24  date consistent with that of the image that had been viewed by

25  Inspector Gebauer during the home visit.  So he could not

BAKER - DIRECT

1    recall the exact date, but he had no reason to believe that

2    they were not all manufactured on the same date in August of

3    2007.

4    Q.  Did you also show him another series of images of his

5    daughter that were taken in a different location at a

6    different time?

7    A.  I did.

8    Q.  There are approximately seven images that belong or appear

9    to belong in that series; is that correct?

10   A.  That is correct.

11   Q.  Describe what they depict, briefly.

12   A.  They depict Amanda Mouton at what appears to be a

13   significantly younger age, two to three years younger than the

14   previous detailed images.  They appear -- she appears in a

15   white blouse, almost like a nightgown.  Other than that, she

16   is wearing no clothes and, in fact, in some of the images she

17   is not wearing the nightgown.

18           And the images have her basically posing in numerous

19   positions on a white-and-green patterned couch inside a

20   residence that Mr. Mouton later advised was his 219 North

21   Street, Boerne, Texas residence, which is where he lived prior

22   to moving to 18 Crystal Circle.

23   Q.  In those images, is the focal point of those images or in

24   some of the images the private parts of Amanda Mouton?

25   A.  Yes, ma'am.  The focal point is the genital area, the

BAKER – DIRECT

1    vaginal area or her anus.

2    Q.   Now, on August of 2007, the first series that we saw,

3    Amanda Mouton would have been twelve years old, correct?

4    A.   That is correct.

5    Q.   So in these images, with the green and white couch, she

6    is, as we said, significantly younger; maybe two to three

7    years younger?

8    A.   That is my estimation, yes, ma'am.

9    Q.   What did the defendant tell you about how those pictures

10   of Amanda were produced?

11   A.   He advised that he had produced each of the images, was

12   not sure exactly what device had been utilized, but that he

13   did produce each of the images at the 219 North Street,

14   Boerne, Texas residence, his residence prior to the 18 Crystal

15   Circle residence.

16   Q.   And I want to draw your attention to Exhibit No. 29, which

17   you described as a third series of images depicting Amanda

18   wearing cowgirl attire and nothing covering her genital area.

19   Describe what happened as you attempted to show the defendant

20   those images.

21   A.   I retrieved the images from Special Agent Cumming, advised

22   Mr. Mouton that I would like to show him one more series of

23   images.  At that point, he advised that he did not want to see

24   any more images.

25           I then explained to Mr. Mouton what the images

BAKER - DIRECT

1  depicted, the outfit that Ms. Mouton was wearing, and I

2  further advised him that I did not want to see the manufacture

3  of these images be unfairly attributed to him, if he did not,

4  indeed, manufacture them, and it was my desire to at least let

5  him look at them briefly to see whether he recognized them or

6  not or -- and knew how they were manufactured.

7  Q.  Now, can you tell from looking at the images where those

8  were manufactured?

9  A.  I can tell through, not directly from this image alone,

10 but from other -- a review of other images from the hard drive

11 that this is Mr. Mouton's previous residence at 219 North

12 Street.

13 Q.  In Boerne, Texas?

14 A.  In Boerne, Texas, yes, ma'am.

15 Q.  How old does Amanda Mouton appear to be in those images?

16 A.  I would estimate her age to be seven to eight years old.

17 Q.  And when you explained to Mr. Mouton that you didn't --

18 you didn't want to attribute these to him if he didn't take

19 them or had nothing to do with them, what was his reaction?

20 A.  He advised that, and to quote him:  You know I made the

21 images.  I know I made the images.  Why do you continue to ask

22 me questions about the images?  I made them.

23 Q.  What did you do at that point?

24 A.  We stopped attempting to show Mr. Mouton any images and

25 turned the interview towards general child pornography

BAKER - DIRECT

1   matters.

2   Q.  Did Mr. Mouton indicate at that time how long he had been

3   producing child pornography using his daughter?

4   A.  Yes, ma'am.  He advised that for a number of years he had

5   been producing child pornography images of Amanda Mouton

6   before he ever decided or ever attempted to touch her.

7   Q.  By that you mean, he took pictures of her without ever

8   sexually touching her?

9   A.  Yes, ma'am.

10  Q.  For a while?

11  A.  Yes, ma'am.

12  Q.  And then, at some point, he began sexually touching her?

13  A.  That is correct.  And we discussed when that occurred and

14  how many times.

15  Q.  What did he tell you about that?

16  A.  He advised that he had only had sexual interactions with

17  Amanda Mouton on one occasion, and it was on that occasion

18  that he actually captured that sexual interaction, and he was

19  referring back to the images that were believed to be produced

20  on August 2007, the images with an adult male penis

21  penetrating Miss Amanda Mouton's vagina and the digital

22  penetration.

23  Q.  Is that what we saw in Exhibit 30, the one he acknowledged

24  was his penis in his daughter's vagina?

25  A.  Yes, ma'am.  That is correct.  So he advised that it

BAKER - DIRECT

1   occurred on one time and he captured that via the digital

2   photography.

3   Q.  Special Agent Barack, is that consistent with your review

4   of the metadata of other images seized in this case?

5   A.  It is not.

6   Q.  Why not?

7   A.  Images that were retrieved from a camera indicate that the

8   potential sexual abuse was spread out over multiple events.

9   Q.  When -- and I will get back to the camera card, but when

10  the conversation then turned to general child pornography,

11  explain that.

12  A.  Essentially, we asked Mr. Mouton general questions related

13  to his involvement in child pornography, how he obtained it,

14  beyond Amanda Mouton, how he obtained it, because we obviously

15  had approximately 400 images from the laptop that did not

16  depict Amanda Mouton, and so we inquired about those images.

17  How did he obtain them?  Did he distribute?  How did he

18  receive them?  How long did he possess them?  Things of that

19  nature.

20  Q.  What did he tell you?

21  A.  He advised that he had been obtaining child pornography

22  via the Internet for a number of years, that this act was

23  cyclical in nature, that he would obtain these images, view

24  them, and after feeling guilt, delete them, and then the

25  process would start over again.

BAKER – DIRECT

1          He advised that, at present, he was utilizing his

2    Dell desktop computer and the Internet to obtain the images

3    and then he would subsequently transfer those images to his

4    Acer brand laptop computer for further review.

5    Q.  Was the Acer laptop password-protected?

6    A.  It was not.

7    Q.  Did you talk about that during the interview?

8    A.  Yes.  He advised that, including the images that he

9    manufactured of Amanda Mouton, these images were just placed

10   openly on his Acer laptop computer which, according to him,

11   Margarite Mouton and Amanda Mouton periodically used or could

12   use, and since they weren't password-protected or encrypted,

13   the question was:  Well, weren't you concerned that they would

14   come across these images?

15   Q.  What did he say about that?

16   A.  He didn't address the concern part, but he said they could

17   have.  They could have seen them.  They were there and they

18   weren't protected.

19   Q.  Knowing that many of the images, at least the ones that

20   were manufactured at the residence at 18 Crystal Circle, were

21   made with the Canon EOS Digital Rebel camera, did you contact

22   Canon?

23   A.  Yes, ma'am.  Our office did contact Canon.

24   Q.  What was the purpose of that?

25   A.  Excuse me.  Just to establish where the Canon EOS Digital

BAKER - DIRECT

1    Rebel camera was actually manufactured.

2    Q.  Did you receive a business records affidavit from the vice

3    president and general manager of sales for Canon USA

4    indicating that the Canon camera was not made in the state of

5    Texas?

6              MR. BASILE:  Your Honor, I am going to object to

7    this under Crawford and Sixth Amendment.  This is testimonial

8    evidence, and to provide it this way by hearsay is -- I object

9    under those rules.

10             THE COURT:  The first question is, did you receive?

11   And I haven't received an answer to that, so there is no

12   objectionable question posed at this time.  That is overruled.

13             THE WITNESS:  Yes, ma'am.  I did receive a business

14   affidavit from Canon.

15             MS. BRAUN:  May I approach, Your Honor?

16             THE COURT:  Yes.

17   BY MS. BRAUN:

18   Q.  I am showing you what has been marked for identification

19   as Government's Exhibit 25.  Do you recognize that?

20   A.  I do.

21   Q.  What is it?

22   A.  It is entitled affidavit of Elliott Peck, and it is a

23   business records affidavit or an affidavit from Canon

24   establishing the fact that the Canon EOS --

25             MR. BASILE:  Your Honor, I am going to object.

Karl H. Myers, CSR, RMR, CRR - (210) 212-8114

BAKER – DIRECT

1           THE COURT:  Just one second here.  You have

2    identified it as a business record.  Next question.

3           MS. BRAUN:  The government offers Exhibit 25.

4           THE COURT:  Everybody come on up.

5           (Bench conference, as follows:)

6           THE COURT:  Okay.  The objection is to hearsay and

7    lack of confrontation.  What is your response?

8           MS. BRAUN:  We have given this affidavit, as well as

9    the business records affidavit from Canon, to the defense and

10   it is a business record.  It falls outside of hearsay.

11          THE COURT:  It is not a business record.  He is

12   testifying that Canon is exclusive importer and distributor,

13   and he is testifying that no digital cameras are manufactured

14   in the United States.  A business record -- an affidavit

15   proving up business records is an affidavit that says the

16   following attached ten pages are true and correct copies of

17   documents regularly maintained in the course and scope of

18   business.  That is not this.

19          MS. BRAUN:  I realize that, but when we requested

20   the records from Canon with regard to this particular camera

21   with this serial number, this is what we got in return.

22          THE COURT:  Okay.

23          MS. BRAUN:  With -- I think with the letter saying

24   this is what we have.

25          THE COURT:  What is the necessity of this document?

BAKER – DIRECT

1     Is it for the interstate connection?

2               MS. BRAUN:  The interstate connection.

3               THE COURT:  Haven't you already established that

4     through the --

5               MS. BRAUN:  The camera itself?

6               THE COURT:  -- the camera itself and the card?  The

7     objection is sustained.  This is not coming in.

8               (End of bench conference.)

9     BY MS. BRAUN:

10    Q.  Agent Baker, the search warrant that was executed at 18

11    Crystal Circle on April 9th of 2008 yielded the Canon camera,

12    correct, that is right there?

13    A.  Yes, ma'am.  Government's Exhibit 32.

14    Q.  And also three media cards; is that correct?

15    A.  At least three, yes, ma'am.

16    Q.  One of those media cards we heard testimony contained

17    numerous images of child pornography?

18    A.  That is correct.

19    Q.  Do you know how many images of child pornography were

20    contained on that media card?

21    A.  Yes, ma'am.  73.

22    Q.  And how do you know that?

23    A.  I reviewed.

24    Q.  Are those images that were found on the camera card

25    located in Government's Exhibit 8?

BAKER - DIRECT

1    A.  Yes, ma'am, they are.

2    Q.  You testified that you also reviewed the images recovered

3    from both of the defendant's computers, the desktop and the

4    laptop; is that correct?

5    A.  That is correct.

6    Q.  Were the images of Amanda that were taken at her residence

7    on Crystal Circle found both on the camera card and on the

8    laptop computer?

9    A.  Yes, ma'am.  The camera card housed all of the images that

10   were found on the laptop computer from that series, so the

11   camera had all of those images plus additional images that

12   were from that series that were not placed on the laptop

13   computer or recovered from the laptop computer.

14   Q.  Describe, if you will, some of the additional images that

15   were found on the camera card that were not on the defendant's

16   laptop computer.

17   A.  There were additional images of an adult male penis

18   penetrating Amanda Mouton's vagina.  There were -- there was

19   an image of what appears to be a plastic cigar holder or

20   sleeve canister placed in Amanda Mouton's vagina.  There is an

21   image of a Kleenex or a tissue of some sort placed inside

22   Amanda Mouton's vagina, and I believe that there is an

23   additional image of fingers digitally penetrating Amanda

24   Mouton's vagina.

25           THE COURT:  Wait for a question.

BAKER – CROSS

1    BY MS. BRAUN:

2    Q.  Sorry.  Special Agent Baker, the images on the camera card

3    were all deleted, correct?

4    A.  That is correct.

5    Q.  What was the date of the deletion?

6    A.  For most of the images, because the camera card housed a

7    number of images, but the 73 child pornographic images, all of

8    them showed a deletion date of October 16th, 2007.

9    Q.  And that date would have been after the phone call

10   Mr. Mouton got from probation saying, "We are coming to your

11   house," and before the date that they actually showed up at

12   his house?

13   A.  According to Mr. Mouton, it would be, yes, ma'am.

14          MS. BRAUN:  May I have just a minute, Your Honor?

15          I have nothing further at this time, Your Honor.

16          THE COURT:  Mr. Basile.

17          MR. BASILE:  May I have a few minutes to confer with

18   my client?

19          THE COURT:  Yes.

20          Anybody want to stand and stretch in place?  Feel

21   free.

22                         *–*–*–*–*–*–*–*

23                      CROSS EXAMINATION

24   BY MR. BASILE:

25   Q.  Good morning, Agent Baker.  How are you?

BAKER - CROSS

1    A.  Good, sir.  Thank you.

2    Q.  I just have a few questions about your testimony.  When

3    you were in this room, this investigative room, who was all

4    present?

5    A.  In the interview room?

6    Q.  Yes.

7    A.  Myself and Special Agent Cumming.

8    Q.  And you said you had picked up Mr. Mouton or he turned

9    himself in at his attorney's office; is that correct?

10   A.  He did not turn himself in.  He was waiting in the parking

11   lot in a vehicle with his wife at the parking lot where his

12   attorney's office is housed.

13   Q.  All right.  And who was his attorney?

14   A.  I do not know.

15   Q.  All right.  Did you talk to his attorney at all?

16   A.  No.

17   Q.  Did you attempt to talk to him?

18   A.  No.

19   Q.  And did Mr. Mouton represent to you at all that he had

20   retained this attorney or consulted with his attorney?

21   A.  When I spoke to Mr. Mouton telephonically the first

22   time -- or, excuse me, the second time, he advised that he was

23   at his attorney's office, did not provide any more information

24   than that.  We did not discuss whether he retained him or

25   anything of that nature.

BAKER – CROSS

1    Q.  Did he discuss it any more when you took him in to the

2    investigative room?

3    A.  No.

4    Q.  Now, you said you gave him his Miranda warnings; is that

5    correct?

6    A.  That is correct.

7    Q.  And one of the warnings is that you have a right to have

8    an attorney; isn't that correct?

9    A.  That is correct.

10   Q.  And if there is an attorney available, you are not

11   supposed to have any contact with him, are you?

12   A.  That is not correct.

13   Q.  Well, explain to me what the Miranda rights say.

14          THE COURT:  That calls for a legal conclusion.  Next

15   question.

16   BY MR. BASILE:

17   Q.  At any time, did Mr. Mouton tell you he wanted to stop the

18   interview?

19   A.  No.

20   Q.  Not once?

21   A.  No.  He refused to look at the pictures and advised that

22   he didn't want to see any more pictures, and I believe that

23   the interview concluded itself.  There were no more questions

24   to be asked.

25   Q.  Now, Agent Baker, you testified about a lot of different

BAKER – CROSS

1   images that you have gotten from the Canon and some other

2   camera.  All of the images but one were actually deleted,

3   weren't they?

4   A.  That is correct.

5   Q.  And the only image that wasn't was the one image in

6   Government's Exhibit No. 1; is that right?

7   A.  That is correct.

8   Q.  And that information, is that something you have personal

9   knowledge of?

10   A.  Is the deletion of those images --

11   Q.  Yes.

12   A.  Yes.

13   Q.  And how do you know that?

14   A.  How do I know that?  I reviewed each forensic report for

15   each image and verified with the forensic examiners the dates,

16   if they were available for deletion or confirmed that the

17   images were deleted or present on the hard drive.  And

18   subsequently, I have also reviewed Government's Exhibit 1,

19   resident on the hard drive, not deleted.

20   Q.  Do you know when Canon started making this camera?

21   A.  Do I know when?  No, sir.

22   Q.  So you don't know whether actually any other pictures were

23   taken than the ones you talked about?

24   A.  Do I know any other images?

25   Q.  Yes.

BAKER – CROSS

1   A.  By "other," you mean other than the ones not attribute --

2   Q.  Other than the ones you testified to.

3   A.  Other -- I know, the images attributed to the 18 Crystal

4   Circle, approximately when they were manufactured.  The other

5   ones, I have estimates, but no exact dates, no, sir.

6   Q.  And during the time that you were interviewing Mr. Mouton,

7   were both of you present, both investigators in the room?

8   A.  Yes, sir.

9   Q.  At the same time?

10  A.  During the questioning, there potentially was a time when

11  we may have retrieved a soda or something for Mr. Mouton that

12  one of us was left there, but we don't question unless two of

13  us are present.

14  Q.  Did you make any kind of recording of this?

15  A.  We do not record interviews.  That is FBI policy.

16  Q.  And did you make a video recording or audio recording of

17  any of this?

18  A.  It is the FBI policy to record no interview.

19          MR. BASILE:  I don't think I have any further

20  questions, Your Honor.

21          THE COURT:  Anything further?

22          MS. BRAUN:  May we approach briefly?

23          THE COURT:  Come on up.

24          (Bench conference, as follows:)

25          MS. BRAUN:  If I could have permission to clarify

BAKER - CROSS

1    the attorney question, and just put in there that the

2    attorney's office was not Mr. Basile, and that it was not an

3    attorney related to this case.

4         I am afraid the jury is left with wondering whether

5    the interview was proper, if he did have an attorney, and the

6    attorney was on probation violation, which the Court -- which

7    we haven't gotten into, so without getting into the fact that

8    he is a criminal defendant who was on probation, and that is

9    the reason for the attorney, I don't want the jury misled into

10   thinking he had an attorney on this matter and that the FBI

11   went around that or circumvented that.  I am just not sure how

12   to do that without --

13        THE COURT:  So your proposed questions are?  The

14   office that you went to was not Mr. Basile's and Mr. Bastille

15   was not the attorney?

16        MS. BRAUN:  And that the attorney that he -- the

17   attorney's office that he was at was not related to these

18   circumstances.  It is related, in the sense of a probation

19   violation, but -- I can go in and explain everything.

20        THE COURT:  I agree, Mr. Basile, that part is not

21   clear, and we don't know what that attorney was retained for

22   and what was the purpose of his visit to that location.

23        MS. BRAUN:  Well, actually, there was testimony from

24   Sean Hiler that he contacted Wallace Ferguson, who is the

25   attorney, and that he did not represent Mr. Mouton on the new

BAKER – CROSS

1    charges.  He would continue to represent him on the 2003

2    offense, but not any new charges.

3              MR. BASILE:  How is this relating to the CPS matter?

4    It is a completely different legal proceeding and a different

5    court.

6              THE COURT:  I am going to allow you to ask questions

7    about, you know, the attorney's office that you went to to

8    arrest Mr. Mouton was not the offices of Mr. Basile, without

9    anybody thinking Mr. Basile did anything ineffective here, at

10   least for this jury and potential clients.  But I mean, I

11   don't see how any -- I don't see any harm on that.  Do you

12   have any problem with that?

13             MR. BASILE:  No.  No problem with --

14             MS. BRAUN:  The questions are left with, I think the

15   impression that the FBI has circumvented or ignored the fact

16   that he was represented by counsel.

17             THE COURT:  That is why -- I'm sorry.  I cut you off

18   on that question.  I didn't want to go into the previous

19   probation issues.  Let's just stop it at, it wasn't

20   Mr. Basile's office and it wasn't Mr. Basile and stop it

21   there.  No further.

22             MS. BRAUN:  Okay.  My concern, Your Honor, is the

23   way the jury instruction is worded is the jury is sort of

24   invited to consider the voluntariness of the confession, and

25   if they are left with any indication that the FBI circumvented

BAKER – CROSS

1     his right to counsel, I am afraid of how that may play out.

2              THE COURT:  Well, tell me what questions you may

3     have.

4              MS. BRAUN:  That it wasn't his office, he wasn't

5     representing him at the time, and that he did not have

6     representation with regard to --

7              MS. WANNARKA:  -- these charges, and it was on a

8     different matter, that it was a different matter that he had

9     an attorney.

10             MS. BRAUN:  That attorney was related to a different

11    matter.

12             THE COURT:  But what does it matter?  I mean, having

13    the right to an attorney -- if they want to believe, what does

14    it matter whether -- whatever his name is or somebody else --

15             MR. BASILE:  He consulted with an attorney was the

16    information that was testified to.  We don't know the details

17    of that consultation, so I still think that to state that he

18    wasn't retained, there is no evidence of that.  I would object

19    to that.

20             MS. BRAUN:  I will just clarify it was not

21    Mr. Basile, and I guess we will let the advice of rights form

22    speak --

23             (End of bench conference.)

24             MS. BRAUN:  Thank you, Your Honor.

25

BAKER – REDIRECT

```
 1                        *–*–*–*–*–*–*–*

 2                   REDIRECT EXAMINATION

 3   BY MS. BRAUN:

 4   Q.  Special Agent Baker, when Mr. Mouton was arrested in the

 5   parking lot of a law office, was that the office of

 6   Mr. Basile?

 7   A.  No, ma'am, it was not.

 8   Q.  In fact, Mr. Basile was not representing Mr. Mouton at

 9   that time, correct?

10   A.  That is correct.

11             MS. BRAUN:  Thank you.

12             Nothing further, Your Honor.

13             THE COURT:  Anything based on that?

14             MR. BASILE:  I have no further questions, Your

15   Honor.

16             THE COURT:  You may step down.  Thank you, sir.

17             Any further witnesses from the government?

18             MS. BRAUN:  No, Your Honor.  At this time, the

19   government rests.

20             THE COURT:  The government rests.

21             Ladies and gentlemen, we need to take a slight

22   break, and this is probably a good time to take our morning

23   break, in any event.  I will bring you back in as soon as I

24   can.

25             All rise for the jury.
```

```
 1                    (Jury leaves courtroom.)

 2               THE COURT:  Please be seated.

 3               Are there any motions?

 4               MR. BASILE:  Yes, Your Honor.  I would make a motion

 5     for judgment of acquittal on, specifically on 2251.  There has

 6     been no evidence presented by the government under that

 7     section of 2251 that there was an intent under 2251 --

 8               THE REPORTER:  Counsel, why don't you approach the

 9     podium.

10               MR. BASILE:  Okay.  That's fine.

11               Under 2251, the statute is fairly wordy, but it is

12     our opinion, Your Honor, that it requires proof, which is

13     halfway through the statute, which -- that the person knows or

14     has reason to know that visual depictions will be transported

15     or transmitted in interstate commerce.

16               There has been no evidence of that presented, that

17     any of this was transported or the intent was to transport in

18     interstate commerce.  So I would ask the Court under Section

19     2251 for a judgment of acquittal on that, nonsufficient

20     evidence on the legal standard, legal sufficiency and factual

21     sufficiency.

22               And on and under 2252, Your Honor, there has been no

23     actual presentation by anybody with knowledge that the

24     pictures taken were actually of a minor.  The one picture that

25     was shown that was not deleted, there has been no medical
```

1    testimony that picture is actually a minor.

2         The only evidence that actually has been presented

3    was presented by Mr. Mouton's statements that he didn't think

4    it was Amanda, because of the physical characteristics.  There

5    have been no witnesses presented that would have the

6    background to do that, and that is one of the requirements

7    under that.

8         And if there is -- all of the other images were

9    deleted, and under that code 2252, if all of the images are

10   deleted, and there are less than three matters that they had,

11   and I would submit to the Court there are only three matters.

12   One was the camera, media card, one was the laptop, and the

13   other was the hard drive.

14        Under a case out of the Ninth Circuit, US v. Laci,

15   that has also been followed in the Fifth Circuit, which I have

16   those cases available for the Court, I would say that is an

17   affirmative defense to 2252, if everything is deleted, there

18   are no images, so I would ask the Court for a judgment of

19   acquittal on that grounds too.

20        THE COURT:  You believe you have a case for that?

21        MR. BASILE:  For the matters -- Your Honor?

22        THE COURT:  No.  For the proposition that if it is

23   deleted, there is no material?

24        MR. BASILE:  Under the statute, it gives an

25   affirmative defense, Your Honor, if it is deleted or if it is

1    turned over to a law enforcement agency.  Everything was

2    deleted but the one image.  And I would state to the Court

3    there is no evidence to show that that image is a minor.

4    There has been no medical testimony to back up that

5    conclusion, as presented to the jury.

6            THE COURT:  Well, let me tackle Count 2 first.  And

7    the question I have for you, Counsel, on that, as I understand

8    your allocution on Count 2, there is no evidence that any

9    individuals depicted in the deleted but restored files are not

10   minors.  As I look at Government's Exhibit 3 and --

11           MR. BASILE:  Your Honor, just to clarify my

12   argument, it is not any of the ones of the deleted files.  It

13   is, the only undeleted picture, there was no proof that it was

14   a minor.

15           Under the section, there is an affirmative defense.

16   If all of the images are deleted, and there are less than

17   three matters, and they are all deleted or turned over to a

18   law enforcement agency.  So that is our argument.

19           THE COURT:  Well, let me make sure I understand the

20   counts of the indictment.  I thought Count 1 of the

21   indictment, the evidence offered by the government is

22   Exhibit 1, a picture depicting a female vagina, and the

23   testimony offered by the case agent is that the defendant

24   admitted that that was a picture of Amanda Mouton, and there

25   is testimony through her birth certificate of her age

1    acknowledging that she is a minor under the statute.  So what

2    am I missing there?

3                MR. BASILE:  Your Honor, I am not denying that

4    Amanda Mouton is a minor.  The birth certificate states that,

5    but they did not provide any evidence.  Maybe your

6    recollection of the evidence is different than mine.  The

7    testimony that just came out from the FBI agent is that

8    Mr. Mouton denied that that was his daughter, that one

9    picture, and said that it didn't look like his daughter

10   because of the physical characteristics.

11               There has been no medical testimony, testimony of

12   any type of medical procedures or medical -- such as the

13   Tanner stages or that type of information that would give

14   information to us to know what age that picture shows of a

15   child.

16               THE COURT:  Your response?

17               MS. BRAUN:  Your Honor, the testimony was Mr. Mouton

18   originally said that was an adult vagina.  He later then

19   looked at that specific image, as well as the one where he is

20   digitally penetrating her and where he has his penis in her

21   vagina, and said:  Yes, that is me, and that is her.

22               And based on the birth certificate and the metadata,

23   the government has proven that she was only twelve years old

24   at the time that those were taken.

25               THE COURT:  Yes.  That is my recollection of the

1    testimony as well.

2            Are there any other -- let me take these things

3    separately.  With regard to Count 2, are there any other

4    grounds for the motion?

5            MR. BASILE:  No, Your Honor.  Just the grounds that

6    I have already stated to the Court.

7            THE COURT:  Okay.  Yes.  With regard to Count 2, the

8    motion is denied.

9            Now, with regard to Count 1, my understanding of

10   your motion is that you are arguing that -- and you are not

11   conceding, but if that was a picture taken of Amanda Mouton, I

12   understand your argument to say that if the defendant took the

13   picture and if it is Amanda Mouton, there has been no evidence

14   to suggest that that picture had been transported in

15   interstate commerce or intended to be transported in

16   interstate commerce.

17           MR. BASILE:  That is correct, Your Honor.

18           THE COURT:  Okay.  Now, let me hear the legal

19   argument on that.

20           MS. BRAUN:  Your Honor, jurisdiction can be

21   established in a production case three ways.  One, the image

22   can actually be transported in interstate commerce.  Two, the

23   picture can be taken with the intent to transport it in

24   interstate commerce.  Or, three, it can be taken or produced

25   using materials that were transported in interstate commerce.

1          In this case, the camera, the camera card, the Dell

2     hard drive, and the Acer hard drive were all manufactured in

3     other countries, so all of them that were used to produce

4     these images of Amanda traveled in interstate and foreign

5     commerce.

6          The jurisdictional nexus is in the alternative:

7     Either they were shipped or they were taken with the intent to

8     be shipped or they were produced using materials that were

9     shipped.

10          THE COURT:  One second.  Let me reread 2251-A.

11          MS. BRAUN:  And, Your Honor, I believe the language

12     of 2251-A was recently changed or was changed in October of

13     2008, so it would be the language before that, to make it even

14     more confused.

15          MR. BASILE:  And, Your Honor, just for the Court's

16     knowledge, I have done some legal research, and I have not

17     found a case, per se, on it.  In the Fifth Circuit, I did find

18     a case, U.S. v. Runyan, 290 Federal 3d 223, where this exact

19     issue went up to the Fifth Circuit.

20          They did not decide the issue because they said in

21     that case there was some evidence that the images had been

22     transported or intended to be transported in interstate

23     commerce.  That was an issue that went up and has not been

24     ruled upon, that I can find, Your Honor.

25          THE COURT:  It is the government's position that I

```
1    am looking at the version of 2251 that was effective from

2    July 27, 2006 to October 7, 2008; is that correct?

3              MS. BRAUN:  Correct.

4              THE COURT:  That section, as it then read, reads:

5    Any person who employs, uses, persuades, induces, entices or

6    coerces any minor to engage in or who has a minor assist any

7    other person to engage in or who transports any minor in

8    interstate or foreign commerce or in any territory or

9    possession of the United States with the intent that such

10   minor engage in any sexually explicit conduct for the purpose

11   of producing any visual depiction of such conduct shall be

12   punished as provided under subsection E, if such person knows

13   or has reason to know that such visual depiction will be

14   transported in interstate or foreign commerce or mail, if that

15   visual production was produced using materials that had been

16   mailed, shipped or transported in interstate or foreign

17   commerce by any means, including by computer, or if such

18   visual depiction has actually been transported in interstate

19   or foreign commerce or mailed.

20             MS. BRAUN:  Your Honor --

21             THE COURT:  The grammar in there is pretty -- let's

22   just put it this way.  There are a heck of a lot of commas in

23   that paragraph.  And with a lot of those paragraphs and those

24   commas, it appears that, my reading, that the first part, the

25   intent to transport the material in interstate commerce is a
```

1    first prerequisite to the rest of it that follows.

2            MS. BRAUN:  I don't believe that is the law, Your

3    Honor.  I would request a short period of time to look that

4    up.  I did not get Mr. Basile's objections to the jury

5    instructions until this morning and have not had time to look

6    that up specifically, but I know this issue came up in a case

7    I did in the Eighth Circuit, which did go up on appeal.  I

8    believe they addressed this issue, but it was a long time ago,

9    and in that case, it was just produced using materials.

10           MR. BASILE:  Your Honor --

11           THE COURT:  You are citing me to 290 F 3d 223?  If

12   you a copy for me, that would be great.

13           MR. BASILE:  I have one copy, Your Honor, which the

14   Court can have.

15           THE COURT:  That's okay.  I will print out one when

16   we take our break.  Did I get the cite right?

17           MR. BASILE:  290 F 3d 223, that is correct.

18           THE COURT:  And what is it called?

19           MR. BASILE:  U.S. v. Runyan, R-u-n-y-a-n.  It is a

20   2002 case, Your Honor.  That's the only one I could find.  And

21   in regards -- Your Honor, I did just provide the jury

22   instructions to them this morning, but this has been a

23   discussion that we have had prior by e-mails, is the

24   difference in our opinion on this statute and how it is

25   interpreted.

1           THE COURT:  Okay.  I am not faulting you all, but in

2    in the future, if we think we are going to have a fight like

3    this on jury charges on a legal question, that would be nice

4    if you all clued me in earlier on.  That way, I can be doing

5    research beforehand, so now I am doing research on the run.

6           While I am researching this point and we take a

7    break, where are we at?  Is the defendant going to put on any

8    witnesses?

9           MR. BASILE:  Let me just ask my client real quick,

10   Your Honor.

11          No, Your Honor.

12          THE COURT:  Okay.  So the defendant intends to rest?

13          MR. BASILE:  Yes, Your Honor.

14          THE COURT:  With that said, then, as I continue to

15   look at this point, are there any objections to the Court's

16   instructions to the jury by the government?

17          MS. BRAUN:  No, Your Honor.

18          THE COURT:  Any objections from the defense?

19          MR. BASILE:  The only objection, Your Honor, would

20   be the proposals that I submitted in my request, which is

21   basically similar to my judgment for acquittal that I just

22   argued.  I would like to have those submitted to the jury as

23   an issue, if the Court doesn't rule on it legally.

24          THE COURT:  Yes.  I believe I prepared a correct

25   version of the Court's instructions, so any tendered

```
 1    instructions that you want are denied that I have not already
 2    incorporated, and I will continue to look at Count 1 of the
 3    indictment.
 4            Let's all go ahead and take a break.  I will conduct
 5    further research, and let's try to gather back in about 30
 6    minutes.
 7            (Brief recess.)
 8            (Jury not present.)
 9            THE COURT:  Thank you.  Please be seated.
10            Any argument from the government?
11            MS. BRAUN:  Yes, Your Honor.  The statute as
12    written, both then and now, I believe contemplates
13    jurisdiction in three ways:  Either sending the images in
14    interstate commerce; intending to; or producing them with
15    materials that have traveled in interstate commerce.  And
16    United States versus Sharpley, which is 399 F 3d 123 --
17            THE COURT:  Does anybody have a copy for me or --
18            MS. BRAUN:  I do.  It is a Second Circuit case.  And
19    United States vs. Mugan.
20            MS. WANNARKA:  That is --
21            MS. BRAUN:  I have both of them for him.
22            Address the constitutionality of 18 USC 2251-A.  And
23    in each of them, they talk about allowing a conviction for
24    production of child pornography based solely on materials that
25    have been transported in interstate commerce, which makes
```

1   sense, because otherwise, you are combining two jurisdictional

2   elements.  Otherwise, it is:  You either send the materials in

3   interstate commerce or you intend to use interstate commerce

4   and they are produced with materials that traveled in

5   interstate commerce.  That would be a double connection to

6   interstate commerce.

7          So those cases -- so it makes sense that the statute

8   is read as three prongs, three potential prongs to get to

9   federal jurisdiction.

10          And both of those cases, and I think -- I only

11  glanced at the Mugan case as I was running over here from the

12  Federal Building, but it seems to discuss that the issue of

13  whether you can use materials that were produced or the issue

14  of whether you can use materials that have traveled in

15  interstate commerce has been addressed and accepted by other

16  circuits, including the Fifth.

17          And so it seems clear from that that just having

18  materials like the camera, the camera card, and both hard

19  drives, that have clearly traveled in interstate and foreign

20  commerce, is sufficient jurisdiction, and that to add the

21  defendant's requested language that they actually be

22  transported is putting an undue burden on the government.

23          There are three different ways to establish

24  jurisdiction.  We have done that with the first way.

25          THE COURT:  Any further argument?

1          MS. BRAUN:  And I believe Mr. Basile had the Mugan

2    case, which sets that forth.

3          MR. BASILE:  Yes, Your Honor.  I had the Mugan case,

4    and even told them about it this morning, that I had one that

5    seemed to -- might have addressed it in a different circuit,

6    not in the Fifth Circuit.  And the only Fifth Circuit case is

7    the one I handed you, which hasn't really addressed that

8    issue -- discussed it, so I wasn't representing to the Court

9    as far as this Circuit made a ruling on it.

10          It is still my opinion, Your Honor, that just

11    reading of the statute, and we are supposed to read the

12    statute and the words that they have and not try to impose

13    anything else, that it seems to be a conjunctive requirement

14    on the statute, the way it is worded.

15          It doesn't say or --

16          (Counsel not speaking clearly.)

17          THE REPORTER:  Counsel, you are losing me.  If you

18    will slow down.

19          MR. BASILE:  It doesn't say "or" before the -- if

20    they have knowledge, so that would mean to me, Your Honor,

21    that that is required.  If they wanted to say something other,

22    they would put an "or" in there or some kind of disjunctive

23    language to show that.

24          Otherwise, I think the intent, if it is not -- it

25    becomes a state matter and, of course, the state can

1    prosecute, if they decide, on child pornography too, if it is

2    not transported -- I don't think the federal court has

3    jurisdiction, Your Honor.

4            THE COURT:  Yes.  With regard to 2251-A, as it

5    existed between '06 and '08, the statute that the government

6    seeks prosecution under in this offense, the Court reads it as

7    follows:  Any person, one, who employs, uses, persuades,

8    induces, entices or coerces any minor; or, two, who has a

9    minor assist any other person to engage in; or, three, who

10   transports any minor in interstate or foreign commerce with

11   the intent that such a minor engage in any sexually explicit

12   conduct, for the purpose of producing any visual depiction of

13   such conduct, shall be punished as provided under subsection

14   E, one, if such person knows or has reason to know that such

15   visual depiction will be transported in interstate or foreign

16   commerce or mailed; two, that visual depiction was produced

17   using materials that had been mailed, shipped or transported

18   in interstate or foreign commerce by any means, including by

19   computer -- and then this is how I read the construction.

20   Then the statute reads "or."  So, then, three, if such visual

21   depiction has actually been transported in interstate or

22   foreign commerce or mailed.

23           So under the statute's disjunctive, which has "or"

24   at the very end, it leads me to read that there are three ways

25   to violate this statute, and that the government is arguing

1    the second means, if that visual depiction was produced using

2    materials that have been mailed, shipped or transported in

3    interstate or foreign commerce by any means, which includes

4    the flash card, Mugan, the United States versus Mugan,

5    M-u-g-a-n, 394 F 3rd 1016, Eighth Circuit, 2005, stands for

6    the proposition that, in that case, where the subject child

7    pornography was produced with materials transported in

8    interstate commerce and the evidence in that case included

9    proof that the offending images were stored on a digital

10   memory card previously transported in interstate commerce,

11   that was sufficient to affirm the conviction.

12          In addition to Mugan, the government provides, and I

13   also independently found United States versus Sharpley, 399 F

14   3rd 123, out of the Second Circuit in 2005.  The Court's

15   independent research also found United States versus Hoggard,

16   H-o-g-g-a-r-d, 254 F 3rd 744; and an Eighth Circuit case in

17   2001, United States versus Grimmett, G-r-i-m-m-e-t-t, 439 F

18   3rd, 1263, Tenth Circuit, 2006; and United States versus

19   Holston, H-o-l-s-t-o-n, 343 F 3rd 83, Second Circuit, 2003;

20   all for the proposition of the constitutionality of this

21   statute, albeit under slightly differing facts than the case

22   we have here.

23          The Court relies upon Sharpley for the proposition

24   that the motion for acquittal ought to be denied.

25          I take note of your case in Runyan, which affirmed

1    on different grounds out of the Fifth Circuit, and the

2    argument in the sufficiency of the evidence challenge in

3    Runyan dealt with whether or not there was sufficient intent

4    to transport in interstate commerce the photos, which is not

5    the issue that we have here.

6          Your objections are noted, overruled, and the Count

7    1 will be presented to the jury for its consideration.

8          Anything else that we need to take up before we

9    bring in the jury?

10         MS. BRAUN:  Nothing from the government, Your Honor.

11         MR. BASILE:  No, Your Honor.

12         THE COURT:  How much time does the government want

13   for closing?

14         MS. BRAUN:  We would anticipate 20 to 30 minutes.

15         THE COURT:  Do you want me to give you a five-minute

16   warning, ten-minute warning?  What do you want?

17         MS. BRAUN:  A ten-minute warning is fine.

18         THE COURT:  And how much time does defendant want?

19         MR. BASILE:  Probably need maybe 15 minutes, Your

20   Honor.  20 at the most.

21         THE COURT:  Okay.

22         MR. BASILE:  Your Honor, has there been actually an

23   official charge prepared?

24         THE COURT:  Yes.  Let's distribute the copies to the

25   attorneys.

1              Oh.  I have extra copies here, don't I?  Here you

2   go.  Do you have all of the copies for the jury?

3              Why don't you be prepared to hand them out when they

4   come in.  They will need the jury charge, they will need a

5   copy of the verdict form and the indictment.

6              Are we prepared for the jury to come in?

7              MS. BRAUN:  Yes, Your Honor.

8              MR. BASILE:  Yes, Your Honor.

9              THE COURT:  Bring them in.

10             MR. BASILE:  My objections are noted, as far as what

11  I proposed --

12             THE COURT:  Yes.

13             MR. BASILE:  -- from my submissions?

14             THE COURT:  Yes.  All of your tendered requests that

15  I did not already incorporate, your objections are noted but

16  overruled.

17             COURTROOM SECURITY OFFICER:  All rise.

18             (Jury enters courtroom.)

19             THE COURT:  Please be seated.

20             Does the defendant rest?

21             MR. BASILE:  The defendant rests, Your Honor.

22             THE COURT:  Ladies and gentlemen, the government has

23  rested and the defendant has rested.  Now, you have heard all

24  of the evidence you are going to hear in this case.  It is my

25  job at this time now to instruct you on what rules will apply

1    in your deliberations, and then after I give you the Court's

2    instruction, then we will recognize the attorneys for their

3    closing arguments.

4            You should have in front of you three documents, one

5    entitled Court's Instructions to the Jury, a second one being

6    the indictment, and the third one being a verdict form.  Does

7    everybody have all three?

8            Okay.  I am going -- it is my obligation to read

9    this out loud to you.  As a courtesy to you all, I have

10   provided you a written copy.  That way, you can follow along.

11   I would suggest you do so.  It gets a bit long and winded.

12           Members of the Jury:

13           In any jury trial there are, in effect, two judges.

14   I am one of the judges; you, the jury, are the other judge.

15   It is my duty to preside over the trial and to decide what

16   evidence is proper for your consideration.  It is also my duty

17   now, at the end of the trial, to explain to you the rules of

18   law that you must follow and apply in arriving at your

19   verdict.

20           First, I will give you some general instructions

21   that apply in every case, such as instructions about burden of

22   proof and how to judge the believability of witnesses.  Then I

23   will give you some specific rules of law about this particular

24   case, and finally I will explain to you the procedures you

25   should follow in your deliberations.

1          You, as jurors, are the judges of the facts.  But in

2     determining what actually happened – that is, in reaching your

3     decision as to the facts – it is your sworn duty to follow all

4     of the rules of law as I explain them to you.

5          You have no right to disregard or give special

6     attention to any one instruction, or to question the wisdom or

7     correctness of any rule I may state to you.  You must not

8     substitute or follow your own notion or opinion as to what the

9     law is or ought to be.  It is your duty to apply the law as I

10    explain it to you, regardless of the consequences.

11         It is also your duty to base your verdict solely

12    upon the evidence that was admitted during trial, without

13    prejudice or sympathy.  That was the promise you made and the

14    oath you took before being accepted by the parties as jurors,

15    and the parties have the right to expect nothing less.

16         The indictment is simply a description of the charge

17    made by the government against the defendant.  It is not

18    evidence of guilt.  Indeed, the defendant is presumed by the

19    law to be innocent.

20         The law does not require a defendant to prove his

21    innocence or produce any evidence at all.  The government has

22    the burden of proving the defendant's guilty beyond a

23    reasonable doubt, and if it fails to do so, you must acquit

24    the defendant.

25         While the government's burden of proof is a strict

1    or heavy burden, it is not necessary that the defendant's

2    guilt be proved beyond all possible doubt.  It is only

3    required that the government's proof exclude any "reasonable

4    doubt" concerning the defendant's guilt.

5           A "reasonable doubt" is a doubt based upon reason

6    and common sense after careful and impartial consideration of

7    all the evidence in the case.  Proof beyond a reasonable

8    doubt, therefore, is proof of such a convincing character that

9    you would be willing to rely and act upon it without

10   hesitation in the most important of your own affairs.

11          As I told you earlier, it is your duty to determine

12   the facts.  In doing so, you must consider only the evidence

13   presented during the trial, including the sworn testimony of

14   the witnesses and the exhibits.  Remember that any statements,

15   objections, or arguments made by the lawyers are not evidence.

16   The function of the lawyers is to point out those things that

17   are most significant or most helpful to their side of the

18   case, and in so doing to call your attention to certain facts

19   or inferences that might otherwise escape your notice.  In the

20   final analysis, however, it is your own recollection and

21   interpretation of the evidence that controls in the case.

22   What the lawyers say is not binding upon you.

23          During the trial I sustained objections to certain

24   questions and exhibits.  You must disregard those questions

25   and exhibits entirely.  Do not speculate as to what the

1    witness would have said if permitted to answer the question or

2    as to the contents of an exhibit.

3            Also, certain testimony or other evidence has been

4    ordered stricken from the record and you have been instructed

5    to disregard this evidence.  Do not consider any testimony or

6    other evidence which has been stricken in reaching your

7    decision.  Your verdict must be based solely on the legally

8    admissible evidence and testimony.

9            Also, do not assume from anything I may have done or

10   said during the trial that I have any opinion concerning any

11   of the issues in this case.  Except for the instructions to

12   you on the law, you should disregard anything I may have said

13   during the trial in arriving at your own findings as to the

14   facts.

15           While you should consider only the evidence, you are

16   permitted to draw such reasonable inferences from the

17   testimony and exhibits as you feel are justified in the light

18   of common experience.  In other words, you may make deductions

19   and reach conclusions that reason and common sense lead you to

20   draw from the facts which have been established by the

21   evidence.

22           You should not be concerned about whether the

23   evidence is direct or circumstantial.  "Direct evidence" is

24   the testimony of one who asserts actual knowledge of a fact,

25   such as an eye witness.  "Circumstantial evidence" is proof of

1    a chain of events and circumstances indicating that something

2    is or is not a fact.  The law makes no distinction between the

3    weight you may give to either direct or circumstantial

4    evidence.

5              I remind you that it is your job to decide whether

6    the government has proved the guilt of the defendant beyond a

7    reasonable doubt.  In doing so, you must consider all of the

8    evidence.  This does not mean, however, that you must accept

9    all of the evidence as true or accurate.

10             You are the sole judges of the credibility or

11   "believability" of each witness and the weight to be given the

12   witness's testimony.  An important part of your job will be

13   making judgments about the testimony of the witnesses,

14   including the -- testimony of the witnesses, and that should

15   be period.  Please disregard "including the defendant who

16   testified in this case."

17             You should decide whether you believe all or any

18   part of what each person had to say, and how important that

19   testimony was.  In making that decision I suggest that you ask

20   yourself a few questions:  Did the person impress you as

21   honest?  Did the witness have any particular reason not to

22   tell the truth?  Did the witness have a personal interest in

23   the outcome of the case?  Did the witness have any

24   relationship with either the government or the defense?  Did

25   the witness seem to have a good memory?  Did the witness

1    clearly see or hear the things about which he testified?  Did

2    the witness have the opportunity and ability to understand the

3    questions clearly and answer them directly?  Did the witness's

4    testimony differ from the testimony of other witnesses?  These

5    are a few of the considerations that will help you determine

6    the accuracy of what each witness said.

7              Your job is to think about the testimony of each

8    witness you have heard and decide how much you believe of what

9    each witness had to say.  In making up your mind and reaching

10   a verdict, do not make any decisions simply because there were

11   more witnesses on one side than on the other.  Do not reach a

12   conclusion on a particular point just because there were more

13   witnesses testifying for one side on that point.

14             The law does not compel a defendant in a criminal

15   case to take the witness stand and testify, and no presumption

16   of guilt may be raised, and no inference of any kind may be

17   drawn from the choice of a defendant not to testify.  You

18   shall not consider the defendant's failure to testify for any

19   purpose during your deliberations.

20             During the trial, you heard the testimony of Michael

21   Stark and Charlie Cox, who have expressed opinions concerning

22   computer forensics.  If scientific, technical, or other

23   specialized knowledge might assist the jury in understanding

24   the evidence or in determining a fact in issue, a witness

25   qualified by knowledge, skill, experience, training, or

1    education may testify and state an opinion concerning such

2    matters.

3            Merely because such a witness has expressed an

4    opinion does not mean, however, that you must accept this

5    opinion.  You should judge such testimony like any other

6    testimony.  You may accept it or reject it, and give it as

7    much weight as you think it deserves, considering the

8    witness's education and experience, the soundness of the

9    reasons given for the opinion, and all other evidence in the

10   case.

11           You are here to decide whether the government has

12   proved beyond a reasonable doubt that the defendant is guilty

13   of the crime charged.  The defendant is not on trial for any

14   act, conduct, or offense not alleged in the indictment.

15   Neither are you concerned with the guilt of any other person

16   or persons not on trial as a defendant in this case, except as

17   you are otherwise instructed.

18           You will note that the indictment charges that the

19   offense was committed on or about a specified date.  The

20   government does not have to prove that the crime was committed

21   on an exact date, so long as the government proves beyond a

22   reasonable doubt that the defendant committed the crime on

23   dates reasonably near the dates stated in the indictment.

24           If the defendant is found guilty by unanimous vote,

25   it will be my duty to decide what the punishment will be.  You

1    should not be concerned with punishment in any way.  It should

2    not enter your consideration or discussion.

3           A separate crime is charged in each count of the

4    indictment.  Each count, and the evidence pertaining to it,

5    should be considered separately.  The fact that you may find

6    the defendant guilty or not guilty as to one of the crimes

7    charged should not control your verdict as to any other.

8           Count One.

9           Title 18, USC, Section 2251(a) makes it a crime to

10   knowingly employ, use, persuade, induce, entice, or coerce a

11   minor to engage in sexually explicit conduct for the purpose

12   of producing a visual depiction of such conduct.  In order for

13   the defendant to be found guilty of that charge, the

14   government must prove each of the following elements beyond a

15   reasonable doubt:

16          First, that in or about August 2007 through October

17   2007, the dates charged in Count I of the indictment, the

18   defendant knowingly employed, used, persuaded, induced,

19   enticed, or coerced a minor, CV1, to engage in sexually

20   explicit conduct;

21          Second, that the defendant did so with the purpose

22   of producing a visual depiction of such conduct; and

23          Third, that the visual depiction was produced using

24   materials that had been mailed, shipped, or transported in

25   interstate and foreign commerce.

1          You have heard evidence of more than one visual

2     depiction involved in the offense.  You must agree unanimously

3     as to which visual depiction was produced.

4          The term "minor" means any person under the age of

5     18 years.

6           The term "sexually explicit conduct" means actual

7     or simulated:

8          A) sexual intercourse, including genital-genital,

9     oral-genital, anal-genital, or oral-anal contact, whether

10    between persons of the same or opposite sex; bestiality;

11    masturbation; sadistic or masochistic abuse; or lascivious

12    exhibition of the genitals or pubic area of any person.

13         Whether a visual depiction of the genitals or pubic

14    area constitutes a lascivious exhibition requires a

15    consideration of the overall content of the material.  You may

16    consider such factors as 1) whether the focal point of the

17    picture is on the minor's genitals or pubic area; 2) whether

18    the setting of the picture is sexually suggestive, that is, in

19    a place or pose generally associated with sexual activity; 3)

20    whether the minor is depicted in an unnatural pose or in

21    inappropriate attire, considering the age of the minor; 4)

22    whether the minor is fully or partially clothed, or nude; 5)

23    whether the picture suggests sexual coyness or a willingness

24    to engage in sexual activity; 6) whether the picture is

25    intended or designed to elicit a sexual response in the

1    viewer; 7) whether the picture portrays the minor as a sexual

2    object; and 8) the caption on the picture.

3           It is for you to decide the weight or lack of weight

4    to be given to any of these factors.  A picture need not

5    involve all of these factors to constitute a lascivious

6    exhibition of the genitals or pubic area.

7           The term "interstate commerce" means commerce or

8    travel between one state, territory, or possession of the

9    United States and another state, territory, or possession of

10   the United States, including the District of Columbia.

11          The term "foreign commerce" means commerce or travel

12   between any part of the United States, including its

13   territorial waters, and any other country, including its

14   territorial waters.

15          Count Two.

16          Title 18, USC, Section 2252(a)(4)(B) makes it a

17   crime to knowingly possess material which contains child

18   pornography.  In order for the defendant to be found guilty of

19   that charge, the government must prove each of the following

20   elements beyond a reasonable doubt:

21          First, that on or about October 18, 2007, the date

22   charged in Count II of the indictment, the defendant knowingly

23   possessed a computer which contained at least one visual

24   depiction of child pornography;

25          Second, that the defendant knew that the visual

depiction or depictions were of a minor engaging in sexually

explicit conduct; and

Third, that the visual depictions were produced

using materials that had been mailed, shipped or transported

in interstate or foreign commerce, including by computer.

You have heard evidence of more than one visual

depiction involved in the offense.  You must agree unanimously

as to which visual depictions the defendant possessed.

The terms "minor," "sexually explicit conduct,"

"interstate commerce," and "foreign commerce" have the same

meanings as previously provided.

The term "child pornography" means any visual

depiction, including any photograph, film, video, picture, or

computer or computer-generated image or picture, whether made

or produced by electronic, mechanical, or other means, of

sexually explicit conduct, where

(a) the production of such visual depiction involves

the use of a minor engaging in sexually explicit conduct;

(b) such visual depiction is a digital image,

computer image, or computer-generated image that is, or is

indistinguishable from, that of a minor engaging in sexually

explicit conduct; or

(c) such visual depiction has been created, adapted,

or modified to appear that an identifiable minor is engaging

in sexually explicit conduct.

1          The word "knowingly," as that term has been used

2     from time to time in these instructions, means that the act

3     was done voluntarily and intentionally, not because of

4     accident or mistake.

5          In determining whether any statement, claimed to

6     have been made by a defendant outside of court and after an

7     alleged crime has been committed, was knowingly and

8     voluntarily made, you should consider the evidence concerning

9     such a statement with caution and great care, and should give

10    such weight to the statement as you feel it deserves under all

11    the circumstances.

12         You may consider in that regard such factors as the

13    age, sex, training, education, occupation, and physical and

14    mental condition of the defendant, his treatment while under

15    interrogation, and all the other circumstances in evidence

16    surrounding the making of the statement.

17         To reach a verdict, whether it is guilty or not

18    guilty, all of you must agree.  Your verdict must be unanimous

19    as to the count listed on the indictment.  Your deliberations

20    will be secret.  You will never have to explain your verdict

21    to anyone.

22         It is your duty to consult with one another and to

23    deliberate in an effort to reach agreement if you can do so.

24    Each of you must decide the case for yourself, but only after

25    an impartial consideration of the evidence with your fellow

1    jurors.

2         During your deliberations, do not hesitate to

3    reexamine your own opinions and change your mind if convinced

4    that you were wrong.  But do not give up your honest beliefs

5    as to the weight or effect of the evidence solely because of

6    the opinion of your fellow jurors, or for the mere purpose of

7    returning a verdict.

8         Remember at all times, you are judges - judges of

9    the facts.  Your duty is to decide whether the government has

10    proved the defendant guilty beyond a reasonable doubt.

11         When you go to the jury room, the first thing that

12    you should do is select one of your number as your foreperson,

13    who will help to guide your deliberations and will speak for

14    you here in the courtroom.  A form of verdict has been

15    prepared for your convenience.

16         The foreperson will write the unanimous answer of

17    the jury in the space provided for each count of the

18    indictment, either guilty or not guilty.  At the conclusion of

19    your deliberations, the foreperson should date and sign the

20    verdict.

21         If you need to communicate with me during your

22    deliberations, the foreperson should write the message and

23    give it to the courtroom security officer.  I will either

24    reply in writing or bring you back into the court to answer

25    your message.

1          Bear in mind that you are never to reveal to any

2    person, not even to the Court, how the jury stands,

3    numerically or otherwise, on any count of the indictment,

4    until after you have reached a unanimous verdict.

5          With that, ladies and gentlemen, I am going to

6    recognize the attorneys' closing arguments.  Again, what the

7    lawyers say is not evidence but, nevertheless, you should pay

8    close attention, because they are going to try to emphasize

9    points that they want you to continue deliberating about when

10   you get to your jury room.

11         And with that, the Court recognizes the government.

12         MS. BRAUN:  Thank you, Your Honor.

13         Now I can see you all.  Good morning.

14         Being a parent is an awesome responsibility.  It is

15   also a great privilege.  As parents, it is our duty, we take

16   on the duty to love and nurture and care for and teach and

17   protect our children, to protect them from harm.

18         Steven Mouton adopted this little girl when she was

19   only two years old and brought her here from China.  By doing

20   so, he was supposed to protect her from harm, not be the harm

21   for her.

22         He had a duty to care for her and love her and to

23   nurture her into a wonderful young woman.  And instead, from

24   the time she got here, he started taking pornographic pictures

25   of her.  He told Sean Hiler, the CPS investigator, that he has

1    been taking pictures of her the whole ten and a half years she

2    was here.

3            He called them sexy times and sexy pictures, and he

4    was frustrated because Sean Hiler didn't understand the

5    emotional aspect of this case.  He was just looking at the

6    legal aspect of this case.

7            I am going tell you, children are beautiful.  They

8    are wonderful.  I had my hard drive crash because I have so

9    many pictures of my children on it.  They are not sexy.  They

10   are not supposed to be sexy.  He looked at this

11   two-and-a-half-year-old girl and saw sexy.

12           That turned into pornographic pictures, it turned

13   into touching her, and it culminated with Exhibit 30, which is

14   his penis in her vagina when she is only twelve years old.  As

15   parents, we have a duty to protect our children from the evils

16   of this world.  Steven Mouton used this child for his own

17   sexual gratification.

18           I am going to go through the elements of the offense

19   and show you why he is guilty of both counts.  In order for

20   you to find him guilty of Count 1, which is sexual

21   exploitation of a child, the government has to prove three

22   things to you beyond a reasonable doubt, three things.

23           One, on -- in or around August of 2007, the

24   defendant knowingly used a minor to engage in sexually

25   explicit conduct; two, that he did so with the purpose of

1    producing a visual depiction of that conduct; and, three, that

2    the visual depiction was made with materials that had been

3    shipped or transported in interstate commerce.

4           Well, you heard a lot.  The camera the defendant

5    says he used to take all of these pictures or most of the

6    pictures of Amanda made in Taiwan.  Camera card, made in

7    China.  Hard drive for the desktop computer, made in Malaysia.

8    Hard drive for the laptop computer made in Thailand.

9           Everything that was used to produce these images of

10   this little girl traveled in interstate and foreign commerce.

11   That has been proven beyond a reasonable doubt.

12          Second, the defendant did so with the purpose of

13   producing a visual depiction of such conduct.  He told you so.

14   He told Sean Hiler so.  These are sexy times, sexy pictures.

15   Yes, I took the pictures.  He told Special Agent Baker:  I

16   took the pictures.  I made them.  You know I made them.  I

17   know I made them.  I made them.

18          He just couldn't understand why everybody else

19   thought it was such a big deal.  No doubt he made them.  He

20   intended to take the pictures.

21          And the first element is that in August of '07

22   through October, he used this little girl to engage in

23   sexually explicit conduct.

24          Well, you have Amanda's birth certificate.  In

25   August of 2007, when a lot of the pictures were taken, she was

1    twelve.  I didn't show you the pictures of her, the series of

2    her on the green and white couch.  She is younger in those,

3    under twelve.  They will go back with you in the jury

4    deliberation room.

5             I know it is uncomfortable to look at the pictures,

6    no matter where you look at them, but if that will help your

7    deliberations, look at them.  She is younger.  There is the

8    series where she is in the cowboy hat and cowboy boots and the

9    brown leather belt, even a little younger.  So she is a minor.

10            Most of the series that were taken at the 18 Crystal

11   Circle, Boerne house were taken between March and August of

12   2007.  She was twelve.  She turned twelve -- this is her

13   twelfth birthday party, I believe.  She turned twelve February

14   16th of 2007.  Pictures date from about March to then a bunch

15   of them are August of 2007.

16            And you have to find that the pictures depict her

17   being used in sexually explicit conduct.  The other thing that

18   the Judge has instructed you on is -- well, back up.

19            Sexually explicit conduct.  I won't show it to you

20   again.  Exhibit 30 is the picture of his penis in a

21   twelve-year-old girl's vagina.  That is sexual intercourse.

22   That is the definition of sexually explicit conduct.  You

23   could all agree that picture taken in August of 2007 of Amanda

24   and that man meets the elements of production of child

25   pornography.

```
1              So he used a minor to engage in sexually explicit
2     conduct, did so with the purpose of producing a visual image.
3     He did.  He produced a lot of visual images of it, and they
4     were produced with materials that had traveled in interstate
5     commerce.
6              The government has proven Count 1 beyond a
7     reasonable doubt.  The physical evidence in this case proves
8     the elements beyond a reasonable doubt.  You have both,
9     though.
10              You have all of the physical evidence in this case.
11    You heard from the forensic examiners and you heard from
12    Special Agent Baker, you can see the pictures, you can see the
13    metadata, you can look at the camera and the camera card, so
14    you have the physical evidence that proves the case.
15              You also heard what the defendant said, though.  You
16    heard what he said to Special Agent Baker and to Investigator
17    Hiler, which is:  Yes, I took the pictures.  I took the
18    pictures and that is my penis in her vagina.
19              Count 1 has been proven beyond a reasonable doubt.
20              With regard to Count 2, in order for you to find him
21    guilty of Count 2, the government also needs to prove three
22    things beyond a reasonable doubt.  One, that on or about
23    October of 2007, the defendant knowingly possessed a computer
24    which contained at least one visual depiction of child
25    pornography.
```

1          You heard that his computer contained 400 and some

2     images of child pornography.  The desktop computer contained

3     ten, and the camera card contained a few more hundred.

4          The Judge has instructed you with regard to this

5     count, that you have heard evidence of more than one visual

6     depiction involving the offense.  You must agree unanimously

7     as to which visual depiction the defendant possessed.  You can

8     unanimously agree he possessed all of them on or about that

9     date.

10          Or you could make it even easier for yourself and

11     agree that he possessed -- I won't show it -- Exhibit 1.

12     Exhibit 1 is the picture that David Gonzales found when he

13     went to the defendant's house on October 18th, and there is a

14     vagina.

15          We know now from other pictures from the metadata

16     and from the defendant that that is his daughter's vagina, and

17     that he took that picture and that he took the picture in

18     August of 2007.  That is the one that is still saved on his

19     computer, still saved to this day on his computer.  So he

20     possessed a computer that contained at least one visual

21     depiction.

22          Two, he knew the visual depiction or visual

23     depictions were of a minor engaging in sexually explicit

24     conduct.  He knew it.  He took it.  He meant to take it.  He

25     liked it.  These were sexy times.  These were sexy pictures.

1      This provided sexual gratification for him.

2              Now, sexually explicit conduct has been defined for

3      you by the Judge.  It includes sexual intercourse, as is

4      demonstrated vividly in Exhibit 30.  It also constitutes the

5      lascivious display of the genitals, and the factors were read

6      to you.

7              I will give you that Exhibit 1 is a picture of a

8      vagina.  A vagina takes up the entire picture.  I mean, not

9      only is the focal point of the picture the vagina -- and if

10     you look at the other pictures, you will see that the focal

11     point of most of these is this little girl's private area.

12     But on Exhibit 1, the picture is the genital area.  It takes

13     up the picture.

14             And, third, the visual depictions were produced

15     using materials that had been mailed, shipped and transported

16     in interstate or foreign commerce, again, every peace of media

17     in this case.

18             The laptop hard drive came from Thailand, the

19     computer came from Taiwan, and the media card came from China.

20     The government has proven every element beyond a reasonable

21     doubt.

22             You will hear that the defendant -- well, you have

23     heard that the defendant deleted all but one of the pictures.

24     You can find him guilty by agreeing on the one picture,

25     Exhibit 1, that he possessed.  You can find that he possessed

1    all of them.

2         You can find him guilty of Count 1 based on

3    Exhibit 30, where he is penetrating her with his penis, but

4    don't forget that Mr. Mouton told Special Agent Baker he got a

5    call from Brooke Davis saying:  Hey, just so you know, in the

6    near future, I am going to come out to your house.

7         October 16th, that was some time in the beginning of

8    October, October 16th, we can't tell from the computer hard

9    drive when those pictures were deleted.  We can tell from the

10   camera card, though, that all of these pictures were deleted

11   on October 16th.

12        Oops.  Someone is coming to my house.  They are

13   going to look at my stuff.  I am going to get rid of this.

14   And then two days later, probation showed up and found the one

15   picture that wasn't deleted.

16        Defendant not only produced all of these pictures,

17   he, over the years, he saved them and enjoyed them, and the

18   government has proven every element beyond a reasonable doubt,

19   and because of that, we ask that you find him guilty of both

20   producing child pornography and possessing child pornography.

21   Thank you.

22        THE COURT:  Mr. Basile.

23        MR. BASILE:  Yes, Your Honor.

24        Ladies and gentlemen of the jury, thank you for your

25   time in listening to what is a very, not very pleasant case to

1    listen to, and I just want to go over the instructions.  And

2    if everybody remembers at voir dire, we talked about that the

3    Judge would instruct you on what the law is, and this is what

4    the Judge has done.

5            He has given you the law and you have agreed to

6    follow that and not allow anything else to come into your

7    decision.  I just want to make sure you understand what the

8    law requires.

9            Of course, the U.S. Attorney just finished talking

10   about what they think is proved beyond a reasonable doubt, all

11   of the elements, and I want to make sure that you understand

12   what you are required to find in here.

13           As everybody knows sitting right now, there is a

14   presumption of innocence, and you heard the evidence, but at

15   this time, since you haven't deliberated, Mr. Mouton is

16   presumed to be innocent, and the only way he can be found not

17   to be innocent is by the evidence that was presented on the

18   witness stand, not by any other -- not by anything else, not

19   any thoughts that you have or any thought about -- or any

20   other information that is there.

21           So, again, the burden of proof is beyond a

22   reasonable doubt.  As we talked about earlier, this is a real

23   high burden of proof that is to be met.  It is not just in a

24   car wreck case, something like that, where you look at a

25   preponderance of the evidence, or even where someone's

1    parental rights are to be terminated to a child.

2              And you heard some testimony about that possibility

3    in this case.  That, again, is an example of the burden of

4    proof that would be different.  That is by what is called

5    clear and convincing evidence.  This is the highest one of

6    all, which is beyond a reasonable doubt.

7              And the Court has given you the definition here to

8    use that says:  Reasonable doubt is a doubt based upon reason

9    and common sense after careful and impartial consideration of

10   all the evidence in the case.

11             Proof beyond a reasonable doubt, therefore, is proof

12   of such a convincing character that you would be willing to

13   rely and act upon it without hesitation in the most important

14   of your own affairs.

15             So it would be something very important in your

16   life, say -- now everybody knows about what is going on with

17   the stock market or whatever.  You can talk about investing

18   your money, what that is going to do for your retirement.

19             I would submit that it is a very, very important

20   decision.  You want to make sure you know as much as possible

21   about that before you make a decision.  I would submit that

22   would be something similar to that, and you can figure out

23   your own things which would be one of the most important

24   parts -- or important of your own affairs.

25             So let's go through some of the testimony and some

1    of the counts.  Count 1 is, Mr. Mouton has been charged with

2    sexual exploitation of a child.  And as you can see the counts

3    here that are required, that first, on or about August of 2007

4    through October of 2007, the dates in the indictment, and

5    those are the only dates that you are allowed to look at.  Any

6    other information, any other pictures, any other evidence that

7    was presented on any dates outside of that are not for your

8    consideration.

9            You are to follow what the indictment says.  The

10   indictment says between the dates of August 2007 and

11   October 2007.

12           So when you go back to look at the evidence, make

13   sure you keep your focus on what the indictment says.  That is

14   what the charge was.  The decision was made by the government

15   on how to charge him.  That is their decision, and that is

16   what you are here to decide, whether the government has

17   actually proven the indictment that they have alleged.

18           As we know, the testimony was that when they came to

19   Mr. Mouton's house on October 18th, 2008, that after they took

20   his computer, seized his computer, they did some searching on

21   it, and there was testimony to the effect that images had been

22   found on his hard drive and the laptop.

23           We also know, through all of the witnesses of the

24   government, both of their computer experts and Agent Baker,

25   that all of those images had been deleted.  Some of them, they

1    could say when.  Some, they couldn't say.  Some, they tried to

2    say it was done in October.  Some, they couldn't say when they

3    were deleted.  They were deleted years and years ago.

4            So those that were deleted years ago, before that,

5    are not to be considered by you, because they are not within

6    the time that is listed in the indictment.  Again, focus on

7    what the Court has instructed you to do by doing that.

8            I would submit to you, ladies and gentlemen, that

9    there is no proof of anything during that time, because the

10   only picture that was there is the one picture of the girl

11   with the vagina, and you will get that there.

12           That is a picture of which, in itself, is not

13   sufficient to show sexual exploitation of a child.  That is

14   just a picture taken of a child, and that is the only one that

15   they can honestly show or really show was still available in

16   October.

17           All of the other ones, as I said, have been deleted.

18   Whether they were deleted two years ago, six months ago or two

19   days before that, they were all deleted at that time.

20           So I would submit to you, ladies and gentlemen,

21   there is no proof that he employed, used, persuaded, induced,

22   enticed or coerced a minor, because they have not submitted to

23   you any proof.

24           They might say:  Well, what about his statements

25   that he made?  That is evidence.

1          Well, you heard the statements that came from the

2     agent, the FBI agent that came in, who picked him up and took

3     him to the room, supposedly read him his rights,

4     understanding, of course, that the questions were after

5     Mr. Mouton had turned himself in from his attorney's office,

6     and that he had a right, in his Miranda warnings, to have an

7     attorney present.

8          And you can look at the Miranda warnings, and you

9     can see what it says.  They gave it to you in there, and you

10    can look at that.  But his attorney was not present, so I

11    would submit to you that his testimony that he gave was not

12    voluntarily; he was not under the advice of counsel.

13          MS. BRAUN:  I am going to object, Your Honor.  This

14    is an improper argument.

15          THE COURT:  Sustained.  Ladies and gentlemen, you

16    are to disregard this portion of the closing.

17          MR. BASILE:  Well, again, I would just ask you to

18    look at that, look at the warning that was given, and you can

19    make your own decision on that, whether it was or wasn't

20    voluntary.

21          Now, the purpose of -- the visual depiction was

22    done, as a second element that is required, and that it was

23    produced using materials that had been mailed, shipped or

24    transported in interstate commerce.

25          The only evidence presented about that was the

1    information on the computer, that I would submit that those,

2    as far as on here, that the first one, as far as the visual

3    depiction of the item, the first element has not been proven

4    under sexual exploitation of a child, and that is the Count

5    2251-A -- or the charge under 2251-A, which is under Count 1.

6    Because when we look at what is here, and how they decide or

7    what they talk about in the description of sexually explicit

8    conduct, it shows sexually explicit conduct is sexual

9    intercourse, including genital-genital, oral-genital,

10   anal-genital, oral -- oral-anal contact, whether between

11   persons of the same or opposite sex, bestiality, masturbation,

12   sadistic or masochistic abuse or the lascivious exhibition of

13   the genitals or pubic area of any person.

14          I would submit clearly that is not shown on the one

15   photograph, the only photogrpah that had not been deleted,

16   which, again, we will get back there.

17          The only question you would have to decide is

18   whether it is a lascivious exhibition of the genitals or pubic

19   area of any person.  And the Court has given you a lot of

20   things to look at to try to decide that, and I will ask you to

21   read through those and make sure you understand what the Court

22   has instructed you before you make any decision.

23          This is not a decision that you want to rush to.

24   You want to take your time, read through that, look at that

25   one photograph and make sure.  I would submit that it doesn't

1    meet all of the things required or most of the factors

2    required.

3            The only possible one would be whether the focal

4    point of the pictures on the minor's genitals or pubic area,

5    which, again, you need to look at yourself.

6            And Count 2, possession of child pornography.

7    Again, I would say that you need to make sure you understand

8    that this actually says on or about October 18th, the date

9    charged, 2007, which is the date that he was arrested or the

10   date they came to his house and seized his computers, that you

11   are to look at that date to see what, again, was on his

12   computer.

13           There was only one photograph that was accessible on

14   the computer.  All of the other photographs had been deleted,

15   and you heard the testimony of the computer expert that once

16   they are deleted, they are not available to a person, unless

17   they have special software.

18           There was no evidence that any of that special

19   software was anywhere in the house, so those pictures that

20   were deleted were not available to anybody else.  The only

21   picture that was available was the one picture that was on the

22   computer, again, which is the same one I discussed.

23           So I will tell you that that one picture, again,

24   possession of child pornography, you use the same definitions

25   above, and I would suggest to you that this doesn't meet the

1    definition of that and it should be found not true or not

2    guilty.

3            So after reading over the charge, going through the

4    charge and making sure you understand the law, I ask you to

5    come back on both counts with a verdict of not guilty.

6            Thank you.

7            THE COURT:  Thank you, Mr. Basile.

8            Ms. Wannarka.

9            MS. WANNARKA:  Thank you, Your Honor.

10           Ladies and gentlemen, when the defendant hit click

11   on the camera, he produced child pornography.  When he put his

12   penis in her vagina and hit click, Count 1 is checked.  You

13   don't have to save the picture.  You don't have to transport

14   it.  You don't have to do anything with it.  After click, it

15   is produced.

16           He did save one of them.  He saved Government's

17   Exhibit 1.  This is a production of child pornography.  This

18   isn't the penetration picture, as is Government's Exhibit 30,

19   but it is a lascivious exhibition of her genitals, and to say

20   that this is not sexually explicit is nothing short of

21   ridiculous.

22           This is a little girl's genitalia displayed for the

23   defendant's sexual interests.  That is lascivious.  When the

24   defendant met with Special Agent Baker, he was given his

25   Miranda warnings and was given an opportunity to discuss them,

```
1    was given them in writing and orally.  And as you saw in

2    Government's Exhibit 26, he knowingly and voluntarily waived

3    those rights.  That is not an issue that we believe is viable

4    in the very least.

5              When the defendant raped his daughter and took a

6    picture of it and did download it to his computer -- maybe

7    deleted them, didn't delete all of them, it doesn't matter.

8    He was essentially celebrating the sexual conquest of a little

9    girl.

10              He was celebrating his dominance over the most

11   vulnerable, someone that he brought here at two.  Did she

12   speak any English?  But she did have pictures taken of her

13   sexually.  That was what she knew of life in our United

14   States.  That is what she was raised to believe is a term of

15   endearment, is a term of love.

16              Amanda Mouton will have a good life and she will

17   grow up and have a good life, but it will not be because of

18   the defendant.  It will be despite the defendant.  We ask that

19   you find him guilty of both counts.  Thank you.

20              THE COURT:  Ladies and gentlemen of the jury, there

21   are thirteen of you.  Under the rules, I am only allowed to

22   send back twelve.  I chose an alternate juror in the event

23   that someone became ill or otherwise was unable to serve.

24              Mr. Alexandria, you are the alternate juror.

25              JUROR:  Okay.
```

1          THE COURT:  I can't send you back.  But what I am

2    going to do is, I want to -- I am going to have Ms. Greenup

3    escort you down to the library.  I am going to ask that you

4    remain for a little while to determine whether or not -- I

5    have had this happen before, where I think I mentioned before

6    that one of the jurors was unable to understand what was going

7    on.

8          I don't want to have a mistrial, considering that we

9    finished this trial, so I am going to segregate you and I am

10    going to put you downstairs in the library.  At this point,

11    you can't have any interaction with anyone else.  Don't

12    discuss this case with anyone else.  Don't speak to anybody

13    else.  If you can just find something to read down there for a

14    little bit.

15          I will notify you, one, whether I will need you back

16    up here or, two, when I can let you go home.  I will certainly

17    let you know when your lunch gets here.  But if you will

18    follow Ms. Greenup.  Thank you.

19          To the remaining twelve of you, I am going to send

20    you now back to the jury deliberation room.  The first thing

21    you ought to do is choose one of your number to serve as your

22    foreperson.

23          You have only known each other for two days, so it

24    is a limited time to really know anybody, but I would suggest

25    to you all select as your foreperson somebody who will allow

```
 1   everybody their fair share in speaking, and so that will be
 2   your first task.
 3            In just a little bit, we will assemble the evidence
 4   and take that into the jury deliberation room for your review.
 5   And otherwise, we await your verdict.
 6            All rise.
 7            (Jury leaves courtroom.)
 8            THE COURT:  Please be seated.
 9            With regard to the exhibits that were admitted in
10   the trial in this case, the government did not ask that they
11   be sealed, but the Court, nevertheless, considering the
12   private nature of the various photos and information, the
13   Court orders that all exhibits tendered into evidence in this
14   case be sealed and only be made available for trial and/or
15   appellate review, so all documents are sealed.
16            This was the Court's copy of the exhibits.  I return
17   these back to the government.
18            I am going to allow the lawyers to go out to lunch.
19   I would ask that you be back in the courtroom by 1:00 o'clock,
20   in the event we receive any instructions from the jury.
21            Anything further?
22            MS. BRAUN:  No, Your Honor.  We have the exhibits
23   put together, and we will give them to Ms. Greenup when she
24   returns.
25            THE COURT:  Anything further?
```

```
 1              MR. BASILE:  No, Your Honor.

 2              THE COURT:  We will see you back at 1:00.

 3              (Recess to 1:26 p.m.)

 4              THE COURT:  Ladies and gentlemen, it is my

 5    understanding you have reached a verdict; is that correct?

 6              JUROR:  Yes.

 7              THE COURT:  And who is the foreperson?  If you will

 8    pass the note to the courtroom security officer.

 9              The verdict is in proper form.

10              Ladies and gentlemen, I will read the verdict now.

11    I would ask you to listen carefully to my reading, because

12    after the end of my reading, one or more of the lawyers may

13    ask to question you all individually as to whether or not this

14    is your verdict.

15              On Count 1, we, the jury, find the defendant, Steven

16    Lynn Mouton, guilty.

17              On Count 2, we, the jury, find the defendant, Steven

18    Lynn Mouton, guilty.  Signed and dated.

19              Does anybody want the jury polled from the

20    government?

21              MS. BRAUN:  No, Your Honor.  Thank you.

22              THE COURT:  Defense?

23              MR. BASILE:  Yes, Your Honor.  I would like to have

24    the jury polled.

25              THE COURT:  Ms. Greenup, if you will poll the jury.
```

```
 1              COURTROOM DEPUTY:  As I call your name, would you
 2    please answer yes or no to the question.  The question to each
 3    of you is this:  Is this your verdict?
 4              Marcella Helmke?
 5              JUROR:  Yes.
 6              COURTROOM DEPUTY:  Edward Onofre?
 7              JUROR:  Yes.
 8              COURTROOM DEPUTY:  Gabriel Jasso?
 9              JUROR:  Yes.
10              COURTROOM DEPUTY:  Cynthia Carrasco?
11              JUROR:  Yes.
12              COURTROOM DEPUTY:  Michael Verstuyft?
13              JUROR:  Yes.
14              COURTROOM DEPUTY:  Dugald Winter?
15              JUROR:  Yes.
16              COURTROOM DEPUTY:  Anna Counts?
17              JUROR:  Yes.
18              COURTROOM DEPUTY:  Martha Nelson?
19              JUROR:  Yes.
20              COURTROOM DEPUTY:  John Gidcumb?
21              JUROR:  Yes.
22              COURTROOM DEPUTY:  Julianne Damore?
23              JUROR:  Yes.
24              COURTROOM DEPUTY:  Joan Michaud?
25              JUROR:  Yes.
```

```
1              COURTROOM DEPUTY:  Marcus Cantu?

2              JUROR:  Yes.

3              THE COURT:  The verdict is proper.

4         Ladies and gentlemen, I would like to thank you for

5    your service, on behalf of my colleagues and I here in the

6    Western District of Texas.  I have got to take up just a

7    couple of matters here and, otherwise, I am going send you

8    back to the jury deliberation room.

9              If you will wait for me just a couple of minutes, I

10   would like to thank you individually and answer any questions

11   that you might have.

12             All rise for jury.

13             (Jury leaves courtroom.)

14             THE COURT:  Please be seated.

15         Mr. Mouton, having been found by the jury guilty on

16   both counts, I will proceed to sentencing you on Wednesday,

17   January the 13th, 2010 at 1:30 in the afternoon.

18             I am going to refer your matter to the probation

19   office.  At this point, a probation officer will prepare a

20   report that I will use in sentencing you.  As a part of that

21   report process, the probation officer will likely want to

22   interview you.

23             You have the right to have an attorney present

24   during any interview.  Once the report is completed, a copy

25   will be given to your lawyer.  You and he can review that
```

```
 1    report.  If there is anything wrong with that report, your

 2    lawyer can file objections to the report.

 3            I will entertain any objections to the presentence

 4    report on the same day that I sentence you, and that is,

 5    again, Wednesday, January the 13th.

 6            Anything further from the government?

 7            MS. BRAUN:  No, Your Honor.  Thank you.

 8            THE COURT:  From the defense?

 9            MR. BASILE:  No, Your Honor.

10            THE COURT:  And with that, we are adjourned.

11            *-*-*-*-*-*-*-*

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              *–*–*–*–*–*–*–*

2     UNITED STATES DISTRICT COURT )

3     WESTERN DISTRICT OF TEXAS     )

4            I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above–entitled matter.

6     I further certify that the transcript fees and format comply

7     with those prescribed by the Court and the Judicial Conference

8     of the United States.

9     Date signed:  April 26, 2010.

10

11                           /s/ Karl H. Myers

12                           _____
                             KARL H. MYERS, CSR, RMR, CRR
                             Official Court Reporter
13                           655 East Durango Blvd., Suite 315
                             San Antonio, Texas 78206
14                           (210) 212-8114

15

16

17

18

19

20

21

22

23

24

25
```